IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHARI L. JENSEN and JAREL J. JENSEN, Plaintiffs, vs. NEBRASKA METHODIST HEALTH SYSTEM, INC., d/b/a Methodist Health System; THE NEBRASKA METHODIST HOSPITAL; RADIOLOGIC CENTER, INC.; and NICK L. NELSON, M.D., Defendants. | CASE NO. 8:24-CV-00129 VIDEO DEPOSITION OF NICK L. NELSON, M.D. |

Video Deposition of NICK L. NELSON, M.D., taken before Angela M. Ickler, Registered Professional Reporter and General Notary Public within and for the State of Nebraska, beginning at 9:01 a.m. Central Time on October 21, 2024, at Mooney, Lenaghan, Westberg Dorn, L.L.C., 450 Regency Parkway, Suite 320, Omaha, Nebraska 68114, pursuant to the Nebraska Supreme Court Rules and the within stipulations.

A-P-P-E-A-R-A-N-C-E-S

APPEARING FOR PLAINTIFFS:

Mr. Patrick J. Cullan
Attorney at Law
Cullan & Cullan LLC
1113 Harney Street
Omaha, NE 68102
(402) 397-7600 FAX: (402) 397-3816
pat@cullanlaw.com

APPEARING FOR DEFENDANTS RADIOLOGIC CENTER, INC. and NICK L. NELSON, M.D.:

Mr. Robert A. Mooney
Attorney at Law
Mooney, Lenaghan Westberg Dorn, L.L.C.
450 Regency Parkway
Suite 320
Omaha, NE 68114
(402) 218-1168 FAX: (402) 218-1178
rmooney@mlwdlaw.com

APPEARING FOR DEFENDANT NEBRASKA METHODIST HEALTH SYSTEM and THE NEBRASKA METHODIST HOSPITAL, INC.:

Mr. David L. Welch
Ms. Kellie Chesire Olson
Attorneys at Law
Pansing Hogan Ernst & Buser, LLP
10250 Regency Circle
Suite 300
Omaha, NE 68114
(402) 397-5500 FAX: (402) 397-4853
dwelch@pheblaw.com
kolson@pheblaw.com

ALSO PRESENT:

Mr. Daniel Whitten, Videographer

D-E-P-O-S-I-T-I-O-N

I-N-D-E-X

CASE CAPTION ............................ Page 1
APPEARANCES ............................ Page 2
INDEX .................................. Page 3
STIPULATIONS ........................... Page 4
TESTIMONY .............................. Page 4
REPORTER CERTIFICATE ................... Page 77

E-X-A-M-I-N-A-T-I-O-N

DIRECT EXAMINATION
By Mr. Patrick J. Cullan ........... Page 5

CROSS-EXAMINATION
By Mr. Robert A. Mooney ............ Page 73

E-X-H-I-B-I-T-S

| DESCRIPTION | MARKED |
|---|---|
| 3. MRI report from 10/12/2021 | 14 |
| 4. MRI image from 10/12/2021 | 16 |
| 5. MRI image from 10/12/2021 | 16 |
| *Exhibits 3, 4, 5 from 10/1/2024 | |
| 9. Plaintiffs' Notice of Taking Audiovisual Deposition of Defendant Nick L. Nelson, M.D. | 4 |
| 10. Curriculum Vitae | 4 |

(Whereupon the following proceedings were had, to-wit:)

(Exhibits 9 and 10 marked for identification.)

(The court reporter asked counsel if there were any stipulations for the record.)

MR. CULLAN: Just pursuant to the Nebraska Rules of Discovery.

MR. MOONEY: You bet.

MR. WELCH: Sounds good.

THE VIDEOGRAPHER: Good morning. We are going on the record at 9:01 a.m. on October 21, 2024.

Will the court reporter please swear in the witness?

NICK L. NELSON, M.D.,
having been first duly sworn,
was examined and testified as follows:

DIRECT EXAMINATION

BY MR. CULLAN:

Q. Doctor, could you state your name and spell your name for the court, please.
A. Nick Nelson, N-E-L-S-O-N.
Q. And what is your occupation?
A. Retired radiologist.



Q. And when did you retire?
A. June 1st.
Q. Of 2024?
A. Yes. Sorry.
Q. That's okay.
Have you given a deposition before?
A. One time. Yeah, a long time ago. Probably 25 years ago maybe.
Q. Okay. And I'm sure you've spoken to your counsel about the deposition process, but I'll just go over some basic ground rules to make sure we get through this --
A. Okay.
Q. -- as smoothly as possible.
The first kind of general rule is that everything we're saying is being transcribed.
A. All right.
Q. So it's vitally important we don't over speak each other because we'll make her job hard.
A. Okay.
Q. So there'll be times, probably a lot of times, you'll know what my question is before I ever get to an end. Just please wait to



respond until --
A. Okay.
Q. -- the question is fully out there.
That's two reasons. One, you'll make sure I'm done, and, two, from time to time, the attorneys may have objections to my question.
A. All right.
Q. But listen to my question because unless you're instructed not to answer, you'll be expected to answer the question if you can. Okay?
A. Okay.
Q. The second kind of rule is that yeses or noes as opposed to uh-huhs or huh-uhs or shakes of the head.
A. All right.
Q. Even though we're on video today, the transcript is kind of what matters.
A. Okay.
Q. It's also important that we communicate. So if there's any time you don't understand my question or -- or want me to rephrase it, please let me know. Okay?
A. Okay.
Q. And similarly, if I ask a question



and you answer it, would it be fair to assume that you understood it as asked?
A. Yes.
Q. Okay.
Okay. With that, tell us, what have you done in preparation for today?
A. I read the initial lawsuit. I was still working at the time, so I reviewed the images at that time at the hospital. I do not have access to those images anymore through the PACS system at the hospital. Only what we have here. Otherwise, I've read a little bit about breast MRI and bone metastasis this morning and not -- not a lot else.
Q. Okay. What sources did you read about from this morning?
A. Just Google. Dr. Google.
Q. Do you know what you put in for the Google search?
A. Breast MRI and bone metastasis.
Q. Okay.
A. There were a couple articles that came up.
Q. Did you see any articles on the concept of oligometastasis?

A. No.
Q. Do you know what that concept is?
A. I know what it means, but I don't know what -- if there's a specific concept behind that.
Q. Okay. What --
A. "Oligo" means little, and "metastasis" is obvious.
Q. Okay. Apart from understanding the general definition of the term oligometastasis, do you know what that means?
A. I've not heard that term specifically in radiology before.
Q. Okay. In your prior answer, you mentioned the PAC system, and just so everyone is clear, what is the PAC system that you were referring to?
A. It's a computer system housed at the Methodist Hospital Clinic -- I don't even know where it's at, to be honest with you -- that I believe houses all of the images in a secure network.
Q. Okay. What did -- what does PAC system, what does that mean, if you know?
A. Something archiving some- -- I don't



know off the top of my head. Pictures -- picture archiving.
Q. Okay. And you understand that's the system within the Methodist Hospitals that houses all radiographic images, being X-rays, MRI, CT, things of that nature?
A. Yes.
Q. And to your knowledge, is it -- is it under the custody and control of the Methodist Health System?
A. To my understanding, yes.
Q. Now, we're going to get talking about your care and treatment that you rendered in 2021, specifically on October 12, 2021. Who was your employer at that time?
A. Radiology Center, Inc.
Q. And what is or was -- I guess is Radiology Center, Inc.?
A. I believe it's a limited liability company that was originated to, you know, have a private radiology group that's contracted through Methodist Hospital.
Q. How many members of the LLC are there?
A. I think there's around 13.



Q. And did you have a specific position within the LLC?
A. We were all general radiologists. I did have a fellowship in ultrasound, and so I was kind of in charge of the ultrasound department.
Q. Did Radiology Center, Inc. have a parallel PAC system for the images that it would review?
A. No.
Q. How would yourself and/or other members of Radiology Center, Inc. gain access to the images you were reviewing under your contract with Methodist?
A. Through a secure password from a Methodist secure computer. I think the ones that -- I mean, we have computers at home also, and they're on a private network.
Q. Okay. So did you have an office at home?
A. Yes.
Q. And within that office was a computer that was supplied to you from Methodist?
A. Yes.
Q. And the computer was supplied to you



from Methodist Health Systems?
A. Yes.
Q. And was it a laptop or what kind of computer was it?
A. It was a box with three screens.
Q. Okay. So the -- the hard drive within a basic stand-alone computer?
A. Right.
Q. With then three monitors?
A. Right.
Q. Anything else that was -- that came with that?
A. Well, there's some hardware that's for the private network. I don't understand all of that, to be honest with you.
Q. And what hardware generally that you --
A. I have no idea. Private, what do they call them, VPNs.
Q. Okay. So software?
A. Again, I -- I assume software and hardware.
Q. Okay. Do you have a basic understanding of how a PAC system works and what data it records?

Page 12

A. I've never thought about it, but I assume the basic PAC system is there to archive images to access for -- access for interpretation, for storage, for comparison.
Q. Okay. So every time you would log into the Methodist Health System mainframe, you would have your own password?
A. Yes.
Q. And you had your own log-in ID?
A. Yes.
Q. And what -- if you recall, what was your log-in ID?
A. I think it was just NNelson.
Q. And do you recall your password?
A. It had to change every six months.
Q. Did you understand that when you would log into the PAC system that there would be an audit trail created of your entry within that system?
A. I assumed.
Q. Yeah.
A. Yeah.
Q. And to your understanding, the PAC system would document and record which images you were viewing, when you opened them, how long

Page 13

you viewed them, things of that nature?
A. I assume it could. I don't -- I'm not aware if it does or not, but I assume it would be able to.
Q. Okay. How long had you been working with Radiology Center, Inc.?
A. I think 22 years.
Q. Okay. So you retired in '24 --
A. Somewhere in there.
Q. -- so you would have begun in rough -- roughly 2002?
A. Yeah. I think that's fairly accurate. I'm ter- -- terrible with dates.
Q. And that's fine. Just to the best of --
A. Yeah.
Q. -- your recollection today.
A. Right.
Q. Now, you stated that when you were still working, you read the lawsuit and reviewed the images at that time on the PAC system?
A. Yes.
Q. Do you know roughly when that would have been?
A. Soon after I received the lawsuit.

Page 14

Q. And which images did you review?
A. I can't recall specifically which ones.
(Exhibit 3 previously marked on 10/1/2024.)
BY MR. CULLAN:
Q. Okay. The -- the lawsuit as it relates to you kind of involves an MRI breast that you reviewed on October 12, 2021, and the report that you generated is here as Exhibit 3. Have you seen Exhibit 3 before?
A. Yes.
Q. When is the last time you would have seen Exhibit 3 or that, your report?
A. Probably when I reviewed the images after getting the lawsuit. I don't remember if we looked at that or not. We referenced it once --
MR. MOONEY: Don't talk about -- stop. Stop it.
THE WITNESS: Okay.
MR. MOONEY: And just don't talk about what we talked about.
THE WITNESS: Oh, okay. All right.

Page 15

MR. MOONEY: That's attorney-client privilege, but he's just asking --
THE WITNESS: Yeah.
MR. MOONEY: -- your best recollection.
THE WITNESS: Okay.
BY MR. CULLAN:
Q. Yeah. So I'll ask you about kind of what you did --
A. Okay.
Q. -- and maybe your thought processes, but any conversation that you had with your -- your counsel --
A. Okay. Sorry.
Q. -- I'm not asking about, and please don't -- don't tell me about those.
A. Okay.
Q. Okay. So the question was you do believe you would have looked at Exhibit 3 at that time?
A. When I got the lawsuit, yes.
Q. And you also then would have viewed the images?
A. Yes, I believe I did.

Page 16

(Exhibit 4 and 5 previously marked on 10/1/2024.)
BY MR. CULLAN:
Q. Okay. And we've printed two images from that -- that study, and those are here as Exhibits 4 and 5.
A. Okay.
Q. I guess first off -- first off is Exhibit 3; do you understand that to be your report?
A. Yes.
Q. Having reviewed the MRI from which that report is derived, do you believe that report is accurate?
MR. MOONEY: Objection. Form of that question.
Go ahead, Doctor.
A. It is accurate at the time of my dictation. I thought it was accurate.
BY MR. CULLAN:
Q. Okay. As you sit here today, do you believe that that report is accurate?
MR. MOONEY: Form and foundation.
Go ahead.
A. In retrospect, there's an abnormality

Page 17

that is subtle that was not included in that report.
BY MR. CULLAN:
Q. Okay. How do you know there is an abnormality?
A. Because it was brought to my attention through the lawsuit.
Q. Prior to the lawsuit, were you aware that there was an abnormality in the sternum?
A. No.
Q. How would you describe the abnormality that we're talking about right now?
A. When I reviewed the images, there was a subtle area of heterogeneity in the sternum.
Q. Approximately what size is the subtle area of heterogeneity in the sternum?
A. When I reviewed the images, it was not measurable per se because it was subtle, and the borders were not well-defined, in my opinion.
Q. Approximately, how large was it?
MR. MOONEY: Objection. Form and foundation.
Go ahead.
A. A centimeter.

Page 18

BY MR. CULLAN:
Q. In which dimension?
A. Axial.
Q. And what would have been the dimensions in a sagittal plane?
MR. MOONEY: Form and foundation.
Go ahead.
A. Two centimeters.
BY MR. CULLAN:
Q. And transverse?
MR. MOONEY: Same objection.
Go ahead.
A. One centimeter.
BY MR. CULLAN:
Q. Now, you said in retrospect there's an abnormality that was not included in the report; is that true?
A. Yes.
Q. What does that mean, "in retrospect"?
A. Well, once the lawsuit was brought to my attention, I reviewed the images. By that time, she had had a second MRI, which showed changes in the sternum that were more -- I believe they were more prominent, which prompted, I believe, Dr. Dorius to go back and

Page 19

mention that there was something wrong in the sternum on the initial October breast MRI.
Q. And how do you know that?
A. Through the lawsuit.
Q. Okay. Have you ever spoken to Dr. Dorius?
A. No.
Q. Ever?
A. I couldn't pick him out of a crowd. If I talked to him at a confer- -- or at like a breast conference or something, I could have, but not that I'm aware of.
Q. Okay. And that takes me to another point. We've taken Dr. Dorius's deposition.
A. Right.
Q. And -- and he has mentioned some things to us. There was a tumor board at Methodist --
A. Right.
Q. -- back in 2021, and I assume continuing to this day. You're aware of that?
A. Yes.
Q. Have you participated from time to time on the tumor board?
A. Yes.

Page 20

Q. With respect to Ms. Jensen, did you participate in her tumor board, having been the radiologist who read her images back in 2021?
A. Not that I'm aware of.
Q. And Dr. Dorius told us that it's his understanding that all patients had a tumor board presentation and meeting amongst the various members of their care teams.
A. I believe that is true.
Q. Okay. And with respect to Ms. Jensen having been imaged, a radiologist would have been present in the normal course of tumor board meetings at hers --
A. Right.
Q. -- in 2021, correct?
MR. MOONEY: Form and --
A. Correct.
MR. MOONEY: -- foundation.
Go ahead.
BY MR. CULLAN:
Q. And so would -- so more likely than not, a radiologist participated in her tumor board, which would have reviewed this MRI that you reported, fair?
MR. MOONEY: Foundation.

Page 21

Go ahead.
A. Yes.
BY MR. CULLAN:
Q. Okay. But you're not sure if you were that particular radiologist in this case?
A. I don't believe I was, but that was a long time ago.
Q. Okay. And then you say you don't believe you were?
A. I don't remember if I was, but I don't believe I was.
Q. Okay.
A. I know.
Q. So I'm going to just kind of pierce this out.
A. All right.
Q. So you don't remember one way or not if you were there?
A. Correct.
Q. Okay. But you also believe that you were not, which is slightly different?
A. Right. I don't think I was.
Q. Okay.
A. I think I would have remembered, but, again, that's a long time ago.

Page 22

Q. Okay. And why do you think you would have remembered had you been in her tumor board meeting?
A. Well, because I read her MRI, and I knew something about her so...
Q. Okay. And any other reason?
A. No.
Q. Okay. Now, on the flip side, because we know in the normal course of things, a radiologist participates in these tumor boards and likely participated in Ms. Jensen's, true?
MR. MOONEY: Foundation.
A. True.
MR. MOONEY: Go ahead.
BY MR. CULLAN:
Q. Would the radiologist that would have participated, more likely than not, have been one of your colleagues from your group, Radiology Center, Inc.?
A. Yes.
Q. And why do you say that?
A. There was a group of us in the -- there was a smaller group in the group that did the breast conferences. The ones that did breast imaging, probably five or six of us.

Page 23

Q. Okay. And what are the names of those individuals back in 2021?
A. Myself, Rick Kutilek --
Q. And if you -- if you know the spellings of the last names...
A. K-U-T-I-L-E-K; Temple Rucker, R-U-C-K-E-R; Linda Snider, S-N-I-D-E-R; Lisa Bladt, B-L-A-D-T -- in '21 -- Tom Bowden, B-O-W-D-E-N; oh, and Dave Hilger, H-I-L-G-E-R. I think that about covers it.
Q. Okay. And you've selected those six names because, along with yourself, those would have been the radiologists within the group who undertook to do breast imaging?
A. Yes.
Q. To your knowledge, would there be a record that would tell us who -- which of these radiologists participated in the tumor board meeting with respect to Ms. Jensen?
MR. MOONEY: Foundation.
Go ahead.
A. I believe there is.
BY MR. CULLAN:
Q. Okay. And where -- tell us what you know about whatever record would exist.

A. There is a coordinator for the breast conference that keeps all of those records, and I believe that they write down who is present because there's some CME things that we can use from those conferences.

Q. Okay. So the conferences work both as a medical meeting about the individual patient, but there's also a component for continuing medical education that --

A. I believe so, yeah. Yes.

Q. -- that the members become eligible for by participating?

A. Yes.

Q. Do you know who the coordinator of the --

A. I should.

Q. -- breast conference would have been in '21?

A. Beth. Beth is the one. I might have her on the phone.

Q. Her last name?

A. Yeah, I might. Hang on. I don't know if I do or not.

Q. Okay.

A. Penke, P-E- --



Q. Could you spell it, please.

A. -- N-K-E.

Q. P-E-N-K-E?

A. Yeah.

Q. And to your knowledge, who does she work for?

MR. WELCH: Objection. Foundation.

Go ahead.

A. Methodist Hospital.

BY MR. CULLAN:

Q. Do you know where she's located?

A. She's retired.

Q. Retired now. Okay.

A. Somebody took over her position. Her first name is Stacy, but I can't -- I don't know her last name.

Q. Okay. But when Ms. Penke was coordinating these breast conferences, would she email -- send you an email from time to time?

A. Yes.

Q. So do you know or would you have access to what that email address would have been?

A. It was the Methodist email.



Q. And just for those of us who don't know what the Methodist email is, what is that?

A. I assume it's an internal email.

Q. And does it have a specific -- for instance, my email is Cullanlaw.com --

A. NM- --

Q. -- does it have a specific --

A. NMHS.org.

Q. Okay. So something at NMHS.org?

A. Yes.

Q. Okay. And do you recall what her prefix would have been?

A. No. Most of it was first name initial with a period and then their last name.

Q. First name all spelled out, middle initial --

A. No. B, period, Penke at NMHS.org.

Q. Gotcha. And you understood that they kept a list of individuals present for each individual patient?

A. I believe they kept a list of who participated in that hour of breast conference where multiple patients were discussed.

Q. On a routine hour, how many individual patients would have been discussed?



A. Probably six to eight new cases and follow-up for maybe six to ten more.

Q. And with respect to imaging, such as the MRI of Ms. Jensen, what role would that have played within the role of new cases?

A. They would have showed the initial mammogram, probably showed the initial ultrasound, probably showed the biopsy, and probably showed the breast MR -- selected images not the whole study.

Q. Right. So whichever radiologist -- you don't believe yourself -- would have participated in Ms. Jensen's, prior to that conference, they would have themselves reviewed the MRI?

A. Yes.

Q. And more likely than not -- than not it would have been one of those six individuals you had identified for us earlier who were all at that time working in their employment relationship with Radiologic Center, Inc.?

A. To the best of my memory, yes.

Q. And, again, the PAC system would show who accessed Ms. Jensen's images at whatever time they did, and how long they looked at those

Page 28

images --
MR. MOONEY: Foundation.
Go ahead.
BY MR. CULLAN:
Q. -- true?
A. I don't know. If it -- I assume it does, but I have no knowledge of how that works.
Q. Okay. And Dr. Dorius told us that he ordered the MRI with respect to Ms. Jensen. Did you understand that to be true?
A. Yes.
Q. Okay. And he had an expectation that any abnormalities on the scans would be identified and reported?
MR. MOONEY: Form and foundation.
Go ahead.
A. Yes.
BY MR. CULLAN:
Q. And was you being the radiologist interpreting the study, was it your duty and responsibility to report all abnormalities?
MR. MOONEY: Form and foundation.
Go ahead.
A. To the best of our ability, yes.

Page 29

BY MR. CULLAN:
Q. Okay. And it would have been your duty and responsibility to identify and report the area of heterogenicity within the sternum?
MR. MOONEY: Form and foundation.
Go ahead.
A. To the best of my ability, yes.
BY MR. CULLAN:
Q. Can we agree you did not meet your duty and responsibility with respect to this MRI --
MR. MOONEY: Form.
BY MR. CULLAN:
Q. -- by failing to identify the area of heterogenicity in the sternum?
MR. MOONEY: Form and foundation.
Go ahead.
A. It's a subtle finding. We always make judgments in radiology of whether things are significant or not significant. There are a lot of incidental things, and we make a lot of judgments as to whether to include something that we think may be insignificant.
So specifically for this case, it's hard to comment on what my mindset was at that

Page 30

time and what I was thinking.
BY MR. CULLAN:
Q. Okay. As you sit here today, you've reviewed those images?
A. Yes.
Q. And you can clearly see the area of heterogen- -- heterogenicity within the sternum?
A. Clearly, no. But in retrospect, it's a little bit heterogenous --
Q. Okay.
A. -- in a subtle way.
Q. Can you tell us why it would have been reasonably prudent not to have identified that abnormality?
MR. MOONEY: Form and foundation.
Go ahead.
A. So during imaging, I mean, we see hundreds of findings, many which are insignificant, and we make a judgment call on whether to include those things in the report or not.
For example, a chest CT, there are often multiple nodules that are statistically not going to be cancer, but one in a hundred, one in a thousand are, so we have to make a

Page 31

decision whether to include that in the report, assume it's a benign thing, or to recommend a follow-up.
And breast MRI is the same way. There's a lot of abnormalities present that are not black and white. They're equivocal, and a judgment has to be made on whether they are significant or not.
BY MR. CULLAN:
Q. Okay. So is it fair to say, if I understand your testimony correctly, you made a judgment call that the area of heterogenicity within the sternum was not significant, and therefore not reported; is that -- is that correct?
A. Not entirely.
Q. Okay. How am I wrong in my recap?
A. Well, I've been thinking about this. So I think, why didn't I mention it in my report?
One, maybe I didn't look at the images, but I did comment on a cyst in the liver. So I did look at those images where that heterogeneity was present. So I don't think it was a lack of looking at the images.

Page 32

So was it that I didn't see the abnormality, which is possible, or, three, I saw it and thought it was insignificant and didn't include it.
Or, four, I saw it and thought, I don't think it's significant, but we'll maybe do a 6- to 12-month follow-up to see if it changes.
Q. Okay. Any other possibility?
A. I don't think so.
Q. So I wrote down four -- four possible scenarios that you, on reflection, believe may be possible; is that fair?
A. Okay. Well, repeat those, please.
Q. Sure. And the first was that you didn't look at the images at all; however, you believe that's not likely --
A. Right.
Q. -- because you did comment on a cyst in the liver, and so you do believe that you would have looked at the images; is that fair?
A. Yes.
Q. The second possibility was that you didn't see the abnormality, and that was possible; is that correct?
A. Yes.

Page 33

Q. The third was that you saw the abnormality and thought it was insignificant, and therefore chose not to include it in your report?
A. Yes.
Q. And the fourth possibility -- realistically the third possibility because the first one --
A. Right.
Q. -- we don't -- we don't think is possible, correct?
A. Right.
Q. The fourth possibility is that you saw it and then recommended a 6- to 12-month follow-up to re-image that area later?
A. To relook at the case, yes, which we do a lot of six-month followups in radiology because there are so many equivocal findings.
Q. Okay. Just to focus in on the last scenario, I'll call it the fourth because that's how I wrote it down, even though I think we agree the first im- -- the first scenario is not likely --
A. Okay.
Q. -- is that what your --

Page 34

A. Yes.
Q. -- testimony is?
Okay. But with respect to the fourth ab- -- fourth scenario, if you saw it and recommended the 6- to 12-month follow-up, in situations where you do that, don't you identify what the abnormality is that we're looking to follow up in 6 to 12 months?
A. And there's -- generally, that's a true statement, yes.
Q. Okay. And so with that generally being true, is it -- does that make that fourth scenario less likely than not?
A. Yes, I think it probably does.
Q. Okay. So if we -- if we look at the realm of possibilities, I think if we narrowed it down to two possible scenarios that are reasonably likely that you think may have occurred --
A. Yes.
Q. -- the first is that you just didn't see the abnormality?
A. Yes.
Q. And that's possible, correct?
A. Correct.

Page 35

Q. And the second would be that you saw it, and that you exercised your judgment and felt it was insignificant, and, therefore, chose not to include it in the report?
A. Correct.
Q. Okay. And those two scenarios that we've just identified you would agree are more likely the case than the others that we've discarded?
A. More likely, yes.
Q. Okay. And between the two, I'll call them realistic possibilities, which of those is more likely?
MR. MOONEY: Form and foundation.
Go ahead and answer.
BY MR. CULLAN:
Q. If you know.
A. I don't know. It's so long ago. I don't know.
Q. In your mind, are they equally as plausible?
A. Yes.
MR. MOONEY: Form and foundation.
Go ahead.

Page 36

BY MR. CULLAN:
Q. And so just again to recap, to make sure we're communicating, as you've looked back and reflected on the case, you think there's two equally possible scenarios which occurred in this case.
One is that when reviewing the MRI, you didn't see the abnormality at all and therefore didn't report on it.
And the second would be that reviewing the MRI, you saw the area -- the abnormality, the area of heterogenicity in the sternum, made a judgment call that it was insignificant, and therefore chose to leave that finding out of the report?
A. Yes.
MR. MOONEY: Form and foundation.
Go ahead.
BY MR. CULLAN:
Q. Okay. And those are the two scenarios that you think are most likely true in this case?
MR. MOONEY: Same objection.
Go ahead, Doctor.
A. Yes.

Page 37

BY MR. CULLAN:
Q. What similarities are there between the area of heterogeneity in the sternum that's present on the study and what is known to be a possible metastasis -- the appearance of a possible metastasis --
MR. MOONEY: Form and foundation.
BY MR. CULLAN:
Q. -- how are those similar?
A. Repeat, please.
Q. Sorry, bad question.
When you looked at the images, you saw an area of heterogeneity within the sternum?
A. I -- I assume.
Again, 2021, October, I don't remember.
Q. Okay. What appearance does a metastasis have --
MR. MOONEY: Objection.
BY MR. CULLAN:
Q. -- a bony metastasis within the sternum?
MR. MOONEY: Form and foundation.
You can go ahead and answer.
A. On MRI, generally, they can have

Page 38

multiple appearances. Generally, they're decreased signal on the T1 images. They can be higher signal on the T2 images, rarely. They can enhance.
BY MR. CULLAN:
Q. Does the abnormality on the '21 scan, did that have decreased signal on T1?
A. I would have to look at that again. It was so subtle, and it depends how you window it and level it.
Q. If you saw the abnormality, tell us why -- what characteristics of the abnormality led you to believe that it was insignificant and therefore appropriate not to have reported it?
A. I cannot remember what I was thinking at that time in 2021. Generally, if you -- in -- in many imaging cases, there are a lot of areas that are heterogenous that are nothing, and that happens all the time in CT when you're looking at a liver. There's areas of heterogeneity in looking at kidneys. There might be some heterogeneity, some altered enhancement that is nothing, but one in a thousand, it ends up being something. And it's just not -- as a radiologist, it's not

Page 39

conceivable -- it's not -- it's not good to include every single little thing in a report because a clinician ends up chasing their tails.
In this case, I don't remember what I was thinking at the time.
Q. Okay. Dr. Dorius is not a radiologist, but we asked him about the images, and he had viewed the '21 scan.
A. Okay.
Q. Okay. He told us that the abnormality in the sternum was readily apparent to him.
A. Okay.
MR. MOONEY: Objection. Form of that --
BY MR. CULLAN:
Q. Do you have any reason to believe that's not true?
MR. MOONEY: Form and foundation.
A. I have no reason to believe that's not true.
BY MR. CULLAN:
Q. Okay. He -- he testified that he believes that the '21 MRI was, quote, misread?
MR. MOONEY: Form and foundation.

Page 40

Go ahead.
BY MR. CULLAN:
Q. Do you agree with that characterization?
A. I agree that that's what he thinks.
Q. Okay. Do you -- do you think that the '21 scan was misread?
MR. MOONEY: Form and foundation.
Go ahead.
A. It's difficult to say in retrospect since I know -- well, I assume that that's a metastasis in the sternum. So do I wish I would have mentioned it? Obviously, now in retrospect. But I don't remember what my mindset was at the time.
Q. Okay.
A. The --
Q. Go ahead. I'm sorry.
A. You know, the main job for the MRI is to look for additional breast images and look for other areas of enhancement and abnormalities in the breast. So we're still responsible for the peripheral stuff, obviously.
Q. And do you know what that term means with respect to imaging, that a study is

Page 41

misread?
A. I guess like incorrectly read or missed a finding or made a finding that's not there or made a finding that makes no difference. "Misread" is a very vague, all-encompassing term.
Q. Have you used it before in your career?
A. Not commonly.
Q. When you have used it, what did -- what did you -- what did you mean with that term -- the use of that term?
A. Again, it's a very general term. I don't know if I have a specific definition or an example of, if I did use that term, what I meant specifically for that.
Q. Okay. You stated that in retrospect you believe that what that area of heterogenicity is is likely a metastasis; do you recall that?
A. Yes.
Q. Okay. Why do you say that?
A. She had follow-up imaging that the lesion had changed, suggesting that it was a metastasis rather than a benign bony finding.

Page 42

I don't believe it was ever biopsied to prove it was a metastasis, but it's assumed.
Q. What benign bony findings would have the characteristics of enhan- -- of increased heterogenicity?
A. Well, things like venous malformations, bony cysts, just heterogeneity of the bone marrow. It's not uncommon.
Q. Okay. With respect to Ms. Jensen, what -- do you agree that it's -- it would be -- it's detrimental that the metastasis was not caught in '21?
MR. WELCH: Objection.
MR. MOONEY: Form and foundation.
MR. WELCH: Form and foundation.
MR. MOONEY: You can go ahead and answer that.
A. Detrimental? If it would have changed her treatment, then, yes, I agree with that statement.
BY MR. CULLAN:
Q. Okay. And Dr. Dorius told us that he would have placed Ms. Jensen on different treatment, gold standard treatment, for metastatic disease in '21 had he known there was

Page 43

a likely metastatic lesion in her sternum.
MR. MOONEY: Form and foundation.
Go ahead.
BY MR. CULLAN:
Q. Do you -- do you have any reason to believe that's not true?
MR. MOONEY: Same objections.
A. No.
BY MR. CULLAN:
Q. Okay. Assuming that's true and that's what Dr. Dorius testified to -- Page 32 of his deposition -- to your knowledge as a physician, how -- how would that cause Mr. Jensen harm --
MR. MOONEY: Form and foundation.
BY MR. CULLAN:
Q. -- if that treatment was not instituted?
A. I'm not -- I'm not an oncologist, so I have no foundation to answer that question with any authority.
Q. Okay. But you're a medical doctor?
A. Yes.
Q. And so you understand that the earlier a cancer is detected and treated, the

Page 44

better the outcome for the patient?
MR. MOONEY: Form and foundation.
MR. WELCH: Form and foundation.
A. Not in all cases, I don't believe that is true.
BY MR. CULLAN:
Q. Okay. But generally, that's the general rule, would you agree?
MR. MOONEY: Objection. Form and foundation.
MR. WELCH: Same objection.
A. In a grand general sense, most people believe that finding cancer earlier, depending on the cancer type, leads to a better outcome.
BY MR. CULLAN:
Q. And why is that?
MR. MOONEY: Objection. Form and foundation. Go ahead.
A. Depending on the cancer, they tend to be more treatable. The classic example is colonoscopy for colon polyps. The smaller they are, the better chance there is not to get an invasive colon cancer.
BY MR. CULLAN:
Q. To your knowledge, did your employer,

Page 45

Radiology Center, Inc., have any policies, memorandums, rules, protocols, procedures, things of that nature that related to your interpretation of MRIs?
A. No.
Q. With respect to your contract that led you to review Ms. Jensen's imaging, Ms. Jensen didn't select you to be her radiologist, fair?
A. Correct.
Q. Okay. Tell us, as you understand it, how it was that you came to interpret -- interpret her images?
A. Generally, we have lists of cases that we are assigned to. So I might be assigned to CT one day. I might be assigned to fluoroscopy. I might be assigned to ultrasound. I might be assigned to plain films.
There was a category of breast MRI that was not assigned to any specific radiologist but put on a list that all of the radiologists that did breast imaging were expected to check on that list, and if there were cases on that list, to read them.
Q. Okay. And this is on -- so you log

Page 46

into the Methodist computer system?
A. Yes.
Q. And then there's a list?
A. Correct.
Q. You're assigned to some cases, other cases you can pick off the list yourself?
A. Correct.
Q. And so did you yourself independently have a contract with Methodist Health Systems?
A. No.
Q. Did you have a contract with the Nebraska Methodist Hospital?
A. No. Through the group.
Q. Okay. So your understanding is Radiologic Center, Inc. had a contract with Nebraska Methodist Health System, Inc.?
A. Yes.
Q. And it's through that contract that you came to interpret Ms. Jensen's radiological images?
A. Yes.
Q. Now, within the contract that Radiological Center, Inc. had with Nebraska Methodist Health System, Inc., were there any policies, rules, memoranda, procedures, anything

Page 47

like that, that would have been applicable to your interpretation of those images?
A. Not that I'm aware of.
Q. To your knowledge, did Methodist Health -- did the Nebraska Methodist Health System, Inc. do anything to ensure that you competently reviewed the images that they assigned to you?
A. Just the usual things to get on the medical staff.
Q. Such as?
A. I'm not sure of what they -- what they do, but you have to go through some procedure to get on the medical staff.
Q. Okay. With respect to interpreting imaging, is there a general rule that every time you interpret an image, you're to generate a report?
A. Yes. Let me rephrase that. We will review images for other radiologists and not always make a report. So I guess that is not true. We don't -- we do look at images without generating a report.
Q. Okay. And that's -- explain that situation again just so I make sure I understand

Page 48

it.
A. Well, for an example, if I was reading a CT scan of the liver, I would look back at the old ultrasound, and I would not dictate a report on the old ultrasound.
Q. Gotcha.
A. And Dr. Kutilek may ask me to look at some images and give an impression, but I would not dictate on that case.
Q. Okay. So the two -- the only time you as a radiologist won't generate a report having viewed studies is, one, where you're doing comparison in reviewing other studies based solely for purposes of comparison?
A. True.
Q. Okay. And the other one would be where a colleague of yours asks you to overlook an image as well?
A. True.
Q. Other than those two specific scenarios, every time you review an image, a report is to be generated, fair?
A. Generally. We do have people in the group that will open an image series, and it will be too difficult, and they'll just close it

Page 49

for somebody else, but that's pretty unusual.
Q. Okay. So just so I understand this scenario, there will be times when a radiologist will select --
A. Will open a series of images --
Q. -- from the --
A. -- that they could interpret but decide not to because it's too complicated, and they just put it back in the queue for somebody else.
Q. And that goes back into this list --
A. Yeah.
Q. -- that you're talking about?
A. Yes.
Q. Okay. The list that you log into and see, is it prioritized?
A. By time, I believe, and there are -- there is a category of images that need to be read quicker, such as emergency room images. So it'll have a little stat icon next to them.
Q. Does that come from how the imaging is ordered versus where the imaging is being taken?
A. Ordered.
Q. Okay. So even if someone is on the

Page 50

floor, if it's ordered stat, that will be higher priority, or that priority will be reflected in the list?
A. Yes.
Q. Is it the same color as the other images or does the color change too?
A. I believe there's a little icon next to it. I don't remember specifically.
Q. And what is -- what -- describe the icon that you recall.
A. Maybe a little red dot or something. I really don't remember.
Q. Okay. And so as you understand it, when you see that icon, then the image is stat; how does that differentiate from the other images?
A. It is an indication to prioritize that study for interpretation.
Q. Okay. And is the same principle true with stat images as it is with, I'll call them routine images, that anytime a study is interpreted, a report should be generated?
A. Generally.
Q. And what's your understanding of the rationale behind that?

Page 51

A. The stat images?
Q. That -- that a report needs to be generated anytime you as a radiologist is interpreting a film or a study?
A. That's our responsibility as radiologists to interpret images and make a report.
Q. Is there a time limit with respect to stat imaging when it is to be interpreted or reported?
A. Not that I'm aware of.
Q. What's the -- is there a reasonable amount of time in which a stat image needs to be interpreted?
MR. MOONEY: Form and foundation.
BY MR. CULLAN:
Q. Like a range, I guess.
A. Not to my understanding.
Q. Has Methodist Health System, Inc. or the Nebraska Methodist Hospital ever provided any guidance with respect to when stat imaging needs to be reported upon?
MR. WELCH: Objection. Form and foundation.
Go ahead.

Page 52

MR. MOONEY: Join.
A. Not that I'm aware of.
BY MR. CULLAN:
Q. So is it fair to say, as you understand the guidance provided by Nebraska Methodist Health Systems, Inc. and/or the Nebraska Methodist Hospital, there's no time limitation to the interpretation of stat imaging?
MR. WELCH: Objection. Form and foundation.
Go ahead.
MR. MOONEY: Join.
Go ahead.
A. Yeah, I believe it should be prioritized, but I am not aware of any specific time constraints or time guidelines.
BY MR. CULLAN:
Q. Have you been provided with any in-house training or other medical education by Nebraska Methodist Health System, Inc. at any time?
A. Please repeat that.
Q. Sure. Have you been provided any medical education by the Nebraska Methodist

Page 53

Health System, Inc. at any time?
A. Through the conferences, I guess you would consider that education, but otherwise nothing specific.
Q. And by the conferences, we're talking about the --
A. Breast conference and the other conferences that we participated in.
I think I did do one urology conference at 7 in the morning from Dr. Morton 20 years ago.
Q. Was that similar to the breast conferences where cases are reviewed?
A. No. It's a urology lecture.
Q. Just like a general meeting?
A. (The witness nodded his head in the affirmative.)
Q. Is that a "yes"?
A. Yes.
Q. Other than breast conferences where cases are discussed, what other types of conferences are there?
A. There are multiple conferences. There are neuro conferences. There's head and neck conference. There's thyroid conference.

Page 54

There's GI conference. There's GU conference. There's -- there's probably additional -- dermatology conference, I believe.
Q. And is a radiologist from your group, Radiologic Center, Inc., typically present at those conferences as well?
A. Yes.
MR. WELCH: And when you say "conference," you're saying tumor board?
THE WITNESS: Tumor board, right.
BY MR. CULLAN:
Q. Okay.
A. Right.
Q. Or these other boards --
A. Yeah.
Q. -- neuro board, head and neck board, thyroid board?
A. Yes.
Q. Prior to the lawsuit, were you ever notified or contacted by anybody with respect to your read and interpretation of the '21 MRI?
A. No.
Q. Did Dr. Dorius ever reach out to you in the fall of '23 --
A. No.

Page 55

Q. -- to discuss your findings on that MRI?
A. No.
Q. To your knowledge, was your interpretation ever subject -- your interpretation of the '21 MRI subject to any peer review?
A. No.
Q. Okay. Apart from this case, have you ever been named in a lawsuit?
A. Yes.
Q. On how many occasions?
A. Once or twice. Once was when I first started my career, and I had read a CT scan of the head. And it eventually went to a lawsuit, and I was named just because I had read a CT scan, but I was dropped without ever doing a deposition or anything. So I don't know if that -- if that counts.
And then about probably 23, 24 years ago, I was named in a lawsuit for a missed breast cancer that I was dropped from, and that is one I did give a deposition in, I believe.
Q. Okay. The first one you mentioned about the head CT --

Page 56

A. Yeah.
Q. -- that preceded the breast cancer --
A. Yes.
Q. -- case?
And were both of those lawsuits in Nebraska?
A. Yes.
Q. Do you have any specialized training in breast imaging?
A. As a general radiologist, not specific. No, I did a fellowship in ultrasound, and so no, not specifically in breast imaging.
Q. What year did your fellowship in ultrasound end?
A. Was it '91?
Q. Oh, here, '92?
A. Okay, '92, yeah.
Q. And that was at UCSF?
A. Yes.
Q. Have you maintained an interest in ultrasound?
A. Yes.
Q. Do you have any special interest in cranial ultrasounds of a newborn?
A. We did perform those for a while, but

Page 57

now we do not anymore. The Children's radiologists read those.
Q. Oh, Children's in-house reads those?
A. Yeah, they do them -- I don't know exactly how it works. But so they, obviously, built the Women's Hospital, and they put a big NICU there in ICU. Before their NICU was at Methodist, but it was kind of connected with Children's Hospital.
So the Children's Hospital radiologists did all of the imaging. Evidently there was some conflict with the Children's radiologists going out to Methodist Hospital -- Women's Hospital to do the NICU imaging, so we did that for a while.
Q. Yeah.
A. But then we came with an agreement with the Children's radiologists to do that imaging.
Q. Or to not do that imaging?
A. So they do it. So we quit doing the imaging for -- for neonatal heads and neonatal imaging altogether.
Q. Okay. Okay. I'll just hand you -- just with respect to Exhibit 9, this is the

Page 58

Notice of your deposition. Have you seen that before?
A. I don't believe so.
Q. Okay. This just tells you that you're going to be deposed today and what time and where to be, but I'll turn to the back, and it requested that you bring certain items with you.
The first item is a copy of your curriculum vitae, and you have brought that today, correct?
A. Yes. That's it.
Q. And that's marked as Exhibit 10?
A. Yes.
Q. And this -- I guess you're retired, so this is the most current and accurate CV that you have?
A. Yes. The address is wrong. We moved since then.
Q. Okay. The office address is wrong or the -- the home address?
A. Home address.
Q. Okay. The office is still located at 8303?
A. Yes.

Page 59

Q. The second thing it asked you to bring any documents that you prepared or that you reviewed in preparation for your deposition. Have you brought any- -- you brought nothing with you other than your CV?
A. Yes.
Q. Did you review anything -- documents -- before coming in here today?
A. When I first got the lawsuit, I did read through that.
Q. Just the lawsuit?
A. Yes.
Q. Okay. And then you mentioned you jumped this morning on --
A. Google.
Q. -- Google and looked at MRI of the breast?
A. And bone metastasis.
Q. Do you recall anything that struck your attention when you reviewed what sites you looked at this morning?
A. I was impressed that bone metastasis on a breast MRI are around 1 percent abnormalities breast -- bone abnormalities, and about a third of those end up being metastasis.

Page 60

So it ends up, you know, point 3 percent of breast MRIs will show a bone metastasis.
Q. Okay. So if I've understood you correctly, 1 percent of breast MRIs --
A. Will --
Q. -- will show --
A. -- have a bone abnormality.
Q. And if there's a bony abnormality on MRI, 33 percent of those --
A. Are metastasis.
Q. Okay. And Mrs. Jensen's MRI has a bony abnormality on it, correct?
A. In retrospect, yes.
Q. Well, I mean, it's -- it's a -- an MRI is just a picture, correct?
A. A series of images.
Q. Okay. And those series of images either do or do not show an abnormality in the sternum --
A. In retrospect --
MR. MOONEY: Object to the form of that question. Go ahead.
A. In retrospect, yes.
BY MR. CULLAN:
Q. Well, they either do or don't,

Page 61

right --
MR. MOONEY: Objection.
BY MR. CULLAN:
Q. -- it's an image, true?
MR. MOONEY: Form and foundation.
Go ahead.
A. There is heterogeneity in the sternum.
BY MR. CULLAN:
Q. And so if there is heterogeneity in the sternum, there's a 33 percent chance that that's a metastasis; is --
MR. MOONEY: Objection.
BY MR. CULLAN:
Q. -- is that correct?
A. No.
MR. MOONEY: Form.
Go ahead.
A. 33 percent of 1 percent.
BY MR. CULLAN:
Q. Well, if there is an abnormality in the sternum --
A. If there is one, okay.
Q. -- there's a 33 -- there's a 33 percent chance that that's a metastasis, true?

Page 62

A. According to that one article I read this morning, yes.
Q. Did you know that at the time that you would have reviewed Ms. Jensen's MRI?
MR. MOONEY: Form and foundation.
Go ahead.
A. I cannot remember if I would have known that or not.
BY MR. CULLAN:
Q. Would that be important information to have as a radiologist interpreting MRIs of the breast?
A. Not necessarily.
Q. And why do you say that?
A. How would that change how you review the images?
Q. Well, earlier you told us that you'll use your judgment to determine whether or not an abnormality should be reported or not. Do you recall that?
A. Yes.
Q. And if you know that an abnormality in the sternum on a breast MRI has a 33 percent chance of being a metastasis, you'd agree that that's important information?

Page 63

A. Yes.
Q. And you'd agree that that would be information that should be reported on the MRI report, true?
MR. MOONEY: Form and foundation.
A. If you -- if you believe that the heterogeneity is an actual bony abnormality as opposed to just a insignificant area of heterogeneity, then that is true.
BY MR. CULLAN:
Q. Okay. Do you have any personal notes relating to Ms. Jensen?
A. No.
Q. That was the third item requested.
The fourth item is any medical records created by you relating to Ms. Jensen's care and treatment?
A. None.
Q. Okay. We have exhibit here -- what is marked as Exhibit 3, and that's a report generated by you interpreting that October 21 MRI; is that correct?
A. Oh, yes.
Q. Other than Exhibit 3, would there be any other medical record you would have

Page 64

generated?
A. No.
Q. Then No. 5, "All PAC system records available to you relating to Ms. Jensen."
It's my understanding you do -- you do not have access to the PAC system?
A. I do not.
Q. And those would be at the Methodist Health System?
A. Yes.
Q. When -- with respect -- just going back to the tumor board, would you receive emails that would delineate which patients are being presented?
A. Yes.
Q. And have you retained those emails?
A. No.
Q. Do you still have -- what -- what email would that have been sent to on your behalf?
A. Through the hospital email system.
Q. So you had an account with an email in the Methodist system?
A. Yes.
Q. Do you recall that -- what that email

Page 65

address was?
A. N.Nelson@NMHS.org.
Q. Okay. And when you retired in June, have you not been able to access that email since then?
A. Yes.
Q. Any reason to believe that those emails would not still exist at Nebraska Methodist Health System?
A. No idea.
Q. With respect to the policies and procedures applicable to radiology, do you understand those to have come from the Nebraska Methodist Health System?
MR. WELCH: Objection. Form and foundation.
MR. MOONEY: Join.
A. Repeat that, please.
MR. CULLAN: Sure. I'll just have it read back for accuracy.
(The requested portion was read back.)
A. I'm not sure what procedures and policies that you're referring to.

Page 66

BY MR. CULLAN:
Q. Okay. Are you aware of any policies and procedures that were applicable to radiology?
A. Not personally.
Q. Okay. Now in front of you was Exhibit 3, and I'll just ask you today, as you sit here today reviewing Exhibit 3, is your report accurate with respect to the imaging taken of Ms. Jensen?
MR. MOONEY: Form. Go ahead.
A. In retrospect, there's an abnormality in the sternum, so in that -- in that way, no, it's not accurate. It should have included that, knowing what we assume to know now.
BY MR. CULLAN:
Q. And why do you say that?
MR. MOONEY: Form and foundation.
Go ahead.
A. Because it was an abnormality that ended up being significant that may have changed her care if followed up at the time of the study.
BY MR. CULLAN:
Q. Okay. And just with respect to your

Page 67

report, under your "Impression" 2, you stated that there should be considered a follow-up MRI in 6 to 12 months; do you see that?
A. Yes.
Q. Did your recommended follow-up that you documented in your report have anything to do with the sternal abnormality?
A. I cannot remember.
Q. So it's possible -- as you sit here today, it's possible that your recommended follow-up was directed at the sternal abnormality?
MR. WELCH: Objection. Form and foundation.
MR. MOONEY: Join.
A. Possible.
BY MR. CULLAN:
Q. And why do you say that?
MR. MOONEY: Same objections.
Go ahead.
A. A lot of incidental things on imaging we recommend follow-up for.
BY MR. CULLAN:
Q. Okay. I guess, let's put it another way. As you sit here today, do you know why you

Page 68

recommended follow-up in 6 to 12 months?
A. I don't remember that day, but generally, it's because there are abnormalities that are equivocal.
Q. Okay. So if I understand you correctly, you don't remember specifically why you recommended a 6- to 12-month follow-up. In your report, however, generally, you will recommend follow-up because of an equivocal abnormality on the study, true?
A. True.
Q. Other than the sternal mass, is there any other equivocal abnormality that would be present on that scan?
A. There were several areas of non-mass enhancement in both breasts, which can -- can signal additional areas of breast malignancy in some women.
Q. Did you report those areas of non-mass enhancement?
A. Yes.
Q. And how so?
A. There are four separate areas of non-mass enhancement along the inferior aspect of the left breast, along with some mild

Page 69

non-mass enhancement along the inferior lateral aspect of the right breast.
Q. Okay. So the equivocal abnormalities within the breast you did report?
A. Yes.
Q. Okay. Were there any equivocal abnormalities that you did not report?
A. I do not remember.
Q. As you sit here today, are you aware of any?
A. I'm sorry, please repeat.
Q. Sorry. As you sit here today, are you aware of any areas of equivocal abnormalities that you did not put in your report?
A. Obviously, I did not put in my report the heterogeneity of the sternum.
Q. Okay. I'll have you look at Images 5 and 6, and with respect to Exhibit 5, are you able to see the area of heterogeneity within the sternum?
A. You know, on this printed, levelled single image, there is an area of increased signal in that area, but we read 2,000 images at a time, and I don't know if this is an accurate

Page 70

representation of all of those images.
Q. Okay. On the image that is selected and marked as Exhibit No. 5, the question was are you able to appreciate an area of increased heterogeneity within the sternum?
A. Yes.
Q. And can you hold up Exhibit 5 and show it to the ladies and gentlemen of the jury where you believe you see an area of increased heterogeneity within the sternum?
A. (Indicating.)
Q. Thank you.
And the same question with respect to Exhibit 4.
A. There is an area of increased signal in the sternum.
Q. Okay. And can you hold that image up to the ladies and gentlemen of the jury, and show us what you believe that area is?
A. (Indicating.)
Q. Thank you.
And you've never looked at the report or the study from the MRI that was taken in December of '23?
A. No. Let me -- I may have looked at

Page 71

that while I was -- I may have looked. I looked at her shoulder MR, I believe, when I got the lawsuit. Because I reviewed the case I read and then I believe she had a shoulder MR, and I did glance at that.
Q. Okay. But --
A. I don't remember if she had a follow-up breast MRI at that time or not.
Q. Okay. So as you sit here today, do you -- you believe you did not review the imaging or the report from the December MRI?
A. Did she have a breast MR then?
Q. Yes, sir.
A. Okay. I honestly can't remember. If it was on the same image set that she had her shoulder MR, because I remember that, I may have glanced at it. I did not spend a significant enough amount of time on it to remember that, but I don't want to be inaccurate.
Q. Okay. With respect to the imaging in '21, other than the sternal mass, is there any evidence of metastatic disease?
A. No.
Q. Okay. Have you understood my questions today?

Page 72

A. Yes.
Q. Is there any aspect about your interpretation of the MRI of Ms. Jensen in '21 that we've not discussed?
A. No.
Q. Are there any important findings that we've not discussed?
MR. MOONEY: Form and foundation. Go ahead.
A. No.
BY MR. CULLAN:
Q. Have you understood my questions?
A. Yes.
Q. And have you answered them truthfully and to the best of your ability?
A. Yes.
Q. Okay. One second here.
What duty does Radiological -- Radiologic Center, Inc. have to ensure that you interpret your images correctly?
MR. MOONEY: Form.
MR. WELCH: Objection. Form and foundation.
MR. MOONEY: Join.
Go ahead.

Page 73

A. I'm not sure what that question entails, but generally, if we make -- if we don't do a good job, quote/unquote, they can -- I mean, get rid of us, I guess.
It's never been an issue, but I assume there's some way. I'm not involved at all in the administrative part of our group. So Dr. Kutilek and Dr. Nelson are -- Kevin Nelson.
BY MR. CULLAN:
Q. Do you have any relation to him?
A. No. No, he's like 8 foot tall.
MR. CULLAN: Okay. I think that's all the questions I have for you today. I'll reserve the rest until the trial in this matter.
Thank you.
THE WITNESS: Okay. Thank you.
MR. WELCH: I have no questions.
CROSS-EXAMINATION
BY MR. MOONEY:
Q. Doctor, just before you run off, two things to clarify. When Radiologic consultants radiologists participate in the tumor board, if they were not the reading radiologist, do they generate a separate report --

Page 74

A. No.
Q. -- of their review of those images?
A. No.
Q. So would that be another example of where a radiologist might open images but not generate a report?
A. Yes.
Q. All right. And then you were asked about other times when you've been named in a lawsuit, and you mentioned two older cases --
A. Yes.
Q. -- and then this one. There's another lawsuit pending right now --
A. Yes.
Q. -- you forgot to mention that one.
Just for point of accuracy, there's another one right now where you have been named?
A. Yes.
MR. MOONEY: All right. I don't have anything further.
MR. CULLAN: Okay.
MR. WELCH: All right. Thank you.
MR. CULLAN: Got you out of here in time.

Page 75

MR. WELCH: Yeah. Thanks.
MS. OLSON: Made me come all the way over here.
MR. CULLAN: Got you over here.
THE VIDEOGRAPHER: The time is 10:30, and we are off the record.
MR. CULLAN: Oh, read and sign?
MR. MOONEY: Doctor, you have the right to read and sign the printed transcription of your deposition once it's prepared to make sure everything was taken down accurately, or you can waive that right.
THE WITNESS: I trust her.
MR. MOONEY: It's up to you. You just need to let her know what you want to do.
THE WITNESS: I'm fine with that.
MR. MOONEY: All right. The same thing is you have the right because it was videotaped to review the video to make sure it was videotaped accurately. You would have to sit here and do that right now before you leave, or you can waive that right.
THE WITNESS: No, thank you.
MR. MOONEY: All right. We're done, Doctor.

THE COURT REPORTER: (Requested transcript orders.)

MR. WELCH: PDF horizontal, condensed.

MR. MOONEY: PDF vertical.

MR. CULLAN: Standard order.

(10:22 a.m. -- Adjournment.)

C-E-R-T-I-F-I-C-A-T-E

STATE OF NEBRASKA )
) ss.
COUNTY OF SAUNDERS )

I, Angela M. Ickler, Registered Professional Reporter and General Notary Public within and for the State of Nebraska, do hereby certify that the foregoing testimony of NICK L. NELSON, M.D. was taken by me in shorthand and thereafter reduced to typewriting by use of Computer-Aided Transcription, and the foregoing seventy-six (76) pages contain a full, true and correct transcription of all the testimony of said witness, to the best of my ability;

That I am not kin or in any way associated with any of the parties to said cause of action, or their counsel, and that I am not interested in the event thereof.

IN WITNESS WHEREOF, I hereunto affix my signature and seal this 3rd day of November, 2024.

ANGELA M. ICKLER, RPR
Registered Professional Reporter
General Notary Public

My Commission Expires: July 17, 2026