IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| SHARI L. JENSEN, and JAREL J. JENSEN, | |
| Plaintiffs, | **8:24CV129** |
| vs. | |
| RADIOLOGIC CENTER, INC., and NICK L. NELSON, M.D., | **MEMORANDUM AND ORDER ON DEFENDANTS' MOTION TO EXCLUDE PLAINTIFFS' EXPERTS AND MOTION FOR SUMMARY JUDGMENT** |
| Defendants. | |

This medical malpractice action by plaintiffs Shari L. Jensen and Jarel J. Jensen arises from the alleged failure of a radiologist, defendant Nick L. Nelson, M.D., to identify and report a mass on Ms. Jensen's sternum shown in an MRI that was part of the initial workup for invasive breast cancer. Filing 1 at 7–8 (¶¶ 39–48). Dr. Nelson was allegedly the employee, agent, servant, director, or apparent agent of defendant Radiologic Center, Inc. (RCI). Filing 1 at 4 (¶ 20). This case is now before the Court on Dr. Nelson's and RCI's Motion to Exclude Plaintiffs' Experts, Dr. Kligerman and Dr. Van Scoy-Mosher, Request for Oral Argument, and Motion for Summary Judgment. Filing 82. Dr. Nelson and RCI argue that the Court should exclude the opinions of the Jensens' experts because they are speculative, unhelpful to the trier of fact, and irrelevant. Filing 83 at 1. If the experts are excluded, Dr. Nelson and RCI contend that they are entitled to summary judgment because the Jensens cannot establish the applicable standard of care or proximate cause to support their claims. Filing 83 at 1.

Notwithstanding Dr. Nelson's and RCI's request for oral argument on their Motions, the Court finds that the parties' positions are fully presented in their written submissions so that oral argument would not be of assistance to the Court. Therefore, the Court deems the Motions fully

1

submitted without oral argument. *See* NECivR 7.1(e) (stating in part, "In general the court does not allow oral argument or evidentiary hearings on motions.").

For the reasons stated below, Dr. Nelson's and RCI's Motions are denied in their entirety.

## I.   INTRODUCTION

### A.  Preliminary Matters

Determining what facts are disputed or undisputed in this case has been complicated by the parties' presentation of their factual allegations. Dr. Nelson's and RCI's first fifteen allegations in their Statement of Undisputed Facts, Filing 95, are headed "Plaintiffs' Allegations" and are purportedly statements of allegations from the Jensens' Complaint. *See* Filing 95 at 1–3 (¶¶ 1–15).[1] Logically, where Dr. Nelson and RCI allege that the Jensens pleaded some fact, the Jensens' admission that they pleaded that fact does nothing to establish whether that fact is disputed or undisputed. On the other hand, NECivR 56.1(a)(1) states in part that a summary judgment motion "shall be supported by a brief and a separate statement of material facts about which the moving party contends there is no genuine issue to be tried. . . ." Because a movant is required by NECivR 56.1(a)(1) to state facts about which the movant contends there is no genuine issue to be tried— *i.e.*, to state purportedly undisputed facts—the Court deems each of Dr. Nelson's and RCI's factual statements identified as "Plaintiffs' Allegations" in their Statement of Undisputed Facts to admit that the fact alleged in the statement is undisputed.

In their Annotated Statement of Disputed Facts, the Jensens did not set out separately their additional factual allegations "in the same form and manner" as the moving party was required to use. *See* NECivR 56.1(b)(2). Instead, the Jensens simply included additional allegations in their

---

[1] Instead of citing the Jensens' Complaint, Filing 1, Dr. Nelson and RCI cite the docket number of the summons issued to them, Filing 7. Filing 7 as docketed does not include a copy of the Jensens' Complaint.

responses to various allegations by Dr. Nelson and RCI. *See* Filing 96. Dr. Nelson and RCI did not then file any response to the Jensens' additional factual allegations, let alone "a statement of concise responses to the opposing party's statement of additional material facts, in the same form as set forth" for the opposing party's statement of additional facts, as required by the local rule. *See* NECivR 56.1(c). Although the local rule makes clear that "[p]roperly referenced material facts in the movant's statement are considered admitted unless controverted in the opposing party's response," there is no such statement about the effect of the movant's failure to controvert the non-movant's statement of additional facts. *Compare* NECivR 56.1(b)(1)(A), *with* NECivR 56.1(c). Thus, uncertainties remain as to what facts are disputed.

The Court entered an order—after the Court discovered failures to comply with NECivR 56.1—required Dr. Nelson and RCI to file a separate statement of material facts in support of their Combined Motion in compliance with NECivR 56.1(a) and requiring the Jensens to file a response to Dr. Nelson's and RCI's properly filed statement of material facts in compliance with NECivR 56.1(b). Filing 94 at 2. Although the parties filed additional statements of fact in response to that order, the parties' factual statements still fall well short of properly identifying factual disputes. The Court expects more careful compliance with applicable federal and local rules, which are intended to facilitate the efficient consideration of the parties' claims and motions.

## B. Factual Background

The Court sets out here a summary of the factual context to the litigation. The Court will summarize additional facts relevant to the two challenged experts when it turns to analysis of the Motion to Exclude Experts. Notwithstanding the problems with the parties' presentation of the facts, the factual statements set out here are undisputed unless otherwise indicated.

*1.  Undisputed Factual Context of the Litigation*

Dr. Nelson's and RCI's statement of "Plaintiffs' Allegations" in their Statement of Undisputed Facts—now deemed undisputed as to the facts stated in cited paragraphs of the Jensens' Complaint—provides the summary of the following pertinent factual background to this litigation.

On October 12, 2021, Ms. Jensen presented to Nebraska Methodist Health Systems, Inc., The Nebraska Methodist Hospital, RCI, and Dr. Nelson "for an MRI Breast w & w/o Contrast Bilateral" (the 2021 MRI). Filing 95 at 1 (¶ 1); Filing 1 at 7 (¶ 39). The documented reason for the 2021 MRI was "invasive breast cancer, stage I/II/III, initial workup." Filing 95 at 1 (¶ 2); Filing 1 at 7 (¶ 40). Dr. Nelson was the diagnostic radiologist who read and interpreted the 2021 MRI. Filing 95 at 1 (¶ 3); Filing 1 at 7 (¶ 42). Dr. Nelson's impression was the following:

> 1. There is a focal mass in the central right breast correlating with the malignancy that was biopsied. No evidence for adenopathy. 2. There are several areas of nonmass enhancement in both breasts suggesting background enhancement. These all have benign washout curves. Consider follow-up breast MRI in 6-12 months.

Filing 95 at 1 (¶ 4); Filing 1 at 7 (¶ 43). Dr. Nelson did not identify or report a distinct signal abnormality representing a mass on the sternum, which is clearly present on the 2021 MRI. Filing 95 at 2 (¶ 5); Filing 1 at 7 (¶ 44).

Dr. Nelson had a duty and responsibility to report any distinct signal abnormalities that were "suspicious" for metastatic lesions. Filing 95 at 2 (¶ 6); Filing 1 at 7 (¶ 45). Dr. Nelson knew or should have known that Ms. Jensen's treating clinical doctors would determine the stage of her breast cancer based on his interpretation of the MRI findings. Filing 95 at 2 (¶ 7); Filing 1 at 7 (¶ 46). Dr. Nelson knew or should have known that any clearly identifiable signal abnormality, such as the obvious mass on the sternum present on the 2021 MRI, should be reported. Filing 95

at 2 (¶ 8); Filing 1 at 7 (¶ 47). However, Dr. Nelson did not report the clearly identifiable signal abnormality present on the sternum when reporting his findings from the 2021 MRI. Filing 95 at 2 (¶ 9); Filing 1 at 8 (¶ 48).

Dr. Nelson knew or should have known that key findings, such as a distinct signal abnormality representing a mass on the sternum, will alter a patient's treatment. Filing 95 at 2 (¶ 10); Filing 1 at 8 (¶ 51). Based on Dr. Nelson's interpretation of the 2021 MRI, Ms. Jensen was staged as Stage I breast cancer. Filing 95 at 2 (¶ 11); Filing 1 at 8 (¶ 52). Based on her staging, Ms. Jensen had surgery and radiation for Stage I breast cancer and did not receive systemic chemotherapy for advanced stage breast cancer. Filing 95 at 2 (¶ 12); Filing 1 at 8 (¶¶ 53–54).

On or about November 13, 2023, Ms. Jensen had a CT scan performed (the 2023 CT scan) that found a metastatic mass on the sternum. Filing 95 at 2 (¶ 13); Filing 1 at 8 (¶ 55). At that time, her treating medical oncologist, Timothy H. Dorius, M.D., informed her that upon his review of her prior scans, it was clear that Dr. Nelson had failed to identify the sternal mass shown on her 2021 MRI. Filing 95 at 2 (¶ 13); Filing 1 at 8 (¶ 56). The Jensens were also informed—presumably by Dr. Dorius, but the Complaint does not say—that due to Dr. Nelson's failure to identify the sternal mass shown on her 2021 MRI, Ms. Jensen had undergone the "wrong cancer treatments" for the past two years. Filing 95 at 2 (¶ 14); Filing 1 at 9 (¶ 60). As a direct and proximal result of Dr. Nelson's interpretation of the 2021 MRI and report, Ms. Jensen did not receive the correct cancer treatment for over two years; she underwent multiple unnecessary surgical procedures; she experienced significant mental and emotional suffering and anguish; and she was ordered to receive and was provided with incorrect treatment from October 2021 to November 2023. Filing 95 at 3 (¶ 15); Filing 1 at 9 (¶¶ 62–66).

5

*2. The Jensens' Additional Factual Context*

The Jensens assert that there are additional facts relevant to the background to this litigation not set out in the first fifteen paragraphs of Dr. Nelson's and RCI's Statement of Undisputed Facts. They allege that Dr. Dorius testified that the following two paragraphs of their Complaint were true and accurate to his knowledge and belief:

> 57.    During an office visit on November 22, 2023, Dr. Dorius again informed Ms. Jensen that "the sternal mass was clearly present at the time of the initial cancer diagnosis and was not caught by the radiologist," Dr. Nelson, who interpreted the MRI back in 2021.

> 58.    Dr. Dorius further stated that he had the imaging reviewed by radiologists on the "Tumor Board", which confirmed that the lesion was clearly present on the October 2021 MRI, and "should have been included in the original MRI interpretation as a suspicious lesion."

Filing 96 at 2–3 (¶ 5), 3 (¶ 6), 4 (¶ 8), 4–5 (¶ 9), 6 (¶ 13).[2] As pointed out above, Dr. Nelson and RCI did not respond to these additional factual allegations, even though they were required to do so by the applicable local rule. *See* NECivR 56.1(c). Nevertheless, because the local rule does not state how the Court is required to treat additional factual statements to which no response is made, *see id.*, the Court will assume that these additional factual allegations are disputed. Moreover, the statements in ¶ 57 and ¶ 58, recounting Dr. Dorius's out-of-court statements to the Jensens, and because they appear to be offered for the truth of the statements, they are hearsay—double hearsay in the case of what Dr. Dorius said that the Tumor Board found—and are inadmissible at trial.

---

[2] The Jensens assert that Dr. Dorius also testified that ¶ 56 of their Complaint was true and accurate to his knowledge and belief in response to each allegation cited in the body. However, the content of the allegation in ¶ 56 of their Complaint is set out in Dr. Nelson's and RCI's Statement of Undisputed Facts, Filing 95 at 2 (¶ 13), as stated in the body of this decision. On the other hand, the content of ¶ 59 of the Jensens' Complaint is not set out in Dr. Nelson's and RCI's Statement of Undisputed facts, nor is it mentioned in the Jensens' Annotated Statement of Disputed Facts in response.

6

3.  *Allegations Concerning Treating Physicians*

The parties agree that Dr. Nelson has been a board-certified radiologist since 1991. Filing 95 at 3 (¶ 16). The Jensens argue that "this fact is evidence that Dr. Nelson is subject to a uniform nationwide benchmark for the skills, knowledge and diligence expected of him." Filing 96 at 7 (¶ 16). However, such argument about what facts show is improper in response to a statement of facts. *See* NECivR 56.1(a)(3) ("The [movant's] statement must not contain legal conclusions."); NECivR 56.1(b)(1)(B) ("A response may not assert legal arguments except to make an objection. . . ."). The parties do not dispute that Dr. Nelson testified that the main purpose of a breast MRI is to look for additional breast images and other areas of enhancement and abnormalities in the breast. Filing 95 at 3 (¶ 17). The Jensens allege that Dr. Nelson clarified further that while the purpose of the MRI was to look at the breast tissue, it was nevertheless his "duty and responsibility" to report all abnormalities present on a breast MRI, including the "peripheral stuff, obviously." Filing 96 at 7 (¶ 17).

The parties do not dispute that Dr. Dorius was Ms. Jensen's treating oncologist. Filing 95 at 3 (¶ 18). The Jensens allege further that Dr. Dorius was the treating oncologist "on or about November 13, 2023," and that the allegation in their Complaint cited by Dr. Nelson and RCI in support of this allegation also states that the 2023 CT scan "found the metastatic mass on the sternum." Filing 96 at 7–8 (¶ 18). Dr. Nelson and RCI allege that Dr. Dorius testified that the main purpose of the breast MRI was to try to confirm and localize other breast masses that might be obscured on the mammogram. Filing 95 at 3 (¶ 19). However, the Jensens allege that the testimony by Dr. Dorius cited by Dr. Nelson and RCI does not support their characterization. Filing 96 at 8 (¶ 19). They quote the cited portion of Dr. Dorius's deposition as follows:

> Q.    What was the purpose of the breast MRI, which had been obtained prior to you seeing Ms. Jensen on October 29th of 2021?
>
> A.    So her initial mammogram noted dense breast tissue, and we will often obtain breast MRIs to confirm the -- try to localize other breast masses that might be obscured on a mammogram.

Filing 96 at 8 (¶ 19) (citing Filing 92-8 at 6 (Dorius Depo., 13:7–14)). The Jensens then allege that

Dr. Dorius testified that a radiologist interpreting an MRI must evaluate the entire scan and report

any abnormality that is visible. Filing 96 at 8 (¶ 19) (citing Filing 92-8 at 9 (Dorius Depo., 24:25–

26:8)).[3]

The parties do not dispute that Dr. Dorius testified that it is not the standard of care to look

for metastatic disease in breast MRIs in patients that are felt to have early-stage disease. Filing 95

---

[3] The deposition testimony cited by the Jensens is the following:

> Q.    And when you order an MRI, such as Ms. Jensen's MRI, you have an expectation that it will be read and interpreted correctly?
> A.    Yes.
>         MR. MOONEY: Form and foundation. Go ahead.
> BY MR. CULLAN:
> Q.    And within that, you understand that it's the duty and responsibility of the reading radiologist, whoever they are, to report abnormal findings --
>         MR. MOONEY: Form and foundation.
> BY MR. CULLAN:
> Q.    -- on the report which is in front of you as Exhibit 3?
>         MR. MOONEY: Please show my objection after the question.
> A.    Yes.
> BY MR. CULLAN:
> Q.    And as you understand things, was that -- did that occur with respect to Exhibit 3 [the 2021 MRI]?
>         MR. MOONEY: Form and foundation.
>         MR. WELCH: Objection. Form and foundation. Go ahead.
> A.    No.
> BY MR. CULLAN:
> Q.    And why not?
> A.    Because --
>         MR. MOONEY: Same objections.
> A.    -- because there was an abnormality that we were able to see after the fact with the benefit of hindsight.

Filing 92-8 at 9 (Dorius Depo., 24:25–26:8).

at 3 (¶ 20). [4] However, the Jensens allege that "a fair reading of Dr. Dorius' testimony is that while it is not standard of care to **order** an MRI breast to look for metastatic disease in this clinical setting, the 'local' standard of care does require the radiologist to report any abnormality." Filing 96 at 8 (¶ 20) (emphasis in the original) (citing Dorius Deposition testimony set out in footnote 4, and additional testimony at Filing 92-8 at 20–21 (Dorius Depo., 66:10-68:3)).

Again, additional facts pertinent to the exclusion of Dr. Kligerman's and Dr. Van Scoy-Mosher's testimony will be addressed separately below.

### C. Procedural Background

The Jensens filed their Complaint in this matter on April 12, 2024. Filing 1. They named as Defendants Nebraska Methodist Health System, Inc., (NMHS); The Nebraska Methodist Hospital (TNMH); Radiologic Center, Inc. (RCI); and Nick L. Nelson, M.D. Filing 1 at 2 (¶ 1). The Jensens assert three claims. Count I alleges medical malpractice/professional negligence against all Defendants. Filing 1 at 10. Count II alleges corporate negligence against NMHS, TNMH, and RCI. Filing 1 at 12. Count III alleges Mr. Jensen's claim for loss of consortium against all Defendants. Filing 1 at 15. Defendants Nebraska Methodist Health Systems, Inc., d/b/a Methodist Health System and The Nebraska Methodist Hospital, filed an Answer denying the Jensens' claims on May 3, 2024. Filing 14. Defendants RCI and Dr. Nelson filed an Answer on May 13, 2024, denying the Jensens' claims and asserting affirmative defenses. Filing 16.

---

[4] The testimony Dr. Nelson and RCI cite in support of this allegation is the following:

Q.    And does it also look at the upper chest to look for metastatic disease or...
A.    That's usually not the -- the -- the purpose of that -- that particular image. So I don't know how to answer that question.
       I think that as part of -- it's not standard of care. In fact, it's to -- to do other systemic imaging in patients that are felt to have early stage disease. So I don't think that's the -- that's really the purpose behind the breast MRI.

Filing 92-8 at 6 (Dorius Depo., 13:23–14:8).

The next procedural matter of significance here is that on May 6, 2025, the Court entered an Order on the Stipulated Motion to Withdraw Motion for Summary Judgment and to Dismiss Nebraska Methodist Health System (NMHS) and The Nebraska Methodist Hospital (TNMH) by the Jensens, NMHS, and TNMH. Filing 64. The Court ordered that NMHS's and TNMH's Motion for Summary Judgment, Filing 48, and all supporting documents, were withdrawn. Filing 64 at 2. The Court also ordered that this matter was dismissed without prejudice as to NMHS and TNMH. Filing 64 at 2. Finally, the Court ordered that this matter would continue as to RCI and Dr. Nelson. Filing 64 at 2.

On September 9, 2025, Dr. Nelson and RCI filed the Motion to Exclude Plaintiffs' Experts, Dr. Kligerman and Dr. Van Scoy-Mosher, Request for Oral Argument, and Motion for Summary Judgment, Filing 82, now before the Court. On November 13, 2025, the Court entered an Order to Correct Filings that required Dr. Nelson and RCI to file a separate statement of material facts in support of their Motion in compliance with NECivR 56.1(a) and requiring the Jensens to file a response in compliance with NECivR 56.1(b). Filing 94 at 2. The Court stated in that Order, "The resulting delay [from requiring these filings] is attributable to the parties' non-compliance with applicable rules." Filing 94 at 2. The corrected filings were timely filed, although as indicated above, they did little to clarify what facts are disputed or undisputed. *See* Filing 95; Filing 96.

This case is set for a jury trial to begin on March 9, 2026. Filing 79.

## II. THE MOTION TO EXCLUDE EXPERTS

Like the parties, the Court begins its analysis with the Motion to Exclude Experts, because the Motion for Summary Judgment is entirely dependent upon the Court granting the Motion to Exclude Experts. The Court first sets out the standards applicable to exclusion of both experts.

## A.  Applicable Standards

### 1.  *Rule 702 and* Daubert *Standards*

A district court's decision on exclusion of an expert is reviewed under a "deferential abuse of discretion standard," meaning that the appellate court "will not reverse unless the district court's ruling is 'manifestly erroneous.'" *Bliv, Inc. v. Charter Oak Fire Ins. Co*., 159 F.4th 539, 542 (8th Cir. 2025) (quoting *Sprafka v. Med. Device Bus. Servs., Inc*., 139 F.4th 656, 660 (8th Cir. 2025), in turn quoting *Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 142 (1997)). The Eighth Circuit Court of Appeals has explained, "Under this standard, 'the district court has a range of choice, and its decision will not be disturbed as long as it stays within that range and is not influenced by any mistake of law.'" *Id.* (quoting *Dunn v. Nexgrill Indus., Inc*., 636 F.3d 1049, 1055 (8th Cir. 2011)).

Federal Rules of Evidence 702 and 703 and *Daubert v. Merrell Dow Pharms., Inc*., 509 U.S. 579 (1993), govern the admissibility of expert testimony. *Id.* at 542–43.

> Under Federal Rule of Evidence 702, "expert opinions must be based upon sufficient facts or data and must be the product of reliable principles and methods that have been reliably applied to the facts of the case." *Sprafka*, 139 F.4th at 660. Rule 703 expressly permits an expert to "base an opinion on facts or data in the case that the expert has been made aware of or personally observed." Fed. R. Evid. 703; *see also Daubert v. Merrell Dow Pharm., Inc*., 509 U.S. 579, 592, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993) ("Unlike an ordinary witness, an expert is permitted wide latitude to offer opinions, including those that are not based on firsthand knowledge or observations. Presumably, this relaxation of the usual requirement of firsthand knowledge ... is premised on an assumption that the expert's opinion will have a reliable basis in the knowledge and experience of his discipline." (internal citations omitted)).

*Bliv, Inc*., 159 F.4th at 542–43. Thus, Rule 703 allows an expert to rely completely on information collected by others, so long as it is reasonable to do so in the expert's field. *Id.* at 543 (citing Fed. R. Evid. 703, Advisory Committee's Notes to 1972 Proposed Rules).

Somewhat more specifically,

> Under Federal Rule of Evidence 702, expert testimony must meet three criteria: (1) "the testimony must be useful to the finder of fact in deciding the ultimate issue of fact, meaning it must be relevant"; (2) "the expert must be qualified to assist the finder of fact"; and (3) "the testimony must be reliable or trustworthy in an evidentiary sense."

*Crabar/GBF, Inc. v. Wright*, 142 F.4th 576, 587 (8th Cir. 2025) (quoting *In re Bair Hugger Forced Air Warming Devices Prod. Liab. Litig.*, 9 F.4th 768, 777 (8th Cir. 2021)). In many cases, *Daubert* requires consideration of the following factors:

> (1) whether the scientific technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and/or publication; (3) the known rate of error for the technique or theory and the applicable standards for operation; and (4) whether the technique is generally accepted.

*Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 791 (8th Cir. 2024) (citations omitted)

Also, in 2023, Rule 702 was amended "to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Advisory Committee notes to 2023 amendment; *see also Sprafka*, 139 F.4th at 660. Furthermore,

> "expert testimony that is speculative, unsupported by sufficient facts, or contrary to the facts of the case is inadmissible." *Lancaster v. BNSF Ry. Co.*, 75 F.4th 967, 970 (8th Cir. 2023) (citations and quotations omitted). The district court's role as the gatekeeper requires it "to discern expert opinion evidence based on good grounds from subjective speculation that masquerades as scientific knowledge." *Ackerman v. U-Park, Inc.*, 951 F.3d 929, 933 (8th Cir. 2020) (quotation omitted). Still, Rule 702 calls for a "flexible inquiry," which "may lead to differing decisions as to whether to admit experts' testimonies." *Allstate Indem. Co. v. Dixon*, 932 F.3d 696, 701 (8th Cir. 2019).

*Bliv, Inc.*, 159 F.4th at 543.

It is also wise to keep in mind that "generally, *Daubert* 'call[s] for the liberal admission of expert testimony.'" *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 791 (8th Cir. 2024)

(quoting *Johnson v. Mead Johnson & Co.*, 754 F.3d 557, 562 (8th Cir. 2014)). Thus, "[a]s long as the expert's scientific testimony rests upon 'good grounds, based on what is known' it should be tested by the adversary process with competing expert testimony and cross[-]examination, rather than excluded by the court at the outset." *Id.* (quoting *Johnson*, 754 F.3d at 562, in turn quoting *Daubert*, 509 U.S. at 590). Finally, the United States Supreme Court has said, and the Eighth Circuit has reiterated, "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of addressing 'shaky but admissible evidence.'" *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

2. *Nebraska's "*Daubert/Schafersman*" Standards*

Nebraska law on admissibility of experts is similar. As the Nebraska Supreme Court explained,

> [Nebraska Revised Statutes] Section 27-702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." And we have identified four preliminary questions that must be answered in order to determine whether an expert's testimony is admissible: (1) whether the witness qualifies as an expert pursuant to § 27-702; (2) whether the expert's testimony is relevant; (3) whether the expert's testimony will assist the trier of fact to understand the evidence or determine a controverted factual issue; and (4) whether the expert's testimony, even though relevant and admissible, should be excluded in light of § 27-403 because its probative value is substantially outweighed by the danger of unfair prejudice or other considerations. *See State v. Greer*, 312 Neb. 351, 979 N.W.2d 101 (2022).

*State v. Woolridge-Jones*, 5 N.W.3d 426, 436 (Neb. 2024). Nebraska courts consider challenges to experts under the *"Daubert/Schafersman*" standard. *Id.* (citing *Daubert*, 509 U.S. 579, and *Schafersman v. Agland Coop*, 631 N.W.2d 862 (Neb. 2001)).

> Under the *Daubert/Schafersman* framework, the trial court acts as a gatekeeper to ensure the evidentiary relevance and reliability of an expert's opinion.

> The *Daubert/Schafersman* framework provides several nonexclusive factors a trial
> court may consider in assessing reliability.

*Woolridge-Jones*, 5 N.W.3d at 436 (internal citations omitted). Much like the *Daubert* factors

mentioned above, the factors under *Daubert/Schafersman* are the following:

> (1) whether a theory or technique can be (and has been) tested; (2) whether it has
> been subjected to peer review and publication; (3) whether, in respect to a particular
> technique, there is a high known or potential rate of error; (4) whether there are
> standards controlling the technique's operation; and (5) whether the theory or
> technique enjoys general acceptance within a relevant scientific community.

*State v. Gleaton*, 3 N.W.3d 334, 344 (Neb. 2024).

With these standards in mind, the Court turns to consideration of the Motion challenging

the Jensens' experts.

### B.  Exclusion of Dr. Kligerman

Dr. Nelson and RCI seek exclusion of Dr. Kligerman's testimony primarily on the ground

that he is not qualified to testify to the standard of care. Filing 83 at 8. The Jensens disagree. Filing

81 at 8. To put in context the parties' arguments, the Court summarizes their allegations concerning

Dr. Kligerman's opinions. Again, the facts set out below are undisputed unless otherwise

indicated.

### 1.  Allegations Concerning Dr. Kligerman's Opinions

Dr. Kligerman is a Professor and Chairman of Radiology in Colorado. Filing 95 at 3 (¶ 21).

The document cited in support of this allegation clarifies that Dr. Kligerman is the Chairman and

Professor in the Department of Radiology at National Jewish Health in Denver, Colorado. Filing

85-2 at 1. The Jensens disclosed Dr. Kligerman as an expert witness to testify as to the standard of

care applicable to Dr. Nelson. Filing 95 at 3 (¶ 22); Filing 96 at 8–9 (¶ 22) (not disputing this

statement but contending that the cited expert disclosure only identifies Dr. Kligerman, not the

14

purpose of his testimony). Dr. Kligerman's expert report states that his opinion is that Dr. Nelson's interpretation of the 2021 MRI and corresponding radiology report violated the standard of care in failing to identify and report the readily apparent mass in Ms. Jensen's sternum. Filing 95 at 3 (¶ 23).

Although the parties dispute whether Dr. Kligerman's expert report was "minimally detailed," as Dr. Nelson and RCI allege, or "self-sufficient," as the Jensens allege, they agree that Dr. Kligerman also provided deposition testimony. Filing 95 at 3–4 (¶¶ 24–25); Filing 96 at 10 (¶¶ 24–25). Dr. Kligerman repeatedly testified during his deposition that, as a cardiothoracic radiologist, he does not read breast MRIs; however, the sternum is present in all the images he reads, which are 95% plus chest and cardiac imaging. Filing 95 at 4 (¶ 26). The Jensens allege further that Dr. Kligerman is "fully qualified" to review breast MRIs and has reviewed thousands of chest and cardiac MRIs that "visualize the sternum." Filing 96 at 10–11 (¶ 26). Dr. Kligerman testified that the purpose of a breast MRI is "to look specifically for breast cancers or signs of infection in the breast tissues themselves," but he viewed the 2021 MRI for a different purpose. Filing 95 at 4 (¶ 27). Because he was not looking at the indication of the purpose for the MRI, he only briefly glanced at the breasts as they are not his area of expertise. Filing 95 at 4 (¶ 27). The Jensens add that Dr. Kligerman looked at the 2021 MRI for a different purpose because he was not a treating provider but an expert witness. Filing 96 at 11 (¶ 27).

Dr. Kligerman referred to a December 29, 2020, breast MRI (the 2020 MRI) more than 20 times during his deposition. Filing 95 at 4 (¶ 28). However, he mistakenly forgot that he added the 2020 MRI as a "normal" comparison and that it was in fact not imaging from Ms. Jensen's record at all. Filing 95 at 4 (¶ 28). The Jensens allege further that Dr. Kligerman stated that the 2020 MRI did not affect his opinions in any way. Filing 96 at 11 (¶ 28).

Dr. Nelson and RCI allege that Dr. Kligerman has not familiarized himself with Methodist Hospital, the resources available to Dr. Nelson, or the standard of care of a general radiologist in Omaha, Nebraska. Filing 95 at 4 (¶ 29). The Jensens dispute this allegation and allege in response,

> Dr. Kligerman is quite familiar with the actual resources that were available to Dr. Nelson in this case, namely the actual MRI images taken of Ms. Jensen, the quality of those images, the quality of the scanner itself, and the PACS system which allowed the viewing of those images, as well as the "local" standard of care required when viewing those images, as testified to by the treating medical oncologist, The Nebraska Methodist Hospital Tumor Board, and Dr. Nelson.

Filing 96 at 11–12 (¶ 29).

Dr. Nelson and RCI also characterize Dr. Kligerman's testimony as applying "a heightened personal standard of care" to Dr. Nelson's reading of the 2021 MRI. Filing 95 at 4 (¶ 30). The Jensens dispute this allegation because they point to deposition testimony by Dr. Kligerman stating the same standard of care set out by Dr. Dorius and Dr. Nelson, which they characterize to be "that it was Dr. Nelson's duty and responsibility to identify and report any non-subtle abnormality on the MRI, and his failure constitutes medical negligence." Filing 96 at 12 (¶ 30).

### 2. Dr. Kligerman's Opinions Are Admissible

#### a. Dr. Kligerman Is Qualified

Dr. Nelson and RCI argue, first, that Dr. Kligerman is unqualified to provide a standard-of-care opinion because he is not in the same line of work as Dr. Nelson. Filing 83 at 8–11. They argue that Dr. Kligerman has dedicated his clinical practice to reading and interpreting chest and cardiac imaging not breast imaging. Filing 83 at 9, 11. They argue that Dr. Kligerman does not read breast MRIs in his clinical practice. Filing 83 at 9, 11. Furthermore, they contend that Dr. Kligerman did not read the 2021 MRI for the same purpose as Dr. Nelson, which was to confirm and localize other breast masses that may have been obscured in a mammogram. Filing

16

83 at 10. Instead, Dr. Kligerman read the 2021 MRI for the different purpose of identifying a lesion in the sternum that was potentially missed. Filing 83 at 10. Finally, they argue that Dr. Kligerman lacks the required knowledge and experience in breast disease and breast imaging diagnosis stated by the American College of Radiology. Filing 83 at 12.

The Jensens dispute the contention that Dr. Kligerman was unqualified. Filing 91 at 8. They argue that the subject matter in this case is the presence of an enhancing lesion in the sternum on the MRI. Filing 91 at 8. They argue that Dr. Kligerman certainly possesses knowledge superior to that of the average layperson to support his opinion that the enhancing lesion was present on the MRI and should have been reported. Filing 91 at 8–9. Indeed, in response to Dr. Nelson's and RCI's contentions that the determination of Dr. Kligerman's qualification should be based on the American College of Radiology guidelines for breast MRIs, the Jensens argue that Dr. Kligerman has the same legal ability and qualifications to do everything in radiology that Dr. Nelson can. Filing 91 at 9. Still more importantly, the Jensen's argue, is the fact that the finding at issue is not in the breast but in the sternum. Filing 91 at 9. Consequently, they argue that Dr. Kligerman offers a valid opinion that a lesion approximately 3.0 cm x 1.0 cm was present on the sternum but was not reported. Filing 91 at 9.

The Court concludes that Dr. Nelson's and RCI's argument that Dr. Kligerman is not qualified because he does not read breast MRIs is a red herring. The question in this case is not whether Dr. Nelson misread a breast MRI, but whether Dr. Nelson should have seen and reported the sternal mass shown in the 2021 MRI. The Court concludes that Dr. Kligerman is clearly qualified to assist the finder of fact and would be useful to the finder of fact in determining whether the sternal mass was present and should have been reported. *See Craybar/GBF, Inc.*, 142 F.4th at 587 (stating the first Rule 702 criterion as "the testimony must be useful to the finder of fact in

17

deciding the ultimate issue of fact" and the second Rule 702 criterion as "the expert must be qualified to assist the finder of fact" (citation omitted)). This is apparent from his education and experience showing that he has reviewed thousands of chest and cardiac MRIs that "visualize the sternum," Filing 96 at 10–11 (¶ 26), and that the sternum is present in all the images he reads which are 95% plus chest and cardiac imaging. Filing 95 at 4 (¶ 26). Dr. Kligerman's testimony is also based on sufficient facts or data and the product of reliable principles and methods, as he read the same 2021 MRI that Dr. Nelson read and based his conclusions on his experience. *See Bliv, Inc.*, 159 F.4th at 542 (stating these requirements of Rule 702). As the Jensens argue, Dr. Kligerman offers valid opinions that none of Dr. Nelson's possible explanations for failing to report the sternal mass withstand scrutiny because it is an obvious "enhancing infiltrative mass in the sternum in someone with breast cancer" that "lights up like a lightbulb" with contrast. Filing 91 at 11. Thus, Dr. Kligerman's testimony about what is shown in the 2021 MRI and what should have been reported is not merely speculative and unsupported. *See id.* at 543. It is instead more likely than not admissible, *see Sprafka*, 139 F.4th at 660; Fed. R. Evid. 702, Advisory Committee Notes to 2023 amendment.

### b. Dr. Kligerman's Opinions Satisfy the "Locality Rule"

Dr. Nelson and RCI argue as a further ground to exclude Dr. Kligerman's opinions that he fails to satisfy the "locality rule." Filing 83 at 12–16. They contend that Dr. Kligerman repeatedly testified to his unfamiliarity with the standard of care applicable to a general radiologist reading and interpreting a breast MRI in Omaha, Nebraska. Filing 83 at 14. Furthermore, they argue that Dr. Kligerman has done nothing to familiarize himself with the standard of care applicable to a diagnostic radiologist reading and interpreting a variety of imaging studies in their clinical practice, or even breast MRIs, in Omaha, Nebraska. Filing 83 at 15. Thus, they contend that

18

Dr. Kligerman lacks foundation to provide a standard-of-care opinion in this case. Filing 83 at 15. Dr. Nelson and RCI contend—without citation to any authority—that "[t]he Nebraska Supreme Court has clearly held that the flaws in Dr. Kligerman's opinions are foundational and do *not* go merely to the weight to be afforded his testimony." Filing 83 at 16.

The Jensens argue that Dr. Kligerman's opinion that the enhancing lesion was present and should have been reported is consistent with the opinions on the "local" standard of care expressed by Dr. Dorius, the Tumor Board, Dr. Nelson, and even the opposing experts, Dr. Herold and Dr. Silberstein. Filing 91 at 9–11. Indeed, they contend that this standard is the national standard. Filing 91 at 11. The Jensens argue that Dr. Kligerman explained that he derives his knowledge of the applicable standard from his review of the testimonies of Dr. Dorius and Dr. Nelson as well as his own background, experience, and training. Filing 91 at 14. The Jensens assert that what matters for familiarity with the local standard is not familiarity with facilities but familiarity with practices relating to abnormalities on MRIs. Filing 91 at 14. They focus on Dr. Kligerman's consideration of the actual MRI images of Ms. Jensen, the quality of the actual MRI images, and the system through which the images were viewed by Dr. Nelson (PACS). Filing 91 at 15.

### i. The Nebraska "Locality Rule"

"[T]he applicable standard of care is a vital element of a medical malpractice claim. But unlike ordinary negligence actions, in a medical malpractice case, expert testimony is also vital for determining whether the defendant breached the standard of care." *J.R.M.B. by & through Morgan-Baker v. Alegent Creighton Health Creighton Univ. Med. Ctr., LLC*, 21 N.W.3d 678, 689 (Neb. 2025). Central to the parties' arguments about Dr. Kligerman's ability to testify about the standard of care in this case is the Nebraska "locality rule" codified in Nebraska Revised Statutes § 44-2810.

The Nebraska Supreme Court has explained,

> Neb. Rev. Stat. § 44-2810 (Reissue 2021) defines the general standard of care in medical malpractice cases as "the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used under like circumstances by members of his profession engaged in a similar practice in his or in similar localities" and provides that to determine what constitutes such ordinary and reasonable care, skill, and diligence in a particular case, the test is that "which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances."

*Slater v. Ichtertz*, 26 N.W.3d 504, 516 (Neb. 2025). The Nebraska Supreme Court refers to this as the "locality rule as set forth in *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023)." *Konsul v. Asensio*, 7 N.W.3d 619, 632 (Neb. 2024).

In *Konsul*, the Nebraska Supreme Court explained the "locality rule" in more detail as follows:

> Section 44-2810 does not define "similar community," but we interpret this term in light of the general purpose of § 44-2810 to define the standard of care to which a defendant is to be held in medical malpractice cases. *Carson v. Steinke, supra.* This purpose would not be served if the similarity of two communities could be determined by considering characteristics that are irrelevant to the level of medical care that is to be expected. Instead, we agree with those jurisdictions that consider medically relevant factors, including available facilities, personnel, equipment, and practices, to determine whether two communities are similar under their medical malpractice statutes. *Id.*

> In *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023), we held that the burden is on the proponent of standard-of-care testimony to demonstrate that the expert is familiar with the customary practice among physicians in the defendant's community or a community that is similar in terms of available resources, facilities, personnel, practices, and other medically relevant factors. If a party cannot demonstrate his or her expert's familiarity with such standard of care, then the expert's testimony is properly excluded. *Id.* In *Carson v. Steinke*, we declined an invitation to interpret § 44-2810 to allow an expert unfamiliar with the defendant's community or a similar community to testify to a national standard of care. We recognized that medical standards of care and skill are becoming national rather than local or regional, but we concluded that we could not eliminate the locality rule explicitly required by the statute that defined the standard of care and set forth public policy as declared by the Legislature.

20

> We further stated in *Carson v. Steinke* that expert testimony establishing a national standard of care is admissible if the expert can establish that the national standard of care does not differ in the defendant's community or a similar community. We stated that testimony regarding a national standard of care must be coupled with the expert's explanation of why the national standard applies under the circumstances.

*Konsul*, 7 N.W.3d at 632–33. The Nebraska Supreme Court observed further,

> Expert testimony concerning the standard of care in a medical malpractice case should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *Carson v. Steinke, supra.* Where an expert's opinion is mere speculation or conjecture, it is irrelevant and cannot assist the trier of fact. *Id.*

*Konsul*, 7 N.W.3d at 632.

## ii.  Application of the "Locality Rule"

The Court concludes that Dr. Kligerman's testimony satisfies the "locality rule" as set out in Nebraska Revised Statutes § 44-2810, *Carson v. Steinke*, 989 N.W.2d 401 (Neb. 2023), and *Konsul v. Asensio*, 7 N.W.3d 619, 632–33 (Neb. 2024). The Nebraska Supreme Court explained in *Konsul* that the "similarity" of communities required by the "locality rule" depends on "medically relevant factors, including available facilities, personnel, equipment, and practices." 7 N.W.3d at 633. The record supports the following allegations by the Jensens:

> Dr. Kligerman is quite familiar with the actual resources that were available to Dr. Nelson in this case, namely the actual MRI images taken of Ms. Jensen, the quality of those images, the quality of the scanner itself, and the PACS system which allowed the viewing of those images, as well as the "local" standard of care required when viewing those images, as testified to by the treating medical oncologist, The Nebraska Methodist Hospital Tumor Board and Dr. Nelson.

Filing 96 at 11–12 (¶ 29). Thus, Dr. Kligerman's opinions are based on "medically relevant factors." *Konsul*, 7 N.W.3d at 633.

21

However, the Court takes a more limited view than the Jensens do of what statements of local standards are relevant. First, the Court concludes that any opinions attributed to the Hospital Tumor Board are hearsay based on Dr. Dorius's recitation, so that they are not admissible as statements of a local standard of care. Filing 1 at 9 (¶ 58). Second, the opinions on the standard of care by Dr. Dorius and an opposing expert, Dr. Silberstein, are not from radiologists but from oncologists. Thus, those opinions are not from "members of [Dr. Nelson's] profession engaged in a similar practice." *Slater*, 26 N.W.3d at 516. Therefore, they lend considerably less support to the statement of the applicable standard of care than the statements of radiologists like Dr. Nelson and his expert radiologist, Dr. Herold.

That said, Dr. Herold agreed that the standard of care was that any abnormality present on the study, if observed, should be reported. Filing 92-18 at 14 (Herold Depo., 14:15–20). Similarly, Dr. Nelson testified,

> You know, the main job for the MRI is to look for additional breast images and look for other areas of enhancement and abnormalities in the breast. So we're still responsible for the peripheral stuff, obviously.

Filing 92-12 at 13 (Nelson Depo., 40:19–23). Dr. Kligerman's opinion is also that Dr. Nelson's interpretation of the 2021 MRI and corresponding radiology report violated the standard of care in failing to identify and report the readily apparent mass in Ms. Jensen's sternum. Filing 95 at 3 (¶ 23). Thus, the standard of care identified by Dr. Kligerman is consistent with the articulation of the "local" standard of care by Dr. Nelson and his standard-of-care expert.

Dr. Nelson and RCI argue that even so the Nebraska Supreme Court has rejected the sufficiency of testimony that an expert relied on the testimony of treating physicians to inform himself of the local standard of care. Filing 93 at 14 (citing *Carson*, 989 N.W.2d at 412). The Court finds no such holding in *Carson*. Instead, in *Carson*, the Nebraska Supreme Court held *inter alia*

22

"that the district court did not abuse its discretion in determining the [plaintiffs] failed to demonstrate [an expert's] familiarity with the standard of care in Grand Island or a similar locality." 989 N.W.2d at 412. In that case, the expert "testified that at the time of his deposition, he knew nothing about Grand Island, St. Francis [the facility involved], or Boon [a defendant doctor] beyond what was on St. Francis' website and in Boon's deposition" and "that he did not do anything to investigate the standard of care for pediatricians practicing at St. Francis in Grand Island and did not discuss the case with any physicians from Nebraska." *Carson*, 989 N.W.2d at 409. In contrast, Dr. Kligerman did investigate the standard of care of radiologists in Omaha at Methodist Hospital by familiarizing himself not only with the actual resources available to Dr. Nelson for obtaining and viewing MRIs, but also by familiarizing himself with the "local" standard of care required when viewing MRI images, as testified to by Dr. Nelson. Filing 96 at 11–12 (¶ 29).

### c.   Dr. Kligerman Did Not Impose a "Heightened" Standard of Care

Dr. Nelson's and RCI's last argument to exclude Dr. Kligerman's testimony is that he applied a personal, "heightened" standard of care. Filing 83 at 16–17. This argument is based on Dr. Kligerman's statement that he considered what "a junior level resident" would pick up when reading the 2021 MRI. Filing 83 at 17. The Jensens argue that the standard of care that Dr. Kligerman applied was not a "heightened personal standard" because it is grounded in the same standard of care articulated by the treating oncologist, the local Tumor Board, the opposing experts, and Dr. Nelson himself. Filing 91 at 12–13.

The part of Dr. Kligerman's deposition on which Dr. Nelson and RCI rely as showing application of a "heightened" standard of care does exactly the opposite. That part of Dr. Kligerman's deposition states,

23

> The standard that a radiologist with basic training would make this finding in nearly every case in a similar clinical situation, being that they have a PACS system look at it. They're in a setting where they have the reasonable equipment, so on and so forth. It's a good quality study. That's what I'm using. And for me I even take it, again because I don't -- I even go low and say I'm not even talking about a, you know, kind of standard radiologist. I'm even going less to a junior trainee to say would a junior trainee see this and that's kind of my cutoff.

Filing 83 at 17 (citing Filing 85-5 at 11 (Kligerman Depo., 42:25–43:10)). Thus, Dr. Kligerman was not using a "heightened" standard of care, but a standard of care at the lowest end of the local standard based on what even "a junior trainee" would have seen and reported using the PACS system and equipment used by Dr. Nelson.

### 3. Summary

The Court concludes that Dr. Kligerman's opinions are admissible on this record because "generally, *Daubert* 'call[s] for the liberal admission of expert testimony.'" *Acad. Bank, N.A.*, 116 F.4th at 791 (quoting *Johnson*, 754 F.3d at 562). Under the circumstances, the Court concludes that the proper course to test Dr. Kligerman's opinions is "the adversary process with competing expert testimony and cross[-]examination, rather than exclud[ing] [the opinions] by the court at the outset." *Id.* (citations omitted). To put it another way, this is a case in which the "traditional and appropriate means" to address such evidence are "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596). The part of Dr. Nelson's and RCI's Motion seeking exclusion of Dr. Kligerman is denied.

### C. Exclusion of Dr. Van Scoy-Mosher

Dr. Nelson and RCI also seek to exclude the Jensens' expert on proximate cause, Dr. Van Scoy-Mosher, primarily on the ground that his opinions are couched in terms of mere possibility. Filing 83 at 18. The Jensens respond that Dr. Van Scoy-Mosher's opinions are straightforward,

firmly grounded in evidence-based oncology, directly relevant to causation in this case, and offered to a reasonable degree of medical certainty. Filing 91 a 16.[5] To put in context the parties' arguments, the Court summarizes their allegations concerning Dr. Van Scoy-Mosher's opinions. Once again, the facts set out below are undisputed unless otherwise indicated.

### 1. Allegations Concerning Dr. Van Scoy-Mosher's Opinions

Dr. Van Scoy-Mosher is a part-time private-practice oncologist in California. Filing 95 at 4 (¶ 31). The Jensens disclosed Dr. Van Scoy-Mosher as an expert witness to testify as to the proximate cause of the Jensens' injuries. Filing 95 at 4 (¶ 32); Filing 96 at 12 (¶ 32) (admitting the allegation but disputing that the cited document, Filing 85-2, discloses anything other than Dr. Van Scoy-Mosher's designation as an expert). Dr. Nelson and RCI allege,

> Dr. Kligerman's [sic] expert report states his opinion that the negligence in misreading the October 2021 MRI will likely cost Ms. Jensen a minimum [of] two to five years of life, [and] took away the probability of her becoming completely disease free.

---

[5] The Jensens contend that Dr. Nelson and RCI do not challenge in their Motion Dr. Van Scoy-Mosher's opinion that the delay in diagnosis and treatment contributed to Ms. Jensen's depression, anxiety, and adjustment disorder. Filing 91 at 17. No challenge to such an opinion can reasonably be discerned from Dr. Nelson's and RCI's Motion, Filing 82, or Brief, Filing 93. Dr. Nelson and RCI make an assertion in their Reply that this opinion is not found in Dr. Van Scoy-Mosher's report and that he is not qualified to offer it. That argument is both too late and not a proper response to an opposition argument. It is instead an entirely new argument well beyond the Jensens' statement that Dr. Nelson and RCI did not challenge the opinion. This Court has explained,

> The Eighth Circuit has stated that normally, courts "refuse to entertain [ ] new argument[s]" that are "assert[ed] for the first time in [a] reply brief." *Berg v. Norand Corp.*, 169 F.3d 1140, 1146 (8th Cir. 1999). In addition, the Eighth Circuit has stated, "The district court d[oes] not abuse its discretion or otherwise commit error by following the court's local rule prohibiting new arguments submitted in a reply brief." *McGhee v. Pottawattamie Cnty., Iowa*, 547 F.3d 922, 929 (8th Cir. 2008). The pertinent local rule provides, "The reply brief may not merely repeat the moving party's initial arguments, but rather must address factual or legal issues raised in the opposing brief. Without leave of court, a reply brief may not raise new grounds for relief or present matters that do not relate to the opposing party's response." NECivR 7.1(c)(2).

*Peterson v. Learfield Commc'ns, LLC*, 705 F. Supp. 3d 937, 955 (D. Neb. 2023). The Court will not consider a challenge to Dr. Van Scoy-Mosher's opinions about causation of psychological distress in this decision.

Filing 95 at 5 (¶ 33). The Jensens allege—correctly—that Dr. Kligerman's report contains no such statement and that the document cited by Dr. Nelson and RCI in support of this allegation, Filing 85-17, does not support any such opinion by Dr. Kligerman. Filing 96 at 12 (¶ 33). The Court concludes that the reference to Dr. Kligerman's expert report is plainly a typographical error, because the document relied on, Filing 85-17, is the expert report of Dr. Van Scoy-Mosher. In that report, Dr. Van Scoy-Mosher states among other things,

> Based on the totality of the circumstances, the negligence in misreading the 2021 MRI will, to a reasonable degree of medical certainty, likely cost Ms. Jensen a minimum of two to five years of life, and took away the probability of her becoming completely disease free.

Filing 85-17 at 2.

As was the situation with Dr. Kligerman's report, the parties dispute whether Dr. Van Scoy-Mosher's expert report was "minimally detailed," as Dr. Nelson and RCI allege, or "self-sufficient," as the Jensens allege, but they agree that Dr. Van Soy-Mosher also provided deposition testimony. Filing 95 at 5 (¶¶ 34–35); Filing 96 at 12–13 (¶¶ 34–35). Dr. Nelson and RCI allege that "Dr. Van Scoy-Mosher repeatedly testified that he relied on the MONALESSA [sic] trial and other studies in forming his opinions in this case; however, his opinions are merely relying on his own recollections of [w]hat those studies show." Filing 95 at 5 (¶ 36). The Jensens dispute these allegations, and they dispute the contention that the cited documents support these allegations. Filing 96 at 13 (¶ 36). They allege further,

> Dr. Van Scoy-Mosher relied on his background, experience and training, his knowledge of the relevant literature, which necessarily included the MONALEESA study, as well as Ms. Jensen's specific medical history, and her personal response to various medical treatments, in offering one of his opinions related to Ms. Jensen's overall survival. Namely, that due to the negligence of the Defendants, Ms. Jensen will now die significantly sooner than she otherwise would have.

26

Filing 96 at 13 (¶ 36). Dr. Nelson and RCI allege that "Dr. Van Scoy-Mosher continuously testified to incorrect details in the medical literature about the MONALEESA trial study." Filing 95 at 5 (¶ 37). The Jensens dispute this allegation and allege further,

> Dr. Van Scoy-Mosher testified that he had not conducted any specific literature search for this case but was relying on his general knowledge of the relevant literature. Furthermore, Dr. Van Scoy-Mosher made clear that although he had not memorized every aspect of the MONALEESA study, there was "no question" in his mind that there was a significant difference in overall survival based between the study populations, a fact which demonstrates the reliability of his methodology.

Filing 96 at 13–14 (¶ 37) (record citations omitted). The Jensens also dispute Dr. Nelson's and RCI's allegation that "Dr. Van Scoy-Mosher formed an opinion on oligometastasis that is unsupported by data and medical literature or the facts of the case." Filing 95 at 5 (¶ 38); Filing 96 at 14 (¶ 38). The Jensens allege further,

> Oligometasta[s]is simply means one or very few metastases. The October 2021 MRI, the only scan performed on Ms. Jensen to evaluate for remote disease, demonstrated a single solitary sternal mass. Based on Ms. Jensen's ultimate response with ribociblib [sic] and the gold-standard treatment, her oligometasta[s]is had a reasonable probability of a cure.

Filing 96 at 14 (¶ 38) (record citations omitted).

Finally, the parties dispute whether Dr. Van Scoy-Mosher's testimony fails to indicate anything more than a "loss-of-chance" theory of causation. Filing 95 at 5 (¶ 39); Filing 96 at 14 (¶ 39). The Court will discuss that dispute to the extent necessary in its legal analysis below.

### 2. Dr. Van Scoy-Mosher's Opinions Are Admissible

#### a. Dr. Van Scoy-Mosher's Opinions Purportedly Based on the MONALEESA Study Are Problematic But Not Inadmissible

In support of their argument that Dr. Van Scoy-Mosher has no sufficient expert opinion on causation, Dr. Nelson and RCI point out that Dr. Van Scoy-Mosher testified that he relied upon the MONALEESA study and other studies, but he was only able to testify that he was aware of

27

the studies. Filing 83 at 18. They also contend that he was unable to provide any details for locating the pertinent parts of the MONALEESA study. Filing 83 at 19. Furthermore, they contend that Dr. Van Scoy-Mosher testified to incorrect details purportedly from the MONALEESA study and otherwise unsupported by the medical literature. Filing 83 at 20. Thus, they argue that Dr. Van Scoy-Mosher's misconceptions of what was studied or shown in the MONALEESA study invalidate the remainder of his testimony about that study. Filing 83 at 21. As a specific example, they point out that Dr. Van Scoy-Mosher not only testified incorrectly that a minority cannot take ribociclib (part of the treatment that the Jensens argue was improperly delayed), but that the MONALEESA study directly contradicts his opinion testimony that Ms. Jensen's combination therapy failed because her prior treatment interfered with her ability to take the ribociclib. Filing 83 at 21.

As to the basis for Dr. Van Scoy-Mosher's opinions, the Jensens assert,

> There is simply no trial that exactly replicates and analyzes Ms. Jensen's clinical scenario, as such a study would likely violate fundamental principles of medical ethics. Dr. Van Scoy-Mosher provides such analysis, relying on available published data and his expertise. Thus, Dr. Van Scoy-Mosher's scientific basis necessarily includes his training, experience, and interpretation of the relevant literature, including the MONALEESA trials.

Filing 91 at 18. They then embark on a discussion of what the MONALEESA studies show and the reliability of Dr. Van Scoy-Mosher's opinions based in part on those studies. Filing 91 at 19–22. Ultimately, they assert that Dr. Van Scoy-Mosher's opinion is based on sound methodology. Filing 91 at 23. Next, the Jensens argue that Dr. Van Scoy-Mosher's opinions are based on the literature and Ms. Jensen's specific response to the various treatments used in her case. Filing 91 at 23. Thus, they contend that those opinions are valid and admissible. Filing 91 at 23.

28

The Court is concerned by Dr. Van Scoy-Mosher's inability to identify specific bases in the literature—such as the MONALEESA study—for his opinions. The Court is also concerned by his reliance primarily on his memories and opinions about what various studies show—many of which are impeached to at least some degree by Dr. Nelson's and RCI's evidence. Indeed, the Jensens' assertion that Dr. Van Scoy-Mosher testified that he had not conducted any specific literature search for this case but was relying on his general knowledge of the relevant literature, Filing 96 at 13–14 (¶ 37) (record citations omitted), does little to allay the Court's concerns. These concerns suggest that Dr. Van Scoy-Mosher's opinions are not based upon sufficient facts or data and reliable application of principles and methods. *See Bliv, Inc.*, 159 F.4th at 542 (explaining that Rule 702 states that expert opinions must be based upon sufficient facts or data, and reliable principles and methods that have been reliably applied to the facts of the case).

Nevertheless, the record does support the Jensens' argument that "[t]here is simply no trial that exactly replicates and analyzes Ms. Jensen's clinical scenario," so that Dr. Van Scoy-Mosher provides his analysis based on available published data and his expertise. Filing 91 at 18. Dr. Nelson and RCI have not shown that there is any such trial or study. Thus, this issue appears to be one in which expertise based on experience is enough to show that Dr. Van Scoy-Mosher is qualified to assist the finder of fact and that his opinions would be useful to the finder of fact in deciding the ultimate issues of fact. *See Crabar/GBF, Inc.*, 142 F.4th at 587 (stating Rule 702 requirements). Furthermore, this apparent lacuna in directly applicable studies suggests that Dr. Van Scoy-Mosher's opinions are best tested with "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

29

### b. Dr. Van Scoy-Mosher's Opinions that Ms. Jensen Was Potentially Curable

The Court begins this part of its analysis with Dr. Nelson's and RCI's argument that Dr. Van Scoy-Mosher's opinion that Ms. Jensen was potentially curable is based on an assumption that the mass on Ms. Jensen's sternum was oligometastatic in 2021, but the record does not support that assumption. Filing 83 at 22. The Jensens respond that Dr. Van Scoy-Mosher's opinion is that there is a reasonable likelihood that the sternal metastasis represented an oligometastasis. Filing 91 at 17. They argue that this opinion was properly asserted to a reasonable degree of medical certainty and probability. Filing 91 at 16–17. They argue that whether the lesion on Ms. Jensen's sternum was oligometastatic at the time of her initial diagnosis is a question of fact because no appropriate imaging and testing were done at the time. Filing 91 at 24.

Contrary to Dr. Nelson's and RCI's contention, the record supports a probability that the sternal metastasis represented an oligometastasis. Filing 91 at 17. Specifically, the Jensens offer record evidence that "oligometasta[s]is" simply means one or very few metastases, and there is no dispute that the 2021 MRI—which was the only scan performed on Ms. Jensen to evaluate for remote disease—demonstrated a single solitary sternal mass. Filing 96 at 14 (¶ 38) (record citations omitted). In other words, there were sufficient facts or data to support an opinion that the sternal mass was oligometastasis. *See Bliv, Inc.*, 159 F.4th at 542 (stating Rule 702 requirements). The state of the record on the issue of whether or not the sternal metastasis represented an oligometastasis suggests that this opinion of Dr. Van Scoy-Mosher is best tested with "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

Dr. Nelson and RCI also contend that Dr. Van Scoy-Mosher was unable to provide the location of any studies to support his opinion that Ms. Jensen's metastasis was "potentially curable." Filing 83 at 22. Furthermore, they contend that Dr. Van Scoy-Mosher's opinion that receiving tamoxifen as a first-line treatment interfered with Ms. Jensen's ability to take the combined treatment involving ribociclib as a second-line treatment is unsupported or even contradicted by the medical literature. Filing 83 at 23. In response, the Jensens clarify that Dr. Van Scoy-Mosher's opinion was that placing Ms. Jensen on tamoxifen-only therapy in the fall of 2021 instead of "gold-standard" treatment was detrimental to her overall survival, reducing it by a period measured in years not months. Filing 91 at 16. The Jensens then contend that Dr. Van Scoy-Mosher's opinion is grounded in peer-reviewed medical literature, reflects the current state of oncology research, and satisfies *Daubert's* requirements for admissibility. Filing 91 at 25. The Jensens argue that the factual basis for Dr. Van Scoy-Mosher's opinions is an issue of credibility rather than admissibility, whether or not Dr. Nelson and RCI disagree with those conclusions. Filing 91 at 25–26.

Again, this issue appears to be one in which expertise based on experience is enough to show that Dr. Van Scoy-Mosher is qualified to assist the finder of fact and that his opinions would be useful to the finder of fact in deciding the ultimate issues of fact. *See Crabar/GBF, Inc.*, 142 F.4th at 587 (stating Rule 702 requirements). The apparent lack of any directly applicable studies suggests that Dr. Van Scoy-Mosher's opinions are best tested with "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596).

Dr. Nelson and RCI argue further that Dr. Van Scoy-Mosher's opinion that Ms. Jensen was curable is merely a "loss-of-chance" doctrine not recognized in Nebraska law. Filing 83 at 23.

31

They argue this is so, because an expert's testimony about a patient's decreased chances of a better outcome is inadequate if the expert cannot state that it is more likely than not that without the underlying medical error the patient would have had a better recovery. Filing 83 at 23. Dr. Nelson and RCI argue that Dr. Van Scoy-Mosher testified that Ms. Jensen's receiving tamoxifen as a first-line treatment, followed belatedly by the "gold standard" combination treatment, resulted in a loss in terms of Ms. Jensen's chance of a long-term survival. Filing 83 at 23. However, they assert that Dr. Van Scoy-Mosher's testimony is "riddled with conjecture and possibility." Filing 83 at 24.

The Jensens argue that Dr. Van Scoy-Mosher's opinion that Ms. Jensen was curable was properly asserted to a reasonable degree of medical certainty and probability. Filing 91 at 16–17. The Jensens argue that Dr. Van Scoy-Mosher opines that if Ms. Jensen's disease was limited to her sternum, she more likely than not could have been cured. Filing 91 at 24. They argue that whether the lesion on her sternum was oligometastatic at the time of her initial diagnosis is a question of fact because no appropriate imaging and testing were done at the time. Filing 91 at 24. The Jensens also contend that this opinion is also grounded in peer-reviewed medical literature, reflects the current state of oncology research, and satisfies *Daubert's* requirements for admissibility. Filing 91 at 25.

The Nebraska Supreme Court explained,

The loss-of-chance doctrine is based upon the Restatement (Second) of Torts, which provides:

> One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if
>
> (a) his failure to exercise such care increases the risk of such harm, or

> (b) the harm is suffered because of the other's reliance upon the undertaking.

*Cohan v. Med. Imaging Consultants, P.C.*, 900 N.W.2d 732, 739 (quoting *Restatement (Second) of Torts* § 323 (1965)), *opinion modified on denial of reh'g*, 902 N.W.2d 98 (Neb. 2017). The court observed,

> Courts have taken this loss-of-chance discussion and applied it to medical malpractice actions by requiring a plaintiff to prove by a preponderance of the evidence that the medical provider's negligence caused the plaintiff's injury, where the injury consists of the diminished likelihood of achieving a more favorable medical outcome. However, they have adopted different permutations of the loss-of-chance doctrine.

*Cohan*, 900 N.W.2d at 740 (citations omitted). After discussing the various "permutations" of the doctrine, the court declined to adopt either the "loss-of-chance" doctrine as stated in caselaw or *Restatement* § 323 in medical malpractice cases. *Id.* at 742; *see also id.* at 743 ("[W]e conclude that this court has not adopted the loss-of-chance doctrine, and we shall not adopt it at this time.").

In a prior decision in *Rankin v. Stetson*, 749 N.W.2d 460 (Neb. 2008), the Nebraska Supreme Court distinguished between mere "loss of chance" opinions insufficient to establish causation and adequate opinions on causation in a medical malpractice case. The court stated,

> [The expert's] statements that [the plaintiff] would have had a "better prognosis" and a "chance of avoiding permanent neurological injury" do not equate with an opinion that it was more likely than not that [the plaintiff] would have had a better outcome if she had undergone surgery immediately following her injury. Opinions dealing with proximate causation are required to be given in terms that express a probability greater than 50 percent. Thus, [the expert's] statements do not establish the required certainty to prove causation. While a 49–percent chance of a better recovery may be medically significant, it does not meet the legal requirements for proof of causation. The terms "chance" and "prognosis" by definition do not establish the certainty of proof that is required.

*Rankin*, 749 N.W.2d at 469; *see also Walton v. Patil*, 783 N.W.2d 438, 447 (Neb. 2010) (rejecting the sufficiency of testimony that a treating physicians' deviation from the standard of care

33

decreased a plaintiff's "chances of a better outcome" because the expert "did not testify that but

for the deviations, a better outcome would have been probable," and reiterating the "greater that

50 percent" standard, citing *Rankin*, 749 N.W.2d at 460).

In another decision, *Richardson v. Children's Hosp.*, 787 N.W.2d 235 (Neb. 2010), the

Nebraska Supreme Court relied on *Rankin* in rejecting a contention that an expert had not given

an opinion "to a reasonable degree of medical certainty" but only a "loss of chance" opinion

insufficient to establish causation. The Court explained,

> In *Rankin*, the plaintiff offered expert testimony that stated "it was more
> likely than not" that the plaintiff would have recovered from her spinal cord injury
> had surgery been performed within the first 72 hours. We stated that an opinion that
> a plaintiff would have had "a 'better prognosis' and a 'chance of avoiding
> permanent neurological injury'" did not establish the certainty of proof that was
> required. However, because the doctor's opinion also stated that early surgical
> decompression of the spinal cord more likely than not would have led to an
> improved outcome, the evidence was sufficient to establish causation.

> Unlike in *Rankin*, where the language at issue indicated "a better prognosis"
> or "a chance," in this case, Dr. McAuliff stated that he believed that with hydration,
> Corey could have recovered. Such was a sufficient basis for Dr. McAuliff's opinion
> that Corey was dehydrated and that IV fluids would have made a difference in the
> ultimate outcome. We conclude these opinions were given with a sufficient degree
> of medical certainty and were sufficient to establish causation for purposes of
> Richardson's case in chief. Appellants' argument to the contrary is without merit.

*Richardson*, 787 N.W.2d at 243.

The Jensens direct the Court to deposition testimony by Dr. Van Scoy-Mosher about his

conclusion that the treatment error caused by Dr. Nelson's negligence in reading and reporting on

the 2021 MRI reduced Ms. Jensen's overall survival by a period measured in years not months.

Filing 91 at 16. The deposition testimony is as following:

> Q       You make a statement in the second-to-the-last paragraph of your
> report, on page 2 of your report, "Based on the totality of the circumstances, the
> negligence in misreading the 2021 MRI will, to a reasonable degree of medical
> certainty, likely cost Ms. Jensen a minimum of two to five years of life and took

34

away the probability of her becoming completely disease-free." Did I read that correctly?

A Yes.

Q First, upon what are you relying to say that the failure to note the sternal lesion on the 2021 MRI likely cost Ms. Jensen a minimum of two to five years of life?

A I think I'm mostly swayed by the fact that, even when she got on the proper treatment, which was quite effective initially -- proper treatment meaning including the ribo -- which was quite effective, but she had to stop it -- again, for reasons I've talked about -- means she's not going to get the typical, very long disease-free -- progression-free survival that women typically got in the MONALEESA trial.

Q Okay.

A She's done well so far, which is a testament, frankly, to how effective even relatively short ribo is.

Filing 92-7 at 16 (Van Scoy-Mosher Depo., 63:7–64:6).

This opinion is stated "to a reasonable degree of medical certainty" and cast in terms of a "probability of her becoming completely disease-free." Thus, it is not a mere "loss of chance" opinion that is inadequate to establish causation under Nebraska law. *See Cohan*, 900 N.W.2d at 740. It is not an opinion that Ms. Jensen would have had only a "better prognosis" and a "chance of avoiding [further] injury" if the 2021 MRI had been properly read "that do[es] not equate with an opinion that it was more likely than not that [Ms. Jensen] would have had a better outcome if" she had received proper treatment based on a proper reading of the 2021 MRI. *See Rankin*, 749 N.W.2d at 469. Rather, it is an opinion stating that proper reading of the 2021 MRI more likely than not—*i.e.*, probably—would have led to an improved outcome, so the evidence is sufficient to establish causation. *Id.*; *see also Richardson*, 787 N.W.2d at 243 ("We conclude these opinions were given with a sufficient degree of medical certainty and were sufficient to establish causation for purposes of Richardson's case in chief."); *Walton*, 783 N.W.2d 447 (explaining that the expert

must state that "a better outcome would have been probable"). The Court does not read *Rankin* to require an express statement by the expert in terms of 50 percent or greater probability; rather, the court in *Rankin* explained the adequate statement of "more likely than not" in terms of a 50 percent or greater probability. *Rankin*, 749 N.W.2d at 469.

### 3. Summary

The Court does find cause for concern that some of Dr. Van Scoy-Mosher's opinions are "shaky" and that Dr. Nelson and RCI have grounds to challenge his opinions. However, "generally, *Daubert* 'call[s] for the liberal admission of expert testimony.'" *Acad. Bank, N.A.*, 116 F.4th at 791 (quoting *Johnson*, 754 F.3d at 562). Thus, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means' of addressing 'shaky but admissible evidence.'" *In re Bair Hugger*, 9 F.4th at 778 (quoting *Daubert*, 509 U.S. at 596). Thus, the Court denies the part of Dr. Nelson's and RCI's Motion seeking exclusion of Dr. Van Scoy-Mosher.

## III. The Motion for Summary Judgment

Dr. Nelson and RCI expressly premised their entitlement to summary judgment on their contention that if the Jensens' experts are excluded, the Jensens cannot establish the applicable standard of care or proximate cause to support their claims. Filing 83 at 1. Because the Court declines to exclude either expert, the Court finds that Dr. Nelson and RCI are not entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a) ("The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."). Thus, the part of Dr. Nelson's and RCI's Motion seeking summary judgment is denied.

## IV. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Dr. Nelson's and RCI's Motion to Exclude Plaintiffs' Experts, Dr. Kligerman and Dr. Van Scoy-Mosher, Request for Oral Argument, and Motion for Summary Judgment, Filing 82, is denied in its entirety.

Dated this 23rd day of January, 2026.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge