IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

SHARI L. JENSEN, and JAREL J. JENSEN,

Plaintiffs,

vs.

RADIOLOGIC CENTER, INC., and NICK L. NELSON, M.D.,

Defendants.

**8:24CV129**

**MEMORANDUM AND ORDER ON DEFENDANTS' POST-TRIAL MOTIONS PURSUANT TO FED. R. CIV. P. 50, 59, AND 60**

This medical malpractice action by plaintiffs Shari L. Jensen and Jarel J. Jensen arises from the alleged failure of a radiologist, defendant Nick L. Nelson, M.D., to identify and report a mass on Ms. Jensen's sternum shown in an MRI that was part of the initial workup for invasive breast cancer. Filing 1 at 7–8 (¶¶ 39–48). The parties stipulated that at all relevant times, Dr. Nelson was an employee of defendant Radiologic Center, Inc., (RCI) and was acting in the course and scope of his employment with RCI when he read imaging studies as part of Shari Jensen's treatment. Filing 108 at 2. A jury returned a verdict in favor of the Jensens, awarded Shari Jensen $9,000,000 in damages for medical malpractice, and awarded Jarel Jensen $3,000,000 for loss of consortium. Filing 150. This case is now before the Court on Defendants' Post-Trial Motions Pursuant to Fed. R. Civ. P. 50, 59, and 60, and Request for Oral Argument. Filing 166.

There can be little doubt that there are tragic aspects to this case. This Court's ruling on Defendants' Post-Trial Motions is not intended to minimize those tragic aspects or the Jensens' suffering. However, the questions now before the Court are whether the Jensens established at trial the liability of Dr. Nelson and RCI for the Jensens' damages under Nebraska law and whether the

circumstances require judgment as a matter of law in Defendants' favor, a new trial, or amendment of the judgment.

Prior to trial, this Court entered more than 70 pages of pretrial rulings. One of those pretrial rulings related to whether the expert testimony offered by the Jensens fulfilled the legal requirement that sufficient expert testimony on causation be offered in order for the jury to conclude that the alleged medical malpractice of Dr. Nelson caused harm to the Jensens. When deciding this issue on pretrial motions, this Court viewed the question of whether Dr. Van Scoy-Mosher's proffered testimony was sufficient to fulfill the legal requirement of causation to be a very close call. However, the Court decided to allow the trial to proceed and let the adversarial process play out and then determine, if the proper motions were made during trial, whether Dr. Van Scoy-Mosher's trial testimony fulfilled the applicable legal requirements.

After hearing and studying Dr. Van Scoy-Mosher's testimony at trial, the Court concludes that Dr. Van Scoy-Mosher's trial testimony fails the causation legal standard as a matter of law. Under Nebraska law, if a plaintiff does not provide admissible expert causation evidence at trial, the verdict must not stand. The Court concludes this result is required here. Indeed, the Court could have made this exact ruling prior to trial, but it instead allowed Dr. Van Scoy-Mosher to testify to see if his testimony at trial would be sufficient.

The Court's determination that Dr. Van Scoy-Mosher's trial testimony fails as a matter of law to fulfill the causation requirement and thus the verdict cannot stand allows this Court to stop there and make no further conclusions. However, in the interest of efficiency and completeness, the Court will also make alternative rulings that even if Dr. Van Scoy-Mosher's trial testimony were found on appeal to be sufficient under the legal causation standard, Defendants would be entitled to a new trial anyway. The Court also concludes that under Nebraska law the $12 million

verdict is excessive as a matter of law and that Nebraska law would require further that the $12 million verdict to be reduced to $2.25 million pursuant to the statutory cap on medical malpractice awards.

For the reasons set out below, Defendants' constituent Renewed Rule 50 Motion for Judgment as a Matter of Law or New Trial is granted on the basis of insufficient expert evidence of causation; Defendants' constituent Rule 59 Motion for New Trial is alternatively granted as to attorney misconduct and excessive damages; and Defendants' constituent Motion to Amend Judgment is alternatively granted; but Defendants' Post-Trial Motions are otherwise denied as moot. Defendants' request for oral argument on their Post-Trial Motions is denied. NECivR 7.1(e).[1]

## I. INTRODUCTION

The parties and the Court are familiar with the factual and procedural background to this litigation, much of which is set out in the Court's Memorandum and Order on Defendants' Motion to Exclude Plaintiffs' Experts and Motion for Summary Judgment. Filing 102, *published at Jensen v. Radiologic Ctr., Inc.*, No. 8:24CV129, 2026 WL 184555 (D. Neb. Jan. 23, 2026). Thus, the Court will state here only briefly the factual and procedural context of this litigation. In its legal analysis to follow, the Court may provide some additional essential factual background, but the Court will focus on the issues that the Court concludes are dispositive rather than consider all the issues raised in Defendants' Post-Trial Motions.

[1] This local rules states in part, "In general the court does not allow oral argument or evidentiary hearings on motions." NECivR 7.1(e). The Court finds oral argument on Defendants' Post-Trial Motions will not be of assistance to the Court in light of the sufficiency of the record, the parties' briefing, and the Court's familiarity with the trial and other proceedings in the case.

### A. Factual Background

On October 12, 2021, Ms. Jensen presented to Nebraska Methodist Health Systems, Inc., The Nebraska Methodist Hospital, RCI, and Dr. Nelson "for an MRI Breast w & w/o Contrast Bilateral" (the 2021 MRI). Filing 95 at 1 (¶ 1); Filing 1 at 7 (¶ 39). The documented reason for the 2021 MRI was "invasive breast cancer, stage I/II/III, initial workup." Filing 95 at 1 (¶ 2); Filing 1 at 7 (¶ 40). Dr. Nelson was the diagnostic radiologist who read and interpreted the 2021 MRI. Filing 95 at 1 (¶ 3); Filing 1 at 7 (¶ 42). Dr. Nelson's impression was the following:

> 1. There is a focal mass in the central right breast correlating with the malignancy that was biopsied. No evidence for adenopathy. 2. There are several areas of nonmass enhancement in both breasts suggesting background enhancement. These all have benign washout curves. Consider follow-up breast MRI in 6-12 months.

Filing 95 at 1 (¶ 4); Filing 1 at 7 (¶ 43). Dr. Nelson did not identify or report a distinct signal abnormality representing a mass on the sternum, which is clearly present on the 2021 MRI. Filing 95 at 2 (¶ 5); Filing 1 at 7 (¶ 44).

On or about November 13, 2023, Ms. Jensen had a CT scan performed (the 2023 CT scan) that found a metastatic mass on the sternum. Filing 95 at 2 (¶ 13); Filing 1 at 8 (¶ 55). At that time, her treating medical oncologist, Timothy H. Dorius, M.D., informed her that upon his review of her prior scans, it was clear that Dr. Nelson had failed to identify the sternal mass shown on her 2021 MRI. Filing 95 at 2 (¶ 13); Filing 1 at 8 (¶ 56). The Jensens were also informed that because of Dr. Nelson's failure to identify the sternal mass shown on her 2021 MRI, Ms. Jensen had undergone the "wrong cancer treatments" for the past two years. Filing 95 at 2 (¶ 14); Filing 1 at 9 (¶ 60).

### B. Procedural Background

The Jensens filed their Complaint in this matter on April 12, 2024, asserting claims of medical malpractice, corporate negligence, and loss of consortium. Filing 1. Although other

defendants were initially named in the Complaint, on May 6, 2025, the Court dismissed those other defendants and ordered that this matter would continue only as to RCI and Dr. Nelson. Filing 64 at 2. On January 23, 2026, the Court entered a Memorandum and Order on Dr. Nelson's and RCI's Motion to Exclude Plaintiffs' Experts, Dr. Kligerman and Dr. Van Scoy-Mosher, Request for Oral Argument, and Motion for Summary Judgment. Filing 82. If the experts were excluded, Dr. Nelson and RCI contended that they were entitled to summary judgment because the Jensens could not establish the applicable standard of care or proximate cause to support their claims. Filing 83 at 1. However, the Court denied that Motion in its entirety. Filing 102.

A jury trial in this matter began on March 9, 2026, and concluded on March 12, 2026. Filings 142, 143, 146, and 147 (trial minutes). Defendants moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50(a) at the close of the Jensens' case-in-chief and renewed that motion at the close of Defendants' case-in-chief. The Jensens did not make a Rule 50(a) motion at the end of their case-in-chief, but they did make such a motion at the close of Defendants' case-in-chief. The Court reserved ruling on all three Rule 50(a) motions. Defendants also moved for mistrial based on allegedly improper comments by the Jensens' attorney during the Jensens' cross-examination of one of Defendants' expert witnesses. The Court reserved ruling on that motion as well.

As mentioned above, the jury returned a verdict in favor of the Jensens, awarded Shari Jensen $9,000,000 in damages for medical malpractice, and awarded Jarel Jensen $3,000,000 for loss of consortium. Filing 150. On March 13, 2026, the Court entered a Memorandum and Order on Unresolved Motions During Trial. Filing 155. In that ruling, the Court denied as moot Plaintiffs' Rule 50(a) motion on which the Court had previously reserved ruling; held that Defendants' Rule 50(a) motion, on which the Court had previously reserved ruling, must be timely renewed pursuant

to Federal Rules of Civil Procedure 50(a) and 59(e) to be considered by the Court; and denied Defendants' motion for mistrial. Filing 155 at 6. Judgment on the jury's verdict was also entered on March 13, 2026. Filing 156.

On April 10, 2026, Defendants filed a Motion for Stay of Judgment Pursuant to Fed. R. Civ. P. 62(b), requesting that the Court extend the automatic stay until the resolution of all post-trial motions in this case. Filing 160 at 1. On April 10, 2026, the Court ordered that the automatic stay on enforcement of a judgment under Fed. R. Civ. P. 62(a) was extended pursuant to Fed. R. Civ. P. 62(b) until the resolution of all post-trial trial motions in this case upon the filing of a "bond or other security" in the amount of $10,000. Filing 165 at 1–2 (¶ 1) (citing Fed. R. Civ. P. 62(b)). The Court also referred this case to a magistrate judge for the scheduling of briefing deadlines on any post-trial motions. Filing 165 at 2.

In addition to their Motion for Stay, on April 10, 2026, Defendants also filed the Post-Trial Motions now before the Court. Filing 166. Pursuant to Federal Rule of Civil Procedure 59, Defendants moved for a new trial on several grounds. Filing 166 at 1. Pursuant to Federal Rules of Civil Procedure 59(e) and 60(b), Defendants moved for correction of the judgment by limiting the amount of the judgment to $2,250,000, the statutory limit on damages of set forth in the Nebraska Hospital-Medical Liability Act. Filing 166 at 2. Defendants also renewed their motion for judgment as a matter of law or in lieu thereof for new trial pursuant to Federal Rule of Civil Procedure 50. Filing 166 at 2. The Jensens filed their Opposition to Defendants' Post-Trial Motions on April 24, 2026. Filing 171. Defendants filed a Reply in further support of their Post-Trial Motions on May 1, 2026. Filing 172.

Defendants' Post-Trial Motions are now fully submitted on the parties' written submissions. Defendants' Post-Trial Motions are essentially three constituent motions, which the

Court will call respectively their "Rule 59 Motion for New Trial," their "Renewed Rule 50 Motion," and their "Motion to Amend Judgment." The disposition of one motion or part of a motion may render other motions or parts of motions moot. Nevertheless, the Court will treat the motions separately and in turn. In doing so, the Court will focus on the part or parts of each motion that the Court finds to be dispositive. The Court begins with Defendants' Renewed Rule 50 Motion for judgment as a matter of law or in lieu thereof for new trial.

## II. DEFENDANT'S RENEWED RULE 50 MOTION

### A. Preliminary Matters

In their Post-Trial Motions, Defendants renewed their motion for judgment as a matter of law or "in lieu thereof for new trial" pursuant to Federal Rule of Civil Procedure 50. Filing 166 at 2. Defendants explain that this Renewed Rule 50 Motion "is grounded on the discussion [elsewhere in their brief] regarding application of Federal Rule of Evidence 702 and *Daubert v. Merrill Dow Pharmaceuticals, Inc*." Filing 167 at 33. They add, "When applied, the testimony of Plaintiffs' experts, Dr. Kligerman and Dr. Van Scoy-Mosher, was inadmissible." Filing 167 at 33.

The part of their brief to which Defendants refer here is the briefing of the parts of their Rule 59 Motion for New Trial asserting that the Court erred in its Pretrial *Daubert* Ruling, Filing 102,[2] by admitting expert testimony from the Jensens' standard-of-care expert, Dr. Seth Kligerman, and from the Jensens' causation expert, Dr. Michael Van Scoy-Mosher. Filing 167 at 4–18. The Court will not reach those parts of Defendants' Rule 59 Motion for New Trial below, because the Court concludes that they are mooted by other dispositive issues. However, the Court will consider that briefing now to the extent it is relevant to the Renewed Rule 50 Motion.

[2] Filing 102 was captioned "Memorandum and Order on Defendants' Motion to Exclude Plaintiffs' Experts and Motion for Summary Judgment." The Court will refer to the constituent part of that Memorandum and Order dealing with experts as its "Pretrial *Daubert* Ruling."

In the Pretrial *Daubert* Ruling, the Court concluded that Dr. Kligerman's opinions were admissible "on the pretrial record" and that the proper course to test his opinions was the adversarial process of trial rather than pretrial exclusion by the Court. Filing 102 at 24. The Court also concluded that, pretrial, it had "cause for concern that some of Dr. Van Scoy-Mosher's opinions are 'shaky' and that Dr. Nelson and RCI have grounds to challenge his opinions" but that the appropriate choice again was to test his opinions in the adversarial process of trial. Filing 102 at 36.

The part of Defendants' brief on the Rule 59 Motion for New Trial concerning the Jensens' experts referenced in support of Defendants' Renewed Rule 50 Motion is directed substantially but not exclusively at the Court's Pretrial *Daubert* Ruling. Defendants argue that they are entitled to a new trial because the jury was allowed to hear and consider inadmissible expert testimony from Dr. Kligerman even though he was unqualified to give opinions on the standard of care applicable to Dr. Nelson. Filing 167 at 4. Similarly, Defendants argue that the Court misapplied Federal Rule of Evidence 702 in its pre-trial ruling by treating reliability defects in Dr. Van Scoy-Mosher's causation opinions as going to weight rather than admissibility. Filing 167 at 10.

Much as Defendants might like to relitigate the Court's rulings on their pretrial *Daubert* motions, the Court believes that its pretrial ruling on the admissibility of the experts' opinions is moot. The Court's concerns on Defendants' Renewed Rule 50 Motion are instead what opinions were ultimately offered at trial and what the adversarial process of trial revealed about the sufficiency of those opinions. Defendants concede as much, at least as to Dr. Van Scoy-Mosher. Filing 167 at 17 (stating that Dr. Van Scoy-Mosher's trial testimony made the reiterated arguments that the Court erred in denying the pretrial *Daubert* motion "academic"). Contrary to the Jensens' contentions, the Court's present concerns were not and could not have been ruled on pretrial. *See*

Filing 171 at 6 (arguing that the Court already considered and rejected Defendants' arguments concerning their experts, so they could not be relitigated post-trial). Thus, the Court declines to revisit the merits of its Pretrial *Daubert* Rulings and instead considers what happened at trial.

**B. Applicable Standards**

Federal Rule of Civil Procedure 50(b) provides for the post-trial renewal of a motion for judgment as a matter of law pursuant to 50(a) made before the case was submitted to the jury. Fed. R. Civ. P. 50(b). The district court and the circuit court apply the same standards to a post-trial Rule 50 motion. *EEOC v. Drivers Mgmt., LLC*, 142 F.4th 1122, 1130 (8th Cir. 2025). Thus, on a post-trial Rule 50 motion for new trial, a court views the evidence in the light most favorable to the verdict, draws all reasonable inferences in favor of the verdict, and resolves any conflicts in favor of the verdict. *Woods v. City of St. Louis, Missouri*, 170 F.4th 1164, 1173 (8th Cir. 2026) (citing *Beran v. VSL North Platte Court LLC*, 144 F.4th 1007, 1012 (8th Cir. 2025)). "Judgment as a matter of law is appropriate only when all of the evidence points one way and is susceptible of no reasonable inference sustaining [the plaintiffs'] position." *Selective Ins. Co. of Am. v. Heritage Constr. Companies, LLC*, 165 F.4th 1132, 1137–38 (8th Cir. 2026) (quoting *Children's Broad. Corp. v. Walt Disney Co*., 357 F.3d 860, 863 (8th Cir. 2004)). Even so, "judgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict." *Jeffery v. Townsend*, 165 F.4th 1065, 1072 (8th Cir. 2026) (quoting *Arabian Agric. Servs. Co. v. Chief Indus., Inc.*, 309 F.3d 479, 482 (8th Cir. 2002)). The Court considers a motion for judgment as a matter of law in light of the elements of the claim at issue. *See Scott v. Dyno Nobel, Inc*., 108 F.4th 615, 625 (8th Cir. 2024) (stating that the court would begin its Rule 50 review "with the most difficult element in this case," which was foreseeability and duty of care in a negligence case); *see also Selective Ins. Co. of Am.*, 165 F.4th at 1138 (considering a Rule 50 motion as applied

to the elements of a negligent misrepresentation claim under Minnesota law); *Jeffery*, 165 F.4th at 1071 (considering a Rule 50 motion as applied to the elements of a fraud claim).

The claim at issue here is a state-law medical malpractice claim. The Nebraska Supreme Court has explained,

> To establish a prima facie case of medical malpractice, a plaintiff must show (1) the applicable standard of care, (2) that the defendant(s) deviated from that standard of care, and (3) that this deviation was the proximate cause of the plaintiff's harm. Generally, expert testimony is required to establish each of these elements.

*Slater v. Ichtertz*, 26 N.W.3d 504, 516 (Neb. 2025).

The applicable standard of care in medical malpractice cases is the "locality rule" defined by Nebraska Revised Statute § 44-2810. *Id.*; *Konsul v. Asensio*, 7 N.W.3d 619, 632 (Neb. 2024) (explaining that this statutory standard is referred to as the "locality rule as set forth in *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023)"). The Nebraska Supreme Court explained,

> Neb. Rev. Stat. § 44-2810 (Reissue 2021) defines the general standard of care in medical malpractice cases as "the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used under like circumstances by members of his profession engaged in a similar practice in his or in similar localities" and provides that to determine what constitutes such ordinary and reasonable care, skill, and diligence in a particular case, the test is that "which health care providers, in the same community or in similar communities and engaged in the same or similar lines of work, would ordinarily exercise and devote to the benefit of their patients under like circumstances."

*Slater*, 26 N.W.3d at 516. "[U]nlike ordinary negligence actions, in a medical malpractice case, expert testimony is also vital for determining whether the defendant breached the standard of care." *J.R.M.B. by & through Morgan-Baker v. Alegent Creighton Health Creighton Univ. Med. Ctr., LLC*, 21 N.W.3d 678, 689 (Neb. 2025).

As to the third element of the prima facie case, "[i]n the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of

care caused or contributed to the injury or damage to the plaintiff." *Slater*, 26 N.W.3d at 519 (internal quotation marks and citation omitted).

With these standards in mind, the Court turns to consideration of whether the Jensens' experts offered sufficient opinions at trial to establish the elements of the Jensens' medical malpractice claim, *id.* at 516 (explaining that expert testimony is required to establish the elements of a prima facie case of medical malpractice), or instead only insufficient opinions, so that the trial evidence "points one way and is susceptible of no reasonable inference sustaining [the Jensens'] position." *Selective Ins. Co. of Am.*, 165 F.4th at 1137–38 (quoting *Children's Broad. Corp.*, 357 F.3d at 863). The Court begins that consideration with the sufficiency of Dr. Van Scoy-Mosher's trial testimony because that is the issue the Court concludes is dispositive. The Court will then consider whether Dr. Kligerman's testimony was also so flawed as to require judgment as a matter of law.

### C. Dr. Van Scoy-Mosher's Causation Testimony Was Inadequate

Defendants seek judgment as a matter of law on the ground that Dr. Van Scoy-Mosher's testimony was insufficient to establish the causation element of the Jensens' medical malpractice claim. Filing 167 at 33. The Court declines Defendants' invitation to revisit its Pretrial *Daubert* Ruling on Dr. Van Scoy-Mosher's testimony because as explained above the focus is on the trial testimony that Dr. Van Scoy-Mosher provided rather than testimony that he might provide. The Court concludes that the dispositive issue in Dr. Van Scoy-Mosher's trial testimony is whether his opinions were no more than inadequate "loss-of-chance" opinions.

#### *1. The Parties' Arguments*

In the part of Defendants' briefing specifically relating to Dr. Van Scoy-Mosher's trial testimony, Defendants argue that Dr. Van Scoy-Mosher testified only as to the possibility that

earlier diagnosis or treatment would have resulted in a cure, but he did not testify that a cure was more likely than not to occur with an earlier diagnosis followed by proper treatment. Filing 167 at 18. Thus, Defendants contend that the jury was allowed to value an interest—loss-of-chance of a better prognosis—that Nebraska law does not recognize as compensable. Filing 167 at 18.

The Jensens contend that Dr. Van Scoy-Mosher testified that the appropriate "gold-standard treatment" would more likely than not have prevented the progression of Ms. Jensen's disease and resulted in a substantially better outcome, including significantly longer survival measured in years. Filing 171 at 3, 12. More specifically, they assert that calling Dr. Van Scoy-Mosher's testimony just a "loss-of-chance" opinion mischaracterizes the law and the record. Filing 171 at 16. They assert that Dr. Van Scoy-Mosher testified that earlier identification and treatment would more likely than not have resulted in a materially better outcome. Filing 171 at 16. They contend that he also testified that the lack of such timely diagnosis resulted in a worse prognosis. Filing 171 at 16.

In reply, Defendants argue that the Jensens conveniently leave out Dr. Van Scoy-Mosher's deposition testimony that it was more likely than not that Ms. Jensen was not oligometastatic at the time of alleged misdiagnosis, but he testified at trial that she was oligometastatic at the pertinent time. Filing 172 at 5. Defendants argue that this change led to a "loss-of-chance" opinion to the effect that if Ms. Jensen was oligometastatic, there was a potential for a cure. Filing 172 at 5. The loss-of-chance nature of the testimony, Defendants contend, is clear from Dr. Van Scoy-Mosher's testimony that in very rare cases patients with oligometastatic cancer have been "cured." Filing 172 at 6.

*2. "Probability" vs. "Loss-of-Chance" Standards*

In its Pretrial *Daubert* Ruling, the Court set out in some detail Nebraska cases distinguishing between "loss-of-chance" opinions that did not satisfy causation standards in

medical malpractice cases and "probability" opinions that were sufficient to do so. Filing 102 at 32–34. The Court will not repeat that entire discussion here. Instead, the Court finds the Nebraska Supreme Court's decision in *Rankin v. Stetson*, 749 N.W.2d 460 (Neb. 2008), provides sufficient guidance for present purposes.

In *Rankin*, the Nebraska Supreme Court distinguished between mere loss-of-chance opinions insufficient to establish causation and adequate opinions on causation in a medical malpractice case. The court stated,

> [The expert's] statements that [the plaintiff] would have had a "better prognosis" and a "chance of avoiding permanent neurological injury" do not equate with an opinion that it was more likely than not that [the plaintiff] would have had a better outcome if she had undergone surgery immediately following her injury. Opinions dealing with proximate causation are required to be given in terms that express a probability greater than 50 percent. Thus, [the expert's] statements do not establish the required certainty to prove causation. While a 49–percent chance of a better recovery may be medically significant, it does not meet the legal requirements for proof of causation. The terms "chance" and "prognosis" by definition do not establish the certainty of proof that is required.

*Rankin*, 749 N.W.2d at 469; *see also* *Walton v. Patil*, 783 N.W.2d 438, 447 (Neb. 2010) (rejecting the sufficiency of testimony that a treating physicians' deviation from the standard of care decreased a plaintiff's "chances of a better outcome" because the expert "did not testify that but for the deviations, a better outcome would have been probable," and reiterating the "greater than 50 percent" standard, citing *Rankin*, 749 N.W.2d at 460).

*3. Dr. Van Scoy-Mosher's Trial Testimony Stated Only a "Loss-of-Chance" Opinion Insufficient to Establish Causation*

The Court has looked in vain for trial testimony by Dr. Van Scoy-Mosher that satisfies the causation requirements for a medical malpractice claim. Almost nowhere does Dr. Van Scoy-Mosher testify in terms of probability, more likely than not, or percentages, *see* *Rankin*, 749 N.W.2d at 469, and even when he does, the probability opinion is tainted with speculations, *see*

*Jeffery*, 165 F.4th at 1072 ("[J]udgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict.").

Dr. Van Scoy-Mosher stated that during the two years that Ms. Jensen was on the "wrong" treatment, "it's clear that the cancer grew, spread and grew to a tremendous extent," so her treatment "had no significant delaying effect." Filing 157 at 20:22–24. However, that is merely an observation about what happened, not an opinion about causation; to conclude that a worse condition established causation is simply an invocation of the fallacy *post hoc ergo propter hoc* (after, therefore because of). Dr. Van Scoy-Mosher then testified, "Effective treatment might well have prevented this." Filing 157 at 21:21–22. Apparently recognizing that "might" does not establish the required level of causation, *see Rankin*, 749 N.W.2d at 469, the Jensens' attorney then spoon fed Dr. Van Scoy-Mosher the correct standard by asking, "And is it more likely than not would have prevented it?" to which Dr. Van Scoy-Mosher belatedly answered, "Yes." Filing 157 at 21:23–24. That agreement with counsel may raise an inference but it does not raise a reasonable inference that all—or perhaps any—of Dr. Van Scoy-Mosher's opinions were cast in terms of "more likely than not." *Rankin*, 749 N.W.2d at 469; *see also Woods*, 170 F.4th at 1173 (explaining that on a post-trial Rule 50 motion, the court draws all reasonable inferences in favor of the verdict). That is apparent considering that the basis for this and other opinions is speculation premised on several caveats. *See Jeffery*, 165 F.4th at 1072 ("[J]udgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict.").

Dr. Van Scoy-Mosher's own explanation of the difference between oligometastatic cancer (involving only one or a few metastases) and metastatic cancer demonstrates the fundamental problem with his causation opinions. He testified,

> When [cancer is] metastatic -- once it's metasta- -- not an oligometastis [sic] but general metastis [sic], it's an incurable situation but the potential for controlling it and keeping it under control for a long period of time is better with less disease.

Filing 157 at 22:14–18. Earlier in his testimony Dr. Van Scoy-Mosher offered one of the few opinions he offered in terms of certainty or probably. He stated that the wrong treatment for two years "will allow the cancer to progress and probably become a higher-stage cancer." Filing 157 at 9:6–7. However, there are at least two problems with such testimony as a basis for a causation finding in this case. First, it was not cast in terms of Ms. Jensen's circumstances but general testimony about cancer treatment. Second, Dr. Van Scoy-Mosher immediately imposed a caveat: "[O]nce you get to Stage 4, which means it's spread to bone, there is no higher stage. There's no Stage 5." Filing 157 at 9:8–9. The undisputed evidence was that Ms. Jensen had a metastatic lesion on her sternum at the time of her misdiagnosis. *See* Filing 157 at 15:24–25 (noting that Ms. Jensen's initial scan showed an "obvious metastasis in her sternum. So in retrospect she had a sternal metastasis at that time."); *see also* Filing 157 at 50:11–15 (asserting that he was not changing his opinion about whether Ms. Jensen was oligometastatic but was "agreeing with myself that statistically it was more likely not olig [sic]"). Dr. Van Scoy-Mosher also testified that there was no way to determine whether Ms. Jensen was oligometastatic or metastatic at the time of the initial MRI because the necessary testing to make that determination was not done. *See, e.g.,* Filing 157 at 29:21–30:1). Thus, this opinion about the probability of a higher stage cancer with the wrong treatment means that nothing but speculation suggests that Ms. Jensen's cancer becoming a higher-stage cancer was because of the wrong treatment. *See Jeffery*, 165 F.4th at 1072.

Similarly, in answer to counsel's question about "why was the misdiagnosis harmful to Miss [sic] Jensen," Dr. Van Scoy-Mosher testified,

> Well, starting early on, because that sternal lesion was not found, it took away the opportunity to determine if, in fact, she was an oligometastatic situation which has been known to -- when it's treated appropriately and aggressively, people

> can get very long-term disease-free survival; and in fact, we think many of them are cured, whereas with diffuse metastatic disease, you hope to control the disease but you can't cure it. So it took away the opportunity to find out if she was oligometastatic which would have changed treatment considerably.

Filing 157 at 24:18–25:2. This testimony does not establish causation to the required standard because it is premised on the possibility—not probability—that Ms. Jensen was oligometastatic at the time of the initial MRI. It is then cast only in terms of a possibility of a long period disease-free and a possible cure but only with the caveat that "it's treated appropriately and aggressively." *Rankin*, 749 N.W.2d at 469; *See Jeffery*, 165 F.4th at 1072. Also, when counsel asked whether Dr. Van Scoy-Mosher could look at various factors with respect to Ms. Jensen at the time of the missed diagnosis "and come up with what the reasonably probable scenarios are with respect to her cancer at that time," Dr. Van Scoy-Mosher ultimately answered that "she falls well into a group that one often sees oligometastasis." Filing 157 at 25:24–26:17. Falling "into a group" where one "often" sees a condition falls well short of a probability opinion. *Rankin*, 749 N.W.2d at 469. After Dr. Van Scoy-Mosher reiterated the opinion that Ms. Jensen was "in a group that is where we often see an oligometastasis situation," counsel again spoon fed Dr. Van Scoy-Mosher the required legal standard asking whether "there's a reasonable probability she's in this oligometastatic category" to which he belated answered, "Yes." Filing 157 at 29:21–30:4. Even then, a reasonable probability that Ms. Jensen was oligometastatic does not amount to a probability of a better outcome or a cure, when such a better outcome was contingent on the caveats mentioned above. *Rankin*, 749 N.W.2d at 469; *Jeffery*, 165 F.4th at 1072. It was also in sharp contrast to or contradiction of Dr. Van Scoy-Mosher's assertion that he was "agreeing with myself that statistically [Ms. Jensen's cancer] was more likely not olig [sic]." Filing 157 at 50:11–15.

In fact, Dr. Van Scoy-Mosher subsequently added another caveat to his opinion about how likely Ms. Jensen was to have an improved result besides the caveats that she had been

oligometastatic and was properly treated: Counsel asked, "[I]f she responds well to treatment, would it be more likely than not she lives significantly longer than she otherwise would have?" Dr. Van Scoy-Mosher answered, "Yes." Filing 157 at 31:5–8. The following exchange then occurred:

> Q. And on the tune of five additional years from where she would be today when she was on the wrong treatment, ineffective treatment for two years?
>
> A. That's -- that's about right. It may also -- there is the potential for cure meaning she would live out a normal lifespan.

Filing 157 at 31:9–14. Thus, his opinion about better outcome is conditioned on speculative caveats and a cure is described as only "potential" not "probable," so that it does not meet the required standards. *Rankin*, 749 N.W.2d at 469; *Jeffery*, 165 F.4th at 1072.[3]

Dr. Van Scoy-Mosher's further testimony on this point bears out this conclusion. His answer of "yes" to the question whether Ms. Jensen's life expectancy was reduced is conditioned on the same speculative caveats already pointed out and is not cast in terms of any measure of probability. Filing 157 at 38:25–39:4 (opining that the misdiagnosis harmed Ms. Jensens and shortened her life expectancy). In response to a question of whether the misdiagnosis deprived her of a cure, Dr. Van Scoy-Mosher expressly asserted the caveat "[w]ith a good response, yes," then tempered his opinion further by stating, "That's a potentially curable situation." Filing 157 at 39:5–9. Again, "potential" for a cure does not meet the required "probability" standard. *Rankin*, 749 N.W.2d at 469. Dr. Van Scoy-Mosher testified that the misdiagnosis "allowed for" spread of the cancer through Ms. Jensen's skeleton and he answered that she would not have suffered excessive

[3] In a part of his testimony that the Jensens did not cite in opposition to Defendants Post-Trial Motions, Dr. Van Scoy-Mosher declined to state "a hundred percent" certainty that Ms. Jensen would have done better on the correct treatment although he stated it was "[m]ore likely than not." Filing 32:18–33:5. This opinion still falls short of the required standard even if cast in the correct terms of probability because it was conditioned on the same speculative caveats about aggressive and appropriate treatment and responding well to that treatment if Ms. Jensen was indeed oligometastatic.

spread of her cancer subject to counsel's speculative caveat, "Had she got on the good treatment." Filing 157 at 39:22–24. He could only "assume" that the misdiagnosis caused mental and emotional suffering. Filing 157 at 40:6–9.

Finally, on cross-examination, Dr. Van Scoy-Mosher could only testify that "I think ultimately she will have a shorter survival than had she been started early on—on ribociclib," and that he "would guest—not guess. I believe that before she had diffuse bone metastases, she would have been able to tolerate the ribociclib." Filing 157 at 58:5–10. What Dr. Van Scoy-Mosher "thinks" or even "believes" might happen falls well short of testimony of a probability of a better result and amounts to no more than speculation. *Rankin*, 749 N.W.2d at 469; *Jeffery*, 165 F.4th at 1072.[4]

For these reasons, Dr. Van Scoy-Mosher's testimony does not provide expert support for the "causation" element of the Jensens' medical malpractice claim. *Slater*, 26 N.W.3d at 519 ("In the medical malpractice context, the element of proximate causation requires proof that the physician's deviation from the standard of care caused or contributed to the injury or damage to the plaintiff." (internal quotation marks and citation omitted)). Because the Jensens cannot establish the causation element, Defendants are entitled to judgment as a matter of law. *Selective Ins. Co. of Am.*, 165 F.4th at 1137–38 (explaining that to obtain judgment as a matter of law, the

[4] In *Richardson v. Children's Hospital*, 787 N.W.2d 235 (Neb. 2010), a case the Court cited in its Pretrial *Daubert* Ruling on the "loss of chance" doctrine, the Nebraska Supreme Court distinguished *Rankin* on the basis that the language in *Rankin* had been "a better prognosis" or "a chance," but in *Richardson*, the expert "stated that he believed that with hydration, [the infant] could have recovered." 787 N.W.2d at 406. In *Richardson*, the Nebraska Supreme Court concluded "these opinions were given with a sufficient degree of medical certainty and were sufficient to establish causation for purposes of [the plaintiff's] case in chief." *Id.* This Court now believes that the decision in *Richardson* cannot be squared with the prior decision in *Rankin* requiring testimony that a better result was "more likely than not." Nevertheless, the Court concludes that Dr. Van Scoy-Mosher's opinions fail not only because they fail to state a probability rather than a bald possibility opinion but in the speculative basis for Dr. Van Scoy-Mosher's opinions which were premised on circumstances that may or may not have occurred. *See Jeffery*, 165 F.4th at 1072 ("[J]udgment as a matter of law is appropriate when the record contains no proof beyond speculation to support a verdict.").

evidence must "point one way and is susceptible of no reasonable inference sustaining [the Jensens'] position" considered in light of the elements of the claim (quoting *Children's Broad. Corp.*, 357 F.3d at 863)).

### D. Dr. Kligerman's Standard-of-Care Testimony at Trial Was Not Inadequate

The Court deems it appropriate to consider Dr. Kligerman's trial testimony as well as Dr. Van Scoy-Mosher's trial, even though the Court reaches a different conclusion on the sufficiency of Dr. Kligerman's testimony. The Court does so because of the attention both Defendants and the Jensens have paid to the sufficiency of both experts' testimony in their pre- and post-trial briefing.

*1. The Parties' Arguments*

As pertinent at this post-trial stage, Defendants contend that Dr. Kligerman was allowed to testify to a standard of care that did not comport with the "locality rule" stated in Nebraska Revised Statute § 44-2810. Filing 167 at 5. Defendants assert that instead Dr. Kligerman's testimony allowed the jury to misapply the standard of care, because his testimony strayed from the ordinary and reasonable care, skill, and knowledge ordinarily possessed and used by a diagnostic radiologist like Dr. Nelson in this locality when reading and interpreting breast MRIs in patients with known breast cancer. Filing 167 at 10.

As pertinent at the post-trial stage, the Jensens argue that there was no genuine dispute regarding the applicable standard of care in this case. Filing 171 at 8. Indeed, the Jensens argue that Defendants stipulated to the standard of care, and the Jensens contend that Dr. Kligerman's opinions that the standard was breached were squarely grounded in that standard of care. Filing 171 at 8–9. They argue that Dr. Kligerman directly applied the undisputed standard of care to the facts of the case when he testified that a clear abnormality was present in the sternum and that Defendants failed to identify and report it although it was their duty to do so. Filing 171 at 9. The

Jensens contend that the jury was entitled to and did weigh Dr. Kligerman's standard-of-care testimony. Filing 171 at 9.

2. *The Applicable "Locality Rule"*

In its Pretrial *Daubert* Ruling, the Court explained the Nebraska "locality rule" in detail. Filing 102 at 19–21. Although the circumstances for evaluating Dr. Kligerman's opinions against the "locality rule" have changed from a pretrial record to his trial testimony, that does not change the formulation or requirements of the "locality rule." Thus, the Court reiterates here the most instructive part of its prior explanation of the applicable "locality rule."

> In *Konsul*, the Nebraska Supreme Court explained the "locality rule" in detail as follows:
>
>> In *Carson v. Steinke*, 314 Neb. 140, 989 N.W.2d 401 (2023), we held that the burden is on the proponent of standard-of-care testimony to demonstrate that the expert is familiar with the customary practice among physicians in the defendant's community or a community that is similar in terms of available resources, facilities, personnel, practices, and other medically relevant factors. If a party cannot demonstrate his or her expert's familiarity with such standard of care, then the expert's testimony is properly excluded. *Id.* In *Carson v. Steinke*, we declined an invitation to interpret § 44-2810 to allow an expert unfamiliar with the defendant's community or a similar community to testify to a national standard of care. We recognized that medical standards of care and skill are becoming national rather than local or regional, but we concluded that we could not eliminate the locality rule explicitly required by the statute that defined the standard of care and set forth public policy as declared by the Legislature.
>>
>> We further stated in *Carson v. Steinke* that expert testimony establishing a national standard of care is admissible if the expert can establish that the national standard of care does not differ in the defendant's community or a similar community. We stated that testimony regarding a national standard of care must be coupled with the expert's explanation of why the national standard applies under the circumstances.
>
> *Konsul*, 7 N.W.3d at 632–33. The Nebraska Supreme Court observed further,
>
>> Expert testimony concerning the standard of care in a medical malpractice case should not be received if it appears the witness is not in possession of such facts as will enable him or her to express a reasonably accurate conclusion as distinguished from a mere guess or conjecture. *Carson v. Steinke, supra*. Where an expert's opinion is mere speculation or conjecture, it is irrelevant and cannot assist the trier of fact. *Id.*

*Konsul*, 7 N.W.3d at 632.

3. *Dr. Kligerman's Trial Testimony Satisfied the "Locality Rule"*

The Court declines Defendants' invitation to revisit its decision in the Pretrial *Daubert* Ruling that Dr. Kligerman was qualified to give a standard-of-care opinion even though he does not read breast MRIs and instead specializes in reading cardiac and chest MRIs. The Court found pretrial that Dr. Kligerman is clearly qualified to assist the finder of fact and would be useful to the finder of fact in determining whether the sternal mass was present and should have been reported. Filing 102 at 17–18. If anything, Dr. Kligerman's trial testimony reinforced his qualification to state his opinions where he demonstrated that Dr. Nelson's conduct violated the "core competencies" of any radiologist reading an MRI for any purpose. In the pertinent part of the Court's Pretrial *Daubert* Ruling, the Court also concluded that Dr. Kligerman's opinions about the standard of care and its breach would satisfy the "similarity" of communities required by the "locality rule" based on "medically relevant factors." Filing 102 at 21 (citing *Konsul*, 7 N.W.3d at 633). Whether or not the Court's pretrial ruling was correct, the question now is whether Dr. Kligerman's trial testimony demonstrated that he was applying the standard of care dictated by the "locality rule." The Court concludes that his trial testimony did apply that standard.

The parties did not request a transcript of Dr. Kligerman's trial testimony. Nevertheless, the Court heard the testimony described below from Dr. Kligerman during the trial. Dr. Kligerman's trial testimony included that he had been invited to give "grand rounds" and lecture at the University of Nebraska Medical Center in Omaha within the last few years. He also testified that from visiting Omaha, he knew that the city has excellent medical facilities and that it is not a small town in the middle of nowhere but a major metropolitan area. He also testified that the imaging he reviewed for the case was top quality. Thus, he opined that the standard of care here involving specifically radiologists with similar training and a similar situation would require those

radiologists to make the same diagnosis. Indeed, he opined that the standard of care was the same in this area as you would find anywhere else in the nation, such as in Denver where he worked. Dr. Kligerman also expressly adopted the stipulated definition of the standard of care as the standard that he would use in this case. Thus, his testimony was sufficient to show that the national standard would apply under the circumstances, based on characteristics that are relevant to the level of medical care that is to be expected. *Konsul*, 7 N.W.3d at 633.

Thus, the Court concludes that Defendants are not entitled to judgment as a matter of law on the basis that the Jensens lacked the required expert testimony on the standard of care and its breach. *See J.R.M.B.*, 21 N.W.3d at 689 (explaining that a medical malpractice case require expert testimony to support both the standard of care and its breach); *see also Selective Ins. Co. of Am.*, 165 F.4th at 1137–38 (explaining that to obtain judgment as a matter of law, the evidence must "point one way and is susceptible of no reasonable inference sustaining [the Jensens'] position." (quoting *Children's Broad. Corp.*, 357 F.3d at 863)).

**E. The Alternative Motion for New Trial**

Defendants' Renewed Rule 50 Motion includes a request for a new trial "in lieu" of judgment as a matter of law. Filing 166 at 2. Federal Rule of Civil Procedure 50 provides that if a Rule 50 motion for judgment as a matter of law is filed, the renewed motion "may include an alternative or joint request for a new trial under Rule 59." Fed. R. Civ. P. 50(b). The rule provides further that in ruling on the renewed motion, "the court may: (1) allow judgment on the verdict, if the jury returned a verdict; (2) order a new trial; or (3) direct the entry of judgment as a matter of law." *Id.*

In the alternative to directing entry of judgment as a matter of law for Defendants because Dr. Van Scoy-Mosher's trial testimony was insufficient to establish the "causation" element of the Jensens' claim, the Court will order a new trial on the ground that the jury's finding of causation

and the jury's damages award are against the weight of the evidence. *See K7 Design Grp., Inc. v. Walmart, Inc.*, 143 F.4th 931, 939 (8th Cir. 2025) (explaining that the district court can grant an alternative motion for new trial *inter alia* for "a verdict against the weight of the evidence"). Even if Dr. Van Scoy-Mosher's trial testimony on causation somehow satisfied minimum requirements, Defendants offered expert testimony at trial that contradicted Dr. Van Scoy-Mosher testimony about the probability of a better outcome or a cure for breast cancer patients generally or for Ms. Jensen specifically. That contrary expert testimony was demonstrably less speculative, because it was better-informed by clinical studies and the scientific literature. The jury's exceptionally large damages award demonstrates that it was inflated by Dr. Van Scoy-Mosher's weak opinions suggesting the possibility of a better outcome or a cure, so that the award was against the weight of the evidence.

### F. Summary

Based on the discussion above, the Court concludes that Defendants' Renewed Rule 50 for Judgment as a Matter of Law is denied as to the insufficiency of Dr. Kligerman's testimony on the standard of care. However, the Motion is granted as to the insufficiency of Dr. Van Scoy-Mosher's testimony on causation. In the alternative, the Court grants Defendants' alternative motion for new trial in their Renewed Rule 50 Motion on the ground that the jury's verdict is against the weight of the evidence and the damages are excessive in light of the deficiency of Dr. Van Scoy-Mosher's causation opinions in the face of other evidence.

## III. DEFENDANTS' RULE 59 MOTION FOR NEW TRIAL

### A. The Motion and the Applicable Standards

Defendants also seek a new trial pursuant to Federal Rule of Civil Procedure 59, as well judgment as a matter of law pursuant to Rule 50, on several grounds. The grounds are the following (a) that the Court erred by admitting expert testimony from the Jensens' standard-of-care expert,

Dr. Seth Kligerman; (b) that the Court erred by admitting expert testimony from the Jensens' causation expert, Dr. Van Scoy-Mosher; (c) that the Court failed to give Defendants' requested instruction based on *Denesia v. St. Elizabeth Cmty. Health Ctr.*, 454 N.W.2d 294 (Neb. 1990); (d) that the Jensens' attorney engaged in misconduct during closing arguments; and (e) that the damages awarded are excessive.

The Eighth Circuit has explained that it "review[s] the denial of a motion for new trial for abuse of discretion, bearing in mind that such motions are generally disfavored and will be granted only where a serious miscarriage of justice may have occurred." *Selective Ins. Co. of Am. v. Heritage Constr. Companies, LLC*, 165 F.4th 1132, 1139 (8th Cir. 2026) (quoting *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 984 (8th Cir. 2019)); *Acad. Bank, N.A. v. AmGuard Ins. Co.*, 116 F.4th 768, 776 (8th Cir. 2024), *reh'g denied*, No. 23-1375, 2024 WL 4499662 (8th Cir. Oct. 16, 2024). A "miscarriage of justice" requires a prejudicial error. *Id*. (citing *Russell v. Whirlpool Corp.*, 702 F.3d 450, 460 (8th Cir. 2012)). "A series of errors can require a new trial if their cumulative effect impacted a party's 'substantial rights' or 'affected the judgment.'" *Id.* at 1143 (quoting *Krekelberg v. City of Minneapolis*, 991 F.3d 949, 959–60 (8th Cir. 2021)).

Applying these standards, the Court concludes that only two of Defendants' grounds for a new trial present a serious miscarriage of justice warranting a new trial. *Id.* at 1139. The first is Defendants' assertion that the Jensens' attorney engaged in misconduct during closing arguments. Filing 166 at 1. The second is Defendants' assertion that the damages awarded by the jury are excessive. Filing 166 at 1. The other grounds—that the Court improperly denied Defendants' motions to exclude the Jensens' experts, so the experts were improperly allowed to testify at trial, and that the Court erred in rejecting a requested instruction, Filing 166 at 1—either do not meet

the miscarriage of justice standard for a new trial or are mooted by the Court's disposition of the two grounds on which the Court will focus and the Court's disposition of the Renewed Rule 50 Motion above. Thus, the Court will consider in turn the two grounds that it finds are dispositive of Defendants' Motion for New Trial.

### B. Attorney Misconduct

Defendants' attorney misconduct ground for a new trial has two prongs: First, that the Jensens' attorney used an improper "golden rule" argument in closing argument and, second, that the Jensens' attorney made improper comments on credibility, the merits, and counsel's medical training. Filing 167 at 21. The Court will consider these prongs in turn.

#### *1. The Improper "Golden Rule" Argument*

##### a. The Parties' Arguments

Defendants argue that the Jensens' attorney's closing argument using a "Two Doors" analogy was an impermissible "golden rule" argument that invited the jurors to consider whether they—rather than a reasonable person—would be as willing to walk through the door to a damages award if they had suffered the malpractice injuries at issue as they would be to walk through the door to proper cancer treatment because the results would be "equal." Filing 167 at 21. Defendants contend that this argument was improper because it asked the jurors to place themselves in the position of a party. Filing 167 at 22. They contend further that this argument was prejudicial because it was the "centerpiece" of the Jensens' closing argument; the Court gave no specific curative instruction; the size of the jury's damages award suggests the prejudicial effect of the improper argument; and this improper argument tipped the scales in a close case. Filing 167 at 22–24.

The Jensens argue that the "Two Doors" argument was a permissible framework for explaining damages, not an improper "golden rule" argument. Filing 171 at 21. They assert that

the "Two Doors" analogy was stated in an objective, reasonable-person framework consistent with the Court's instructions, rather than an invitation to award damages based on personal interest, bias, or emotions. Filing 171 at 21–22. They contend that when read in full, the argument repeatedly referenced the law, the Court's instruction, the proper burden of proof, the jury's duty to act without passion or prejudice, and tied the conclusion to fair compensation for the injuries the Jensens suffered. Filing 171 at 22. The Jensens argue that no curative instruction was required because the argument was not improper; there was no contemporaneous objection; the focus of the argument was on the record evidence; and the jury's damages award properly reflected the evidence. Filing 171 at 212–24.

In reply, Defendants point out that the Jensens' rebuttal closing argument repeatedly asked the jurors to imagine themselves suffering the same harm as the Jensens. Filing 172 at 7. Indeed, they argue that the Jensens' rebuttal closing argument specifically asked the jury for a verdict based on whether the jurors would be comfortable going through either door, so that the argument asked the jury to stand in the place of Ms. Jensen. Filing 172 at 7.

b. Applicable Standards

The Eighth Circuit Court of Appeals has recognized that "when a lawyer departs from the path of legitimate argument, [s]he does so at [her] own peril and that of [her] client." *Gilster v. Primebank*, 747 F.3d 1007, 1013 (8th Cir. 2014) (alterations in the original) (quoting *Chicago & N.W. Ry. v. Kelly*, 84 F.2d 569, 573 (8th Cir. 1936)). However, "when a new trial motion is based on improper [opening statements or] closing arguments, a new trial should be granted only if the statements are plainly unwarranted and clearly injurious and cause prejudice to the opposing party and unfairly influence a jury's verdict." *Selective Ins. Co. of Am.*, 165 F.4th at 1141 (alteration in the original) (quoting *Harrison v. Purdy Bros. Trucking Co.*, 312 F.3d 346, 351 (8th Cir. 2002)). When a party fails to make a contemporaneous objection to improper arguments—as was the case

here—the question is whether the error was plain, that is, whether it was so prejudicial as to cause a miscarriage of justice. *See Smith v. Tenet Healthsystem SL, Inc.*, 436 F.3d 879, 884 (8th Cir. 2006) (failure to object to voir dire questions) (citing *Ratliff v. Schiber Truck Co., Inc.*, 150 F.3d 949, 956 (8th Cir. 1998)). That standard requires a court to find, "at a minimum, an error that affected a party's substantial rights and seriously affected the fairness and integrity of the trial." *Mahaska Bottling Co., Inc. v. Bottling Grp., LLC*, 6 F.4th 828, 831 (8th Cir. 2021).

The Eighth Circuit has listed several factors that a court should consider in determining whether improper arguments warrant a new trial:

> First, we consider whether the actions were "minor aberrations made in passing." *[Ventura v.] Kyle*, 825 F.3d [876,] 885 [(8th Cir. 2016)] (internal quotation marks omitted). Next, we examine whether "the district court took specific curative action." *Id.* (internal quotation marks omitted). Third, we look at whether "the size of the damage award ... suggest[s] that counsel's comments had a prejudicial effect." *Id.* (alterations in original) (internal quotation marks omitted). And, finally, we examine the overall trial record—the "weight of the evidence"—to determine "whether the improper argument deprived a party of a fair trial." *Id.* (internal quotation marks omitted).

*Dean v. Searcey*, 893 F.3d 504, 520 (8th Cir. 2018); *see also Nicholson v. Biomet, Inc.*, 46 F.4th 757, 767 (8th Cir. 2022) ("To determine whether the [improper arguments] prejudicially influenced the outcome of the case, [courts] look to the jury's verdict." (quoting *Coterel v. Dorel Juv. Grp., Inc.*, 827 F.3d 804, 808 (8th Cir. 2016))). In addition to whether a court itself took curative action, a court may consider whether opposing counsel had an opportunity to respond to the improper closing argument and remedy the potential prejudice that improper argument might cause. *Mahaska Bottling Co.*, 6 F.4th at 832 (citing *Keller Farms, Inc. v. McGarity Flying Serv., LLC*, 944 F.3d 975, 985 (8th Cir. 2019)).

Even if counsel's statements were "inflammatory" or "problematic," they do not necessarily warrant a new trial. *Selective Ins. Co. of Am.*, 165 F.4th at 1141. That is because "[s]tatements that merely restate facts elicited at trial from properly admitted evidence are neither

prejudicial nor injurious." *Id.* at 1142. Also, to the extent the statements were prejudicial, the district court may have sufficiently remedied any prejudice by instructing the jury, before opening statements, after closing arguments, or both, that counsel's remarks are not evidence. *Id.*

Here, Defendants argue that the Jensens' closing argument was improper because it included a "golden rule" argument. The Nebraska Supreme Court has explained,

> "A 'golden rule' argument tells the jur[ors] 'to place themselves in the plaintiff's shoes and award the amount they would "charge" to undergo equivalent disability, pain and suffering.'" Such an argument is improper because it asks the jurors to place themselves or their loved ones in the plaintiff's position, effectively urging them to become advocates for the plaintiff. Although an invitation to jurors to put themselves in the place of a party is improper argument, it is not a ground for a reversal unless the jurors were prejudicially affected by the remark. Golden Rule cases typically involve remarks made during closing arguments.

*Anderson v. Babbe*, 933 N.W.2d 813, 821 (Neb. 2019) (citations omitted). The Eighth Circuit's formulation is essentially the same:

> A Golden Rule argument asks the jury to place itself in the [party's] position. *See Spray–Rite Serv. Corp. v. Monsanto Co.*, 684 F.2d 1226, 1246 (7th Cir.1982), *aff'd*, 465 U.S. 752, 104 S.Ct. 1464, 79 L.Ed.2d 775 (1984). Such an argument is universally condemned because it encourages the jury to "depart from neutrality and to decide the case on the basis of personal interest and bias rather than on the evidence." *Id.*; *Dole v. USA Waste Servs. Inc.*, 100 F.3d 1384, 1388 (8th Cir.1996).

*Lovett ex rel. Lovett v. Union Pac. R. Co.*, 201 F.3d 1074, 1083 (8th Cir. 2000). The Eighth Circuit has also observed that even though a golden rule argument is improper, the opposing party must still demonstrate that it was prejudiced. *Id.*

c. The Initial "Two Doors" Argument Was Not a Prejudicial "Golden Rule" Argument

Near the end of his initial closing argument, the Jensens' attorney addressed "fair compensation" for the Jensens' injuries with the following analogy:

> I submit to you this is the way to think about it. Imagine two doors. Behind door number one the diagnosis is made, the MRI was read correctly, Shari's treated appropriately. Everything happens the way it shoulda happened. There's no harm.

> No harm. But you go through that door, there's also no money from the jury. Door number one is no harm. That's put in one scale.
>
> Well, how -- how do we balance it? Well, the law tells you you put in the other scale money 'cause that's all there is.
>
> So behind the second door is your job. Behind the second door, the scan gets missed for whatever reason. It's missed. Shari goes through everything she's gone through: Misdiagnosis, wrong treatment two years, loss of a chance of a cure, loss of the best medicine at the brightest time. She's not moving and living in Arizona. She trusts her doctors. That's behind door number two. All the harm and your verdict restoring her to where she should be. . . .
>
> [I]f you make the right jury verdict, then those two doors are equal. A reasonable person looks at those two doors and it doesn't matter which one he goes through 'cause they're equal. They've been balanced.

Filing 159 at 10:17–11:16. Thus far, counsel's "Two Doors" argument was unobjectionable because it was cast in terms of a "reasonable person" and what "he" (*i.e.*, that reasonable person) would do under the circumstances, and it did not "tell[ ] the jur[ors] 'to place themselves in the plaintiff's shoes and award the amount they would "charge" to undergo equivalent disability, pain and suffering.'" *Anderson*, 933 N.W.2d 821 (citation omitted); *Lovett*, 201 F.3d at 1083.

However, counsel's further explanation is more problematic:

> So how much amount of money would make those two doors equal? That means a reasonable person standing in front of those -- those doors would look at those two doors and honestly be able to say I can walk through either 'cause they're equal. It's uncomfortable maybe for some people 'cause it's a lot of money but the law is clear. That's the question that needs to be answered: Are the doors equal? If they are, you could walk through either. They're balanced.

Filing 159 at 12:2–9. This statement also starts off by referring to "a reasonable person" and whether that reasonable person would be able to say, "I can walk through either [door]." *Anderson*, 933 N.W.2d 821 (citation omitted); *Lovett*, 201 F.3d at 1083. However, it begins to trespass into the zone of an improper "golden rule" argument by observing, "It's uncomfortable maybe for some people 'cause it's a lot of money," which invites a personal reaction to the circumstances rather than the determination of a reasonable person. It then goes too far by placing the jurors in the

position of the injured party: "Are the doors equal? If they are, you could walk through either. They're balanced." Filing 159 at 12:8–9.

Yet even "inflammatory" or "problematic" statements do not necessarily warrant a new trial. *Selective Ins. Co. of Am.*, 165 F.4th at 1141. The Court concludes that this passing reference to a juror's personal decision in the circumstances is not so prejudicial that it affected Defendants' substantial rights and seriously affected the fairness and integrity of the trial. *Mahaska Bottling Co., Inc.*, 6 F.4th at 831; *see also Dean*, 893 F.3d at 520 (identifying a factor as whether the actions were minor aberrations made in passing). Defendants also had the opportunity to respond to this argument in their own closing argument which could have remedied or mitigated any prejudice if the Jensens' initial use of the "Two Doors" analogy was improper. *See Mahaska Bottling Co.*, 6 F.4th at 832.

In short, were that the end of the references to the "Two Doors" in the Jensens' closing argument, a new trial would not be warranted on the basis of an improper "golden rule" argument.

d. The "Two Doors" Rebuttal Closing Argument Was a Prejudicial "Golden Rule" Argument Warranting a New Trial

That was not the end, however. The Jensens' attorney returned to the "Two Doors" analogy near the end of the Jensens' rebuttal closing argument, as follows:

> And when you leave, the verdict will tell us how you value what happened here. What is the value of the harm? And if you're all comfortable saying -- if you're all comfortable with the numbers -- I apologize. The slide's screwed up.
>
> Well, if you're able to ask yourselves would I be able to walk through both doors equally comfortable? If you're able to walk -- if you can honestly answer that question I'd be happy with either 'cause they're the same, then your verdict is just. If you can't do that, your verdict is not just. It's a discount, it's a Walmart super sale verdict.
>
> The Jensens are not here for a Walmart discounted verdict. We're not asking for -- I mean, you do see verdicts in the country for a hundred million here or two hun- -- we're not asking for that but we're asking for fair justice. There's eight of

> you. You'll be able to figure it out amongst yourselves but it's literally millions of dollars. Millions of dollars.

Filing 159 at 14:12–15:3. Counsel then addressed Jarel Jensen's claim specifically, as follows:

> That's Shari's claim for sure but Jarel's claim too. Shari's obviously the -- the lead plaintiff here, obviously. But Jarel's claim is equally impactful, and if you're comfortable at the end saying they're -- the -- you -- you made the doors equal, you've made the scales of justice equal, we will accept your verdict; and I thank you for your time.

Filing 159 at 15:4–9.

These rebuttal arguments are unquestionably improper "golden rule" arguments. From start to finish, they tell the jurors to place themselves in the plaintiff's shoes and award the amount the jurors would charge to undergo equivalent disability, pain, and suffering. *Anderson*, 933 N.W.2d at 821; *see also* *Lovett*, 201 F.3d at 1083. These arguments ask how "you," meaning the jurors, "value what happened here," and ask if the jurors are "comfortable with the [damages] numbers." These arguments expressly ask the jurors to ask themselves, "[W]ould I be able to walk through both doors equally comfortable," then asserts that if the jurors would be "happy with either," then the verdict is "just." As to Jarel Jensen, counsel again asked jurors to decide "if you're comfortable at the end." Thus, these arguments encouraged the jurors to depart from neutrality and to decide the case based on personal interest and bias rather than based on evidence. *Lovett*, 201 F.3d at 1083.

However, it is not enough for the Court to conclude that the rebuttal "Two Doors" argument was an improper "golden rule" argument; to warrant a new trial, the improper argument must also prejudicially affect the jurors. *Anderson*, 933 N.W.2d at 813; *Selective Ins. Co. of Am.*, 165 F.4th at 1141; *Smith*, 436 F.3d at 884; *Lovett*, 201 F.3d at 1083. Indeed, it must be sufficiently prejudicial to cause a miscarriage of justice. *Smith*, 436 F.3d at 884. That standard requires "at a minimum, an error that affected [Defendants'] substantial rights and seriously affected the fairness and

integrity of the trial." *Mahaska*, 6 F.4th at 831. The Court concludes that the improper "Two Doors" rebuttal closing argument had such a prejudicial effect in this case.

First, the "Two Doors" argument in rebuttal did not merely restate facts elicited at trial. *Selective Ins. Co. of Am.*, 165 F.4th at 1141 (explaining that such an argument is not sufficiently prejudicial or injurious). Indeed, the improper rebuttal argument mentions no facts elicited at trial. Filing 159 at 14:12–15:9. Second, while the problematic statements at the end of the Jensens' initial closing argument were no more than "minor aberrations made in passing," *see Dean*, 893 F.3d at 520 (quoting *Kyle*, 825 F.3d at 885), the problematic statements permeated the entire rebuttal closing argument on damages—and Defendants are correct that the "Two Doors" argument was the "centerpiece" of the Jensens' damages argument. Third, there was no curative action by the Court at the time where the prejudicial statements came at the very end of rebuttal and opposing counsel did not object. *Id.* (identifying whether the court took curative action as a factor). In these circumstances, the Court's general instruction not to award damages on the basis of speculation, guess, or conjecture, and not to award any damages by way of punishment or through sympathy, Jury Instruction No. 14, was insufficient to cure the potential prejudice. *See Selective Ins. Co. of Am.*, 165 F.4th at 1142 (considering whether such general instructions may have cured the potential prejudice). The timing of the improper argument also precluded opposing counsel from having any opportunity to respond. *Mahaska*, 6 F.4th at 832.

Perhaps most importantly, the jury's verdict demonstrates the prejudicial influence of the improper argument, *Nicholson*, 46 F.4th at 767; *Dean*, 893 F.3d at 520 (identifying the size of the damage award as a factor that may suggest a prejudice effect), particularly here when combined with consideration of the weight of the evidence. *Dean*, 893 F.3d at 520. The amount of the damages awarded was out of all proportion to a reasonable assessment of the Jensens' non-

economic damages,[5] suggesting bias, speculation, and emotional reaction as well as the intent to punish defendants in a state that prohibits punitive damages. Although the Court does not doubt that the Jensens suffered real emotional distress, there was no evidence—such as treatment records or expert testimony—of emotional distress so extreme as to warrant such an extreme damages award.

Under these circumstances, Defendants are entitled to a new trial because of an improper "golden rule" argument in the Jensens' rebuttal closing argument.

#### 2. *The Improper Comments on Credibility, the Merits, and Counsel's Medical Training*

##### a. The Parties' Arguments

The second prong of Defendants' attorney misconduct ground for a new trial is that during closing argument, the Jensens' attorney improperly stated a personal opinion as to the justness of the Jensens' cause, the credibility of witnesses, and his medical training. Filing 167 at 25. Although Defendants concede that these comments could be considered just minor aberrations, one of them was made during rebuttal closing argument when it would have the greatest emotional impact on the jury and Defendants' counsel would have no opportunity to respond. Filing 167 at 26. Defendants point out that no curative instruction was given, although they argue that the effect of the statements would not have been mitigated even if they had objected and a curative instruction had been given. Filing 167 at 26–27. Defendants argue that the prejudicial effect is apparent from the size of the jury's verdict and that prejudicial effect was enhanced by counsel's reference to his

[5] The Jensens sought no economic damages and did not present admissible evidence supporting most if not all of the economic damages that might be available. At one point in the trial, the Jensens sought to enter into evidence hundreds and hundreds of pages of medical records without sufficient foundation. Indeed, they tried to admit medical records into evidence without a witness on the stand to testify about the documents. The Court of course rejected the Jensens' efforts to admit piles of medical records without foundation or even a witness. Given the clearly deficient manner in which the attorneys for the Jensens sought admission of medical records, it appears likely to the Court that the Jensens strategically decided not to make a concerted effort to admit the medical records.

medical training despite a motion in limine ruling barring such references. Filing 167 at 27. Defendants argue that the closeness of the case and the cumulative effect of the improper arguments warrant a new trial. Filing 167 at 27.

The Jensens argue that Defendants are trying to reframe permissible trial advocacy as improper argument. Filing 171 at 25. They contend that Defendants' attorney misconduct argument was waived by Defendants' failure to object to any of the comments Defendants now rely on. Filing 171 at 25. More importantly, the Jensens contend that the challenged comments constitute permissible commentary on the evidence and witness credibility, not expressions of personal knowledge or opinions of counsel. Filing 171 at 25. The Jensens contend that a reference to counsel being "shocked" or "appalled" when first presented with the case is no more than a brief rhetorical comment on the seriousness of the allegations. Filing 171 at 26. They assert further that their counsel's comments on credibility were properly grounded in the evidence presented at trial and none suggested counsel's personal knowledge of matters outside the record. Filing 171 at 26. Finally, because the Jensens contend that none of the arguments about individual comments have merit, the Jensens argue that those statements cannot be aggregated to reach the extraordinary circumstances required for a new trial. Filing 171 at 27.

In reply, Defendants assert that the Jensens' attorney did not merely argue that statements were not credible because they were inconsistent or contradicted by the record but that their attorney commented on his personal beliefs about credibility unconnected to any evidence of inconsistencies or contradictory evidence. Filing 172 at 8.

b. Plaintiff's Counsel's Comments Were Improper

Nebraska Rule of Professional Conduct § 3-503.4(e) states in pertinent part, "A lawyer shall not . . . assert personal knowledge of facts in issue except when testifying as a witness, or

state a personal opinion as to the justness of a cause, [or] the credibility of a witness. . . ." In a criminal case, the Nebraska Supreme Court explained the application of this rule as follows:

> In cases where the prosecutor comments on the theory of defense, the defendant's veracity, or the defendant's guilt, the prosecutor crosses the line into misconduct only if the prosecutor's comments are expressions of the prosecutor's personal beliefs rather than a summation of the evidence.

*State v. Cotton*, 910 N.W.2d 102, 141 (Neb. 2018), *disapproved of on other grounds by State v. Avina-Murillo*, 917 N.W.2d 865 (Neb. 2018), *and State v. Hagens*, 26 N.W.3d 174 (Neb. 2025); *see also State v. Custer*, 903 N.W.2d 911, 922 (Neb. 2017) (stating the same standard).

Defendants premise this part of their attorney misconduct ground for a new trial on two parts of the Jensens' attorney's closing argument.[6] The first concerns allegedly improper comment on the merits of the Jensens's case in counsel's initial closing argument. Filing 159 at 9:4–5. Counsel noted that in determining fair compensation, the Court had instructed the jurors that one factor was the nature and extent of what happened. Filing 159 at 9:4–5. Counsel then stated,

> Could it have been worse? Maybe. This is catastrophic. This is unbelievable. When they came to my office, I was shocked, appalled.

Filing 159 at 9:5–7. He followed this statement with the following one:

> What is the nature of it? Shari lost all chance to fight her cancer. She lost her chance at a cure, at treating the disease early, at getting on the best medication at the best possible time. She lost all faith in the medical system, uprooted her family, moved out of the state, has had -- you've heard what she's dealt with. Cancer's eating her entire body unbeknownst to her 'cause it's not being checked.

Filing 159 at 9:8–14.

[6] Defendants cited no specific references by the Jensens' attorney to his medical training in closing arguments or elsewhere in the record. Although the Court was aware that there were a few passing references to the Jensens' attorney's medical training—and agrees that those references violated the Court's ruling on the pertinent motion in limine, and the Court chastised the attorney for them at the time—the Court finds that those comments fall short of causing the kind of prejudice that would warrant a new trial without more.

Counsel's first comment on the nature and extent of what happened is clearly stated as a personal belief of counsel that the circumstances were "catastrophic," "unbelievable," and that he specifically "was shocked, appalled." Filing 159 at 9:5–7; Neb. R. Prof. Cond. § 3-503.4(e); *Cotton*, 910 N.W.2d at 141. It is just as clearly a personal opinion as to the justness of the Jensens' cause. Neb. R. Prof. Cond. § 3-503.4(e). This statement—at least in isolation—was plainly improper. Neb. R. Prof. Cond. § 3-503.4(e); *Cotton*, 910 N.W.2d at 141. Immediately after this improper comment, however, counsel summarized the evidence of the circumstances in the second statement quoted above. Filing 159 at 9:8–14; Neb. R. Prof. Cond. § 3-503.4(e); *Cotton*, 910 N.W.2d at 141. The Court will consider in the next subsection whether the summary of the evidence in the second comment was sufficient to mitigate the prejudicial effect of the first improper comment.

The second statement on which Defendants rely was part of the Jensens' rebuttal closing argument. Counsel stated,

> I did lose my temper a few times and I apologize but I felt there was testimony coming out of the stand that was just [a] blatant lie. I'm gonna tell you that now. I was uncontrolled. I apologize. If I did anything during this trial that offended you, it's not my intention but I do believe we saw people on the stand knowingly misrepresent fact.

Filing 159 at 13:25–14:5.

This statement was an improper expression of counsel's personal beliefs—specifically, his belief as to the credibility of some unidentified witnesses. Neb. R. Prof. Cond. § 3-503.4(e); *Cotton*, 910 N.W.2d at 141. It set out counsel's personal beliefs that there had been "testimony coming out of the stand that was just [a] blatant lie" and that he "believe[d] we saw people on the stand knowingly misrepresent fact." Filing 159 at 14:1–5. There is no reference to any specific witness, any statement of any specific inconsistencies in any specific witness's testimony, or any identification of specific evidence contradicting any specific witness's testimony. The comment is

a broadside attack on the credibility of Defendants' entire case with no evidentiary underpinning to justify the comment, so that the comment was plainly improper. Neb. R. Prof. Cond. § 3-503.4(e); *Cotton*, 910 N.W.2d at 141.

c. The Improper Comments Warrant a New Trial

For an improper argument to warrant a new trial, it must not only be improper but prejudicial. *Anderson*, 933 N.W.2d at 813; *Selective Ins. Co. of Am.*, 165 F.4th at 1141; *Smith*, 436 F.3d at 884. The Court concludes that at least one of the improper arguments now at issue had such a prejudicial effect in this case.

First, the statements in the Jensens' attorney's rebuttal argument about the nature and circumstances of the case were improper, and the language was extreme, stating counsel's belief that the circumstances were "catastrophic," "unbelievable," and that he "was shocked, appalled." Filing 159 at 9:5–7. That extreme language made the comment stand out as more than just a momentary rhetorical flourish or a "minor aberration[ ] made in passing," *see Dean*, 893 F.3d at 520 (quoting *Kyle*, 825 F.3d at 885). On the other hand, the prejudicial effect of that statement is at least somewhat mitigated by the next comments that restated facts elicited at trial. Filing 159 at 9:8–14; *see Selective Ins. Co. of Am.*, 165 F.4th at 1141 (explaining that mere restatement of facts elicited at trial is not sufficiently prejudicial or injurious). The timing of this improper argument also did not preclude opposing counsel from having any opportunity to respond with Defendants' closing argument, so that Defendants' closing argument likely remedied or mitigated somewhat the prejudicial effect of the improper argument. *Mahaska*, 6 F.4th at 832. The improper closing argument about the nature and circumstances of the case was not sufficiently prejudicial—standing alone—to warrant a new trial.

The Court's conclusion regarding the improper rebuttal closing argument about the credibility of witnesses is different. That part of counsel's rebuttal closing argument did not merely

restate facts elicited at trial. *Selective Ins. Co. of Am.*, 165 F.4th at 1141 (explaining that such an argument is not sufficiently prejudicial or injurious). Indeed, the improper rebuttal argument on witness credibility mentions no facts elicited at trial. Filing 159 at 14:12–15:9. Second, this argument was no "minor aberration[ ] made in passing." *See Dean*, 893 F.3d at 520 (quoting *Kyle*, 825 F.3d at 885). Instead, the improper argument about credibility of witnesses stood out as one of the main pillars of the rebuttal closing argument. Third, there was no curative action by the Court at the time where the prejudicial statements came during rebuttal closing argument and opposing counsel did not object. *Id.* (identifying whether the court took curative action as a factor). The timing of the improper argument also precluded opposing counsel from having any opportunity to respond. *Mahaska*, 6 F.4th at 832. Fourth, the jury's verdict demonstrates the prejudicial influence of the improper argument, *Nicholson*, 46 F.4th at 767; *Dean*, 893 F.3d at 520 (identifying the size of the damage award as a factor that may suggest a prejudice effect), particularly here when combined with consideration of the weight of the evidence. *Dean*, 893 F.3d at 520. As the Court concluded above, the amount of the damages awarded was out of all proportion to a reasonable assessment of the Jensens' non-economic damages, suggesting bias, speculation, and emotional reaction as well as the intent to punish defendants as "liars."

The Court concludes that this improper argument prejudicially influenced the outcome of the case, as indicated by the jury's verdict. *See Nicholson*, 46 F.4th at 767. Thus, standing alone—and certainly in conjunction with the improper "Two Doors" rebuttal closing argument—it warrants a new trial. *See Selective Ins. Co. of Am.*, 165 F.4th at 1143 ("A series of errors can require a new trial if their cumulative effect impacted a party's 'substantial rights' or 'affected the judgment.'" (quoting *Krekelberg*, 991 F.3d at 959–60)).

### C. An Excessive Damages Award

The other ground for a new trial that the Court finds is dispositive is Defendants' contention that the damages awarded are excessive. Filing 166 at 1. The Court turns now to that ground, even though the Court must also determine below whether to reduce the verdict to an applicable statutory cap. Here, the question is whether, without regard to the statutory cap, should the $12 million verdict be set aside because it calls into question the entire decision of the jury? The Court concludes that the answer is yes.

#### *1. The Parties' Arguments*

Defendants contend that the verdict was given under the influence of passion or prejudice. Filing 167 at 29. They point out that the jury heard testimony from one expert that they contend was unqualified and one that they contend was unreliable, as well as improper evidence of a "lost chance" or "lost opportunity" for a cure, and an improper "golden rule" argument. Filing 167 at 29. They contend that this evidence and argument "exploited jurors' fear of cancer" and permitted the jury to assign value to the case beyond what the evidence could reasonably support. Filing 167 at 29. Defendants contend that the award was extreme for a personal injury verdict in Nebraska, particularly in a case with no evidence of or claim for economic damages and only questionable evidence of proximate cause. Filing 167 at 29–30. Defendants also assert that the verdict is excessive in light of the caps on damages under the Nebraska Hospital-Medical Liability Act. Filing 167 at 30.

The Jensens argue that the verdict is not excessive, so that it provides no basis for a new trial. Filing 171 at 29. They contend that the verdict is neither "monstrous" nor "shocking" in light of "evidence that Ms. Jensen endured years of untreated cancer progression, suffered extensive skeletal destruction, including an impending fracture requiring surgery, experienced significant physical pain and emotional distress, multiple invasive interventions, and lost years of meaningful

life and survival." Filing 171 at 30. They also dispute that the verdict was the product of passion or prejudice because they assert that their experts' opinions were sound and supported the verdict. Filing 171 at 30. The Jensens also dispute that the absence of economic damages provides any support for Defendants' argument. Filing 171 at 31. Instead, they assert that the Eighth Circuit recognizes that non-economic injuries involving significant pain and suffering can support substantial verdicts because the subjective determination of such matters is committed to the sound discretion of the jury. Filing 171 at 31. They reiterate that the verdict is supported by the evidence presented at trial. Filing 171 at 34.

*2. Applicable Standards*

The Jensens' claims were based on Nebraska medical malpractice law. When a claim is under state law, "state law guides [the court's] inquiry into whether the award is excessive." *Beran v. VSL N. Platte Ct. LLC*, 144 F.4th 1007, 1014 (8th Cir. 2025); *Hallmark Cards, Inc. v. Murley*, 703 F.3d 456, 462 (8th Cir. 2013) ("When determining if a damage award arising from a state-law claim is excessive, state case law guides [the court's] inquiry." (citing *England v. Gulf & Western Mfg. Co.*, 728 F.2d 1026, 1029 (8th Cir. 1984)). As the Eighth Circuit recently explained,

> Nebraska law deems an award excessive where it is "so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law." *Shipler v. Gen. Motors Corp.*, 271 Neb. 194, 710 N.W.2d 807, 840 (2006). An award will be sustained if it is supported by the evidence and "bears a reasonable relationship to the elements of the damages proved." *Funk v. Lincoln-Lancaster Cnty. Crime Stoppers, Inc.*, 294 Neb. 715, 885 N.W.2d 1, 13 (2016). Given that an amount of "damages for pain, suffering, and emotional distress inherently eludes exact valuation," the plaintiff is "simply required to offer sufficient proof of damages so that the jury could reach its award without awarding an uncertain, speculative recovery." *Roth v. Wiese*, 271 Neb. 750, 716 N.W.2d 419, 436 (2006).

*Beran*, 144 F.4th at 1014–15.

*3. The Award Is So Excessive that It Warrants a New Trial*

The Court recognizes that it must "afford latitude to juries and tolerate 'disparities among juries as to what constitutes adequate compensation for certain types of pain and suffering.'" *Beran*, 144 F.4th at 1014 (quoting *Vanskike v. Union Pac. R.R. Co.*, 725 F.2d 1146, 1150 (8th Cir. 1984)). Nevertheless, the Court concludes that the damages award here is "so clearly against the weight and reasonableness of the evidence and so disproportionate as to indicate that it was the result of passion, prejudice, mistake, or some means not apparent in the record, or that the jury disregarded the evidence or rules of law." *Id.* at 1014 (quoting *Shipler*, 710 N.W.2d at 840).

Specifically, the Court observed above that the amount of the damages awarded was out of all proportion to a reasonable assessment of the Jensens' non-economic damages—in other words, it does not "bear[ ] a reasonable relationship to the elements of the damages proved." *Id.* at 1014–15 (quoting *Funk*, 885 N.W.2d at 13). Thus, it suggests bias, speculation, and emotional reaction as well as the intent to punish Defendants. The Court finds that it is significant that there was no evidence of economic injury, so that the general damages award was entirely dependent upon the evidence of non-economic injury. The testimony of the Jensens themselves on their non-economic injuries might provide an evidentiary basis to warrant an award of damages for such injuries. Nevertheless, as the Court observed above, there was no evidence—such as records of treatment or expert evidence—of emotional distress so extreme as to warrant such an extreme damages award. Also—as the Court explained in more detail above in § II.C. in its consideration of Dr. Van Scoy-Mosher's trial testimony—much if not all of the evidence of injury caused by Defendants was based on speculative possibilities rather than probability. *See Lewison v. Renner*, 905 N.W.2d 540, 548 (Neb. 2018) ("When the character of an alleged injury is subjective rather than objective, a plaintiff must establish the cause and extent of the injury through expert medical testimony."). The record also suggests that the size of the damages award was likely influenced by the improper

closing arguments discussed in § III.B. above. Thus, in the Court's view the Jensens did not offer "sufficient proof of damages so that the jury could reach an award without awarding an uncertain, speculative recovery." *Id.* at 1015 (quoting *Roth*, 716 N.W.2d at 436). Rather, the size of the award suggests that it was the product of sympathy, emotion, and speculation.

Defendants are entitled to a new trial on this ground as well.

### D. Summary

Based on the discussion above, the Court concludes that Defendants' Rule 59 Motion for New Trial is granted in part and denied in part. Defendants' Rule 59 Motion for New Trial is granted on the basis of attorney misconduct, consisting of both an improper "golden rule" argument and improper comments on credibility of witnesses and the merits. It is also granted based on an excessive damages award. However, the Rule 59 Motion for New Trial is otherwise denied, as the other grounds are moot.

## IV. DEFENDANTS' MOTION TO AMEND JUDGMENT

*1. The Parties' Arguments*

Finally, the Court will address Defendants' "Motion to Amend Judgment." Defendants move pursuant to Federal Rules of Civil Procedure 59(e) and 60(b) for correction of the judgment by limiting the amount of the judgment to $2,250,000, because that is the statutory limit on damages set forth in the Nebraska Hospital-Medical Liability Act. Filing 166 at 2. The Jensens do not dispute that the Nebraska Hospital-Medical Liability Act applies in this case. Filing 171 at 35. Rather, they contend that Defendants did not properly respond to their request in their Complaint for "strict proof" that any Defendant relying on the Act was covered by and in compliance with the Act. Filing 171 at 34 (citing Filing 1 at 5 (¶ 31)). The Jensens assert that Defendants provided no such proof until after the Court entered judgment on the jury's verdict against Defendants. Filing 171 at 35. Defendants reply that their Answer stated that they were qualified providers under

the Act. Filing 172 at 9 (citing Filing 16 at 2–3 (¶ 15)). They contend further that they produced the relevant insurance agreement in their initial disclosures and that the Jensens never promulgated any discovery request to ascertain Defendants' coverage under the Act. Filing 172 at 9–10 (citing Filing 28 at 35). Finally, they state that the Court granted leave at the pretrial conference for Defendants to supplement their Exhibit List to include two qualification letters from the Nebraska Excess Liability Fund. Filing 172 at 9–10.

2. *Standards to Amend a Judgment*

Rule 59(e) permits a "motion to alter or amend a judgment," but it does not state grounds for such a motion. Fed. R. Civ. P. 59(e). However, the Eighth Circuit has explained, "Federal Rule of Civil Procedure 59(e) was adopted to clarify a district court's power to correct its own mistakes in the time period immediately following entry of judgment." *Chapman v. Hiland Partners GP Holdings, LLC*, 862 F.3d 1103, 1110–11 (8th Cir. 2017) (quoting *Innovative Home Health Care, Inc. v. P.T.–O.T. Assocs. of the Black Hills*, 141 F.3d 1284, 1286 (8th Cir. 1998)). In contrast, Rule 60(b) permits relief from a judgment or order on several enumerated grounds, including "mistake," as well as "any other reason that justifies relief." Fed. R. Civ. P. 60(b). The Court concludes that amending a judgment to conform to statutory damages limits would be correction of a "mistake" in application of the law or that the statutory limits on damages under the Nebraska Hospital-Medical Liability Act is a "reason that justifies relief." Fed. R. Civ. P. 59(e); Fed. R. Civ. P.60(b).

3. *Application of the Statutory Cap Requires Amendment of the Judgment*

The pertinent provision of the Nebraska Hospital-Medical Liability Act provides, "(1) The total amount recoverable under the Nebraska Hospital-Medical Liability Act from any and all health care providers and the Excess Liability Fund for any occurrence resulting in any injury or death of a patient may not . . . (e) two million two hundred fifty thousand dollars for any occurrence

after December 31, 2014." Neb. Rev. Stat. § 44-2825. Thus, Defendants are correct that the statutory limit on damages in this case is $2,250,000.

The Court concludes that the Jensens had adequate notice of the applicability of this limit to Defendants from Defendants' Initial Disclosures, which included a provision of the insurance policy starting that "COPIC agrees to provide coverage under this **policy** contingent upon the **named insured(s)'** continued participation in the Nebraska Excess Liability Fund." Filing 28 at 35 (emphasis in the original). Indeed, the Jensens had notice of Defendants' contention that the Act was applicable from Defendants' Answer. Filing 28 at 35. The Jensens provide no evidence that they promulgated any discovery of Defendants' qualification for coverage under the Act. They also cite no authority suggesting that Defendants were obligated to respond to their "demand" in their Complaint for "strict proof that at all times relevant herein, any Defendant making such a claim, was covered by and in compliance with the Act," Filing 1 at 5 (¶ 31), as part of an Answer or to do so if no further discovery request was made. Defendants have now—with leave of Court—disclosed to the Jensens and the Court letters from the Nebraska Department of Insurance reflecting Defendants' coverage under the Act for the pertinent time periods. Filing 168-2; Filing 168-3. Under these circumstances, the Court concludes that it is appropriate to amend the judgment to conform to the statutory limit.

Therefore, Defendants' Motion to Amend Judgment is granted, and the judgment in this case is reduced to $2,250,000 if the jury's verdict is subsequently reinstated.

## V. CONCLUSION

Upon the foregoing,

IT IS ORDERED that Defendants' Post-Trial Motions Pursuant to Fed. R. Civ. P. 50, 59, and 60, and Request for Oral Argument, Filing 166, are granted in part and denied in part as follows:

1. The Request of Oral Argument is denied;

2. Defendants' Renewed Rule 50 for Judgment as a Matter of Law is

a. denied as to the insufficiency of Dr. Kligerman's testimony on the standard of care and breach of that standard; but

b. granted as to the insufficiency of Dr. Van Scoy-Mosher's testimony on causation; and

c. granted as to Defendants' alternative request for new trial on the ground that the jury's verdict is against the weight of the evidence and the damages are excessive in light of the deficiency of Dr. Van Scoy-Mosher's causation opinions in the face of other evidence;

3. Defendants' Rule 59 Motion for New Trial is

a. granted based on attorney misconduct, consisting of both an improper "golden rule" argument and improper comments on credibility of witnesses and the merits; and

b. granted based on an excessive damages award; but

c. otherwise denied as moot; and

4. Defendants' Motion to Amend Judgment is granted, and the judgment in this case is reduced to $2,250,000 if the jury's verdict in the Jensens' favor is subsequently reinstated.

IT IS FURTHER ORDERED that the previous judgment on the jury's verdict is set aside and judgment as a matter of law shall enter in favor of Defendants.

FINALLY, IT IS ORDERED that the extended automatic stay in this matter pending the resolution of all post-trial trial motions in this case is lifted, and Defendants' bond to obtain that stay is exonerated.

Dated this 23rd day of July, 2026.

BY THE COURT:

Brian C. Buescher
Chief United States District Judge